# In the United States Court of Appeals for the Third Circuit

JAMES P. SCANLAN; CARLA RINER,
*Plaintiffs-Appellants,*

v.

AMERICAN AIRLINES GROUP INC; AMERICAN AIRLINES INC,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2-18-cv-04040 (The Hon. Harvey Bartle III)

## PLAINTIFFS-APPELLANTS' APPENDIX: VOLUME II (131–238)

R. JOSEPH BARTON
COLIN M. DOWNES
BARTON & DOWNES LLP
1633 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 734-7046

PETER ROMER-FRIEDMAN
PETER ROMER-FRIEDMAN LAW PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(718) 938-6132

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
2001 K Street NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

ADAM T. KLEIN
MICHAEL J. SCIMONE
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 209-0671

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on inside cover)*

March 23, 2023

MATTHEW Z. CROTTY
RIVERSIDE LAW GROUP, PLLC
905 W. Riverside Avenue, Suite 404
Spokane, WA 99201
(509) 850-7011

THOMAS G. JARRARD
LAW OFFICE OF THOMAS G.
JARRARD LLC
1020 N. Washington Street
Spokane, WA 99201
(425) 239-7290

# INDEX

| VOLUME I | | | |
|---|---|---|---|
| **ECF No.** | **Date** | **Document** | **Page** |
| 191 | December 1, 2022 | Notice of Appeal | 1 |
| 190 | November 2, 2022 | Judgment | 5 |
| 189 | November 2, 2022 | Order on Summary Judgment | 10 |
| 188 | November 2, 2022 | Opinion on Summary Judgment | 11 |
| 176 | August 29, 2022 | Order re Joint Stipulation re Defendants' Statement of Undisputed Material Facts | 32 |
| 156 | April 6, 2022 | Order Modifying Class | 35 |
| 155 | April 6, 2022 | Memorandum Opinion re Modifying Class | 40 |
| 125 | October 8, 2021 | Order re Class Certification | 57 |
| 124 | October 8, 2021 | Memorandum Opinion re Class Certification | 60 |
| 93 | May 5, 2020 | Order on Motion to Dismiss | 93 |

| 92 | May 5, 2020 | Memorandum Opinion re Motion to Dismiss | 94 |
| 85 | April 26, 2021 | Order Deeming Second Amended Complaint Filed | 103 |
| 50 | June 18, 2019 | Order on Motion to Dismiss | 105 |
| 49 | June 18, 2019 | Memorandum Opinion re Motion to Dismiss | 106 |

| VOLUME II | | | |
|---|---|---|---|
| ECF No. | Date | Document | Page |
| 81-3 | February 27, 2020 | Second Amended Complaint | 131 |
| 82-9 | February 27, 2020 | Defendants' Interrogatory Responses (March 2020) | 167 |
| 82-12–82-15 | February 27, 2020 | American Airlines, Inc. 401(k) Plan for Pilots | 182 |

| VOLUME III | | | |
|---|---|---|---|
| ECF No. | Date | Document | Page |
| 82-15–82-17 | February 27, 2020 | American Airlines, Inc. 401(k) Plan for Pilots (cont.) | 239 |
| 82-18 | February 27, 2020 | American Airlines Group Inc. Amended and Restated Profit Sharing Plan | 274 |

| 83-1 | March 3, 2020 | James Scanlan Declaration In Support of Class Certification | 283 |
| 135 | January 6, 2022 | Defendants' Amended Answer to Second Amended Complaint | 287 |
| 172 | July 29, 2022 | Exhibits to Plaintiff's Motion for Partial Summary Judgment | 334 |
| 173 | July 29, 2022 | Attachments to Defendants' Motion for Summary Judgment | 612 |

| VOLUME IV | | | |
|---|---|---|---|
| **ECF No.** | **Date** | **Document** | **Page** |
| 173 | July 29, 2022 | Attachments to Defendants' Motion for Summary Judgment (cont.) | 821 |
| 177 | August 31, 2022 | Attachments to Plaintiff's Opposition to Defendants' Motion for Summary Judgment | 1677 |
| 178 | August 31, 2022 | Attachments to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment | 1840 |
| 180 | September 16, 2022 | Defendants' Reply In Support of Motion for Summary Judgment | 1878 |

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

JAMES P. SCANLAN, on behalf of himself
and all others similarly situated,

                              Plaintiff,

-vs.-

AMERICAN AIRLINES GROUP, INC.,
and AMERICAN AIRLINES, INC.

                           Defendants.

**Case No. 2:18-cv-04040-HB**

**SECOND AMENDED
COMPLAINT – CLASS ACTION**

**EXEMPT FROM FILING FEES
UNDER 38 U.S.C. § 4323(h)(1)**

---

       Plaintiff James P. Scanlan, on behalf of himself and other similarly situated individuals, by and through his attorneys, alleges as follows:

### INTRODUCTION

       1.     This is a class action under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, and a breach of contract action on behalf of current and former employees of American Airlines Group, Inc. ("AAG") and American Airlines, Inc. ("AAI") who took military leave from their employers, and (1) did not receive credit under the American Airlines Group Inc. Global Profit Sharing Plan ("the Plan") for periods during which they took military leave, and/or (2) did not receive pay from AAI during short-term military leave, consisting of payment of the differential between the employee's regular salary and the amount he or she received in compensation for his or her military service while on leave (as he or she would have been paid for jury duty leave).

       2.     USERRA protects the rights of military service members who take leaves of absence from their civilian employers to perform qualified military service.  USERRA § 4316(b)

requires military leave to be treated no less favorably than other, comparable forms of leave. AAG and its subsidiary, AAI, violated this provision in two ways. First, AAG adopted and implemented a policy or practice whereby AAG does not credit employees with imputed earnings or otherwise credit their short-term military leave under the Plan. In contrast, AAG does credit and/or impute employees' earnings under the Plan for comparable forms of non-military leave, such as jury duty leave and bereavement leave. By crediting earnings of employees who took non-military leave when calculating profit sharing awards, AAG was required to credit the imputed earnings of employees who took short-term military leave.

3.      Second, AAI continued to pay AAI employees who went on leave for non-military reasons, such as jury duty (for which employees receive the difference between their regular compensation and the compensation received from the government during the period of their leave) and bereavement leave. However, AAI did not pay equivalent compensation to AAI employees who went on short-term military leave. As a result, AAG and AAI contravened USERRA's mandate to not subordinate military leave to other forms of leave.

4.      As a result of these violations, Plaintiff and other servicemembers employed by AAI received less compensation than they would have received had AAI provided them with paid leave during periods of their short-term military leave on an equivalent basis to other comparable forms of non-military leave. In addition, Plaintiff and other servicemembers employed by AAG received smaller profit sharing awards than they otherwise would have had AAG credited them with imputed earnings for their periods of military leave and were able to defer smaller amounts of compensation into their defined contribution plan accounts than they otherwise would have had AAG complied with USERRA.

5.     On behalf of the servicemember-employees who are or were participants in the Plan, this action seeks (a) a declaration that AAG violated USERRA by failing to credit the earnings associated with periods of military leave when calculating the profit sharing awards under the Plan for Plaintiff and members of the Class, (b) an order requiring AAG to credit imputed earnings associated with military leave in the future, and (c) an order requiring AAG to recalculate and pay the prior profit sharing awards of Plaintiff and members of the Class consistent with the requirements of USERRA and the terms of the Profit Sharing Plan.

6.     On behalf of the servicemember-employees of AAI, Plaintiff seeks (a) a declaration that AAI violated USERRA by failing to provide these Class Members with paid leave during periods of their short-term military leave on an equivalent basis to other, comparable forms of non-military leave; (b) an order requiring AAI to provide paid leave during periods of short-term military leave on an equivalent basis to other, comparable forms of non-military leave; and (c) an order requiring AAI to recalculate and pay the compensation of Plaintiff and members of the Class consistent with the requirements of USERRA (*i.e.*, the differential between an employee's regular wages or salary and the amount he or she received in compensation for his or her military service while on leave).

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Count I and Count III pursuant to 38 U.S.C. § 4323(b)(3), which provides that the district courts of the United States have jurisdiction over a USERRA action brought against a private employer.  This Court also has subject matter jurisdiction over Count I and Count III under 28 U.S.C. § 1331, because this action arises under laws of the United States. This Court has supplemental jurisdiction over

Plaintiff's state law claim under Count IV pursuant to 28 U.S.C. § 1367 because the state law claim is so related to Plaintiff's other claims that they form part of the same case or controversy.

8.      Venue is proper under 38 U.S.C. § 4323(c)(2), because Defendant AAG is a private employer and maintains a place of business in this District at the Philadelphia International Airport.  Defendant American Airlines, Inc., as well as another wholly-owned subsidiary airline of AAG, Piedmont Airlines, Inc. ("Piedmont"), have primary transportation hubs and employ thousands of employees at the Philadelphia International Airport, and the Philadelphia Airport is the main base for Piedmont Airlines.  A third wholly-owned subsidiary of AAG, PSA Airlines, Inc. ("PSA"), has one of its handful of crew bases at the Philadelphia Airport.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims in this action occurred in this District.

## PARTIES

9.      Plaintiff James P. Scanlan is and has been employed as a pilot for American Airlines, Inc. since October 1999.  James P. Scanlan is also a Major General in the United States Air Force Reserve and has served in the United States Armed Services since 1985**.**  Throughout his employment at American Airlines, Plaintiff has taken leave to engage in qualified military service to perform his military reserve obligations.  During 2016 and 2017, Plaintiff was a participant in the Plan.  During the time that Plaintiff was a participant in the Plan, Plaintiff took military leave in 2016 and 2017.  Plaintiff resides in Doylestown, Pennsylvania.

10.     Defendant American Airlines Group Inc. ("AAG"), a Delaware corporation, is the parent company of wholly-owned subsidiaries AAI, Envoy Air, Inc. ("Envoy"), Piedmont, and PSA (collectively, "the AAG Airlines").  The AAG Airlines operate airlines and provide services under the American Airlines brand with a significant hub presence in Philadelphia, Pennsylvania,

which is located in this District.  As the sole owner and parent of the AAG Airlines, Defendant

AAG established and maintains the American Airlines Group Inc. Global Profit Sharing Plan

("the Plan") to provide benefits to employees of the AAG Airlines in the form of profit sharing

based on AAG's profit.

11.     Defendant American Airlines, Inc. ("AAI"), a Delaware corporation, is a wholly-

owned subsidiary of Defendant AAG.  AAI provides scheduled air transportation services for

passengers and cargo.  At all times during Plaintiff Scanlan's employment with AAI, AAI paid

Plaintiff's employment compensation.

12.     Under Section C of the Plan, Defendant AAG calculates and determines profit

sharing awards based on employees' wages and salaries.  Pursuant to Section C of the Plan,

Defendant AAG is obligated to make profit sharing award payments to employees annually and

from its general assets.  Pursuant to Section H of the Plan, AAG has the authority to modify,

amend, annul, or terminate the Plan and, as such, has the authority to increase, reduce, or

eliminate employees' profit sharing awards.  According to AAG's Form 10-Ks filed with the

Securities and Exchange Commission, Defendant AAG was obligated to pay profit sharing

awards under the Plan in the amounts of $316 million for 2016 and $241 million for 2017.

Defendant AAG meets the definition of an employer within the meaning of 38 U.S.C.

§ 4303(4)(A), because it "pays salary or wages for work performed" and it "has control over

employment opportunities" for the employees who are eligible participants in the Plan.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following Profit Sharing Class:

> Current and former employees of American Airlines, Inc., Envoy Air, Inc.,
> Piedmont Airlines, Inc., and PSA Airlines, Inc. who, from January 1, 2016

through the date of judgment in this action, (1) are or were participants in the American Airlines Group Inc. Global Profit Sharing Plan, and (2) while participants in the Plan are or were either employed inside the United States or are or were a citizen, national or permanent resident alien of the United States employed in a foreign country, (3) after becoming a participant in the Plan took a period of military leave during a Plan Year in which they were eligible to receive an award under the Plan (or who would have been eligible to receive an award under the Plan if earnings associated with qualified military leave had been credited) and (4) whose profit sharing award under the Plan did not include credit or imputed earnings for periods of military leave.

14.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Subclass of Profit Sharing Class (the American Pilot Profit Sharing Subclass):

All members of the Profit Sharing Class who, from January 1, 2016 through the date of judgment in this action are or were eligible to participate in the American Airlines, Inc. 401(k) Plan for Pilots and are or were subject to taxation in the United States.

15.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Paid Leave Class:

Current and former employees of American Airlines, Inc. who took short term military leave from their employment with American Airlines, Inc. at any time from January 1, 2013 through the date of judgment in this action and during that leave were not paid the amount equal to what they would have earned had they continued to work their ordinary work schedules for American Airlines, Inc.

16.     Excluded from the Classes and Subclass are the following: (a) any members of the Committee which was responsible for administering the Plan; (b) all former or current employees who previously reached settlements with or judgments against American Airlines Group, Inc. in their individual USERRA actions concerning inadequate profit sharing awards that were based on earnings that did not take into account imputed income for periods of short-term military leave and/or the failure to pay compensation to employees during their short term military leave; and (c) any employees who are covered by the 2005 Agreement between US Airways, Inc. and the Communication Workers of America representing Passenger Service

Employees, the Passenger Service Agreement between American Airlines, Inc. and CWA-IBT Association representing Passenger Service Employees effective December 1, 2015, the Agreement between US Airways, Inc. and the International Association of Machinists and Aerospace Workers representing Fleet Service Employees dated May 8, 2008, the Fleet Service Agreement between US Airways, Inc. and the Fleet Service Employees as represented by the International Association of Machinists and Electrical Workers dated July 18, 2014, or the Agreement between US Airways, Inc. and the International Association of Machinists and Electrical Workers representing Mechanical Employees..

**Impracticality of Joinder**

16.     The members of Classes and the Subclass are so numerous that joinder of all members is impracticable.

17.     Participants in the Plan include employees of AAI, Envoy, Piedmont, and PSA. AAI, a wholly-owned subsidiary of AAG, has over 100,000 employees.  Envoy (formerly American Eagle Airlines), which is a wholly-owned subsidiary of AAG and claims to be the world's largest regional carrier that flies under the American Eagle brand, has approximately 14,000 employees.  Piedmont, a wholly-owned subsidiary of AAG that flies under the American Eagle brand (formerly flying under the US Airways Express brand), has approximately 7,000 employees.  PSA, which is a wholly-owned subsidiary of AAG that flies under the American Eagle brand, has approximately 3,900 employees.

18.     AAI and each of its regional carriers (*i.e.*, Envoy, Piedmont, and PSA) actively recruit and encourage members of the military to become employees.  For example, on its website, American Airlines states that it is "committed to hiring, training and developing candidates with a strong desire to learn and grow, both personally and professionally, and to

supporting the diversity of thought and rich experience that military veterans bring to our workforce and embrace the opportunity to have them as part of the American Airlines family."[1] Piedmont dedicates an entire web page to its "military transition program," and informs servicemembers that "Piedmont values your service to our country.  If you're seeking to make a transition to civilian flying, we'll make it easy with our Military Transition Program."[2]  Based on the number of airline employees who serve in the National Guard and Reserve and the AAG Airlines' active recruitment of members of the military, thousands of current and former employees of the AAG Airlines are members of the Classes.

19.     The members of the Classes and the Subclass are geographically dispersed across the country.  AAI currently has domestic and international "hubs" in the United States at the following locations: Philadelphia, Pennsylvania; Queens, New York; Brooklyn, New York; Los Angeles, California; Miami, Florida; Chicago, Illinois; Charlotte, North Carolina; and Dallas/Fort Worth, Texas.  AAI pilots report for flying duty at pilot domicile bases located in all the hubs and also the focus cities of Boston, Massachusetts and St. Louis, Missouri.  Envoy has hubs in Queens, New York; Miami, Florida; Chicago, Illinois; and Dallas/Fort Worth, Texas.  Piedmont has hubs in Philadelphia, Pennsylvania, and Charlotte, North Carolina.  PSA has a hub in Charlotte, North Carolina, and maintains crew bases in Dayton and Cincinnati, Ohio; Knoxville Tennessee; Washington, D.C.; Charlotte, North Carolina; Philadelphia, Pennsylvania; and Norfolk, Virginia.  Based on the varied locations of the employees of the airlines whose

---

[1] *Military Community Recruiting*, American Airlines, https://jobs.aa.com/content/veterans/.

[2] *Careers*, Piedmont Airlines, http://piedmont-airlines.com/Careers/Career-Guides/Pilots; *see also Military Transition Program*, Piedmont Airlines, http://piedmont-airlines.com/military-transition-program.

employees are eligible to participate in the Plan, the members of the Classes are geographically dispersed across the country.

**Commonality**

20.     The central question in this case, which will generate a common answer as to the Profit Sharing Class, is whether Defendant AAG's policy or practice of failing to credit Class Members with imputed earnings for their periods of short-term military leave in calculating profit sharing awards under the Plan violates USERRA § 4316.  As to the American Pilot Profit Sharing Subclass, the central question in this case, which will generate a common answer, is whether Defendant AAG breached its contractual obligations under the Profit Sharing Plan by failing to credit members of the Subclass with earnings for periods of qualified military leave in accordance with the terms of the American Airlines, Inc. 401(k) Plan for Pilots. As to the Paid Leave Class, the central question in this case, which will generate a common answer, is whether Defendant AAI's policy or practice of failing to pay employees their regular compensation during periods of short-term military leave violates USERRA § 4316 and/or USERRA § 4318.

21.     Plaintiff's claims raise subsidiary common questions, including the following: (a) whether, for the purposes of calculating profit sharing awards, the Plan had to consider imputed earnings for qualified military service because short-term military leave is comparable to jury duty leave or bereavement leave; (b) whether under the terms of the Profit Sharing Plan, eligible earnings included compensation imputed for qualified military leave, (c) whether, for the purposes of paying its employees' regular compensation during periods of qualified military service, short-term military leave is comparable to other forms of leave for which AAI pays its employees' compensation; and (d) whether Defendants' violations of USERRA were willful, such that they should be required to pay liquidated damages to Class Members.

22.     Because Defendant AAG adopted and applied a uniform policy or practice of not considering earnings that would have been paid during periods of short-term military leave in calculating profit sharing awards or otherwise crediting military leave, answers to these questions will produce common answers for all members of the Profit Sharing Class and the American Pilot Profit Sharing Subclass.  Because Defendant AAI adopted and applied a uniform policy or practice of not paying its employees during periods of short-term military leave on an equivalent basis to other forms of paid leave, answers to these questions will produce common answers for all members of the Paid Leave Class.

23.     As Defendants AAG and AAI acted in a uniform, systematic manner with respect to the Classes and the Subclass, all members of each of the Classes and the Subclass suffered the same type of injury based on a single policy or practice and resolving the claims of the Classes and the Subclass will be based on common legal and factual questions.  Because the calculation and determination of awards under the Plan were based on a uniform, written policy, the issues relating to the relief Profit Sharing Class and the Pilot Profit Sharing Subclass should receive are also common.  To the extent that the policy or practice for either Class or the Subclass is found to violate USERRA or to constitute a breach of contract, the determination of the amounts to be paid to members of the Classes will be formulaic and can be readily calculated.

**Typicality**

24.     Plaintiff's claims are typical of the other members of the Profit Sharing Class because the claims challenge a uniform policy or practice by which Defendant AAG failed to credit imputed income for periods of short-term military leave, including while crediting earnings for comparable forms of non-military leave for purposes of calculating profit sharing awards under the Plan. Plaintiff's claims are typical of the other members of the American Pilot

Profit Sharing Subclass because the claims challenge calculations of the profit sharing awards under the terms of the Plan. Plaintiff's claims are typical of the other members of the Paid Leave Class because the claims challenge a uniform policy or practice by which Defendant AAI failed to pay its employees during periods of short-term military leave on an equivalent basis to other, comparable forms of paid leave.

**Adequacy**

25.     Plaintiff will fairly and adequately protect the interests of other members of the Classes and the Subclass.

26.     Plaintiff does not have any conflict with any other member of the Classes or the Subclass.

27.     Defendant has no unique defenses against the Plaintiff that would interfere with Plaintiff's representation of the Classes or the Subclass.

28.     Plaintiff is represented by counsel with significant experience in prosecuting class action litigation, including class action litigation involving rights and benefits of servicemembers under USERRA.

**Rule 23(b)(1)**

29.     This action can be maintained as a class action under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure.  The central question for the Profit Sharing Class is whether the uniform policy or practice by which Defendant AAG failed to include imputed income for periods of short-term military leave, including when AAG credited earnings for comparable forms of non-military leave for purposes of calculating profit sharing awards under the Plan, violated USERRA.  The central question for the American Pilot Profit Sharing Subclass is whether this uniform policy or practice violated AAG's obligations under the terms of the Profit

Sharing Plan Document. The central question for the Paid Leave Class is whether the uniform policy or practice by which Defendant AAI failed to pay its employees during periods of short-term military leave on an equivalent basis to other, comparable forms of paid leave, violated USERRA.  As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct.

30.     This action can be maintained as a class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure.  As a practical matter, resolution of whether AAG was required under USERRA or the terms of the Profit Sharing Plan Document to credit imputed earnings associated with short-term military leave under the Plan would be dispositive of that matter for other participants in the Plan even if they were not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Profit Sharing Class or the Subclass.  Similarly, resolution of whether AAI was required under USERRA to pay its employees during periods of short-term military leave on an equivalent basis to other forms of comparable paid leave would be dispositive of that matter for other employees even if they were not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Paid Leave Class.

**Rule 23(b)(2)**

31.     This action can also be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Defendants AAG and AAI have acted and/or failed to act on grounds generally applicable to the respective Classes, making declaratory and injunctive relief appropriate with respect to the members of Classes as a whole.

32.     Defendant AAG maintained a uniform policy or practice as to all members of the Profit Sharing Class and the American Pilot Profit Sharing Subclass.  Defendant AAG is alleged to have violated USERRA and the terms of the Profit Sharing Plan Document by refusing to credit imputed earnings associated with short-term military leave when calculating profit sharing awards for all Plan participants who took short-term military leave.  As such, Defendant AAG has acted or refused to act on grounds that apply generally to the Class and the Subclass.  As a result, final declaratory and injunctive relief is appropriate with respect to the Class as a whole.

33.     Defendant AAI maintained a uniform policy or practice as to all members of the Paid Leave Class.  Defendant AAI is alleged to have violated USERRA by refusing to pay its employees during periods of short-term military leave on an equivalent basis to other forms of paid leave.  As such, Defendant AAI has acted or refused to act on grounds that apply generally to the Class.  As a result, final declaratory and injunctive relief is appropriate with respect to the Class as a whole.

34.     The relief sought consists primarily of (a) a declaration establishing that Defendant AAG has violated USERRA by failing to include imputed income for periods of short-term military leave in calculating profit sharing awards under the Plan; (b) a declaration establishing that Defendant AAI has violated USERRA by failing to pay its employees during periods of short-term military leave on an equivalent basis to other forms of non-military leave; and (c) an order requiring Defendants to recalculate and pay profit sharing awards and regular compensation to Class Members consistent with the requirements of USERRA and the terms of the Profit Sharing Plan.  The monetary relief sought either flows from and/or is incidental to the declaratory relief sought, as it flows directly from the ordering of such declaratory relief and can be calculated in a simple, objective, and mechanical manner.  Specifically, the amount owed the

Profit Sharing Class can be calculated by (a) comparing the profit-sharing award amount received by the Class with the amount that would have been provided had imputed income for periods of short-term military leave been included in calculating profit sharing awards and (b) paying the Class the difference between those amounts. Similarly, the amount owed the American Pilot Profit Sharing Subclass can be calculated by (a) comparing the profit-sharing award amount received by the Subclass with the amount that would have been provided had Eligible Earnings been correctly calculated under the terms of the Profit Sharing Plan (b) paying the Class the difference between those amounts. Similarly, the amount owed the Paid Leave Class can be calculated by (a) comparing the regular compensation paid by Defendant AAI to the Class with the amount of compensation actually received by the Class during periods of short-term military leave, and (b) paying the Class the difference between those amounts.

**Rule 23(b)(3)**

35.     The claims can also be certified as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because the questions of law and fact common to the members of the Classes predominate over questions affecting only individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

36.     The common questions of law and fact concern whether Defendant AAG's policy regarding the failure to credit imputed earnings associated with short-term military leave under the Plan violated USERRA and breached the terms of the Profit Sharing Plan and whether Defendant AAI's policy or practice of failing to pay its employees during periods of qualified short-term military leave on an equivalent basis to other forms of non-military leave violated USERRA. As the members of the Profit Sharing Class and American Pilot Profit Sharing Subclass were all participants in the Plan who took short-term military leave, their payments

were affected by AAG's violations and common questions related to liability will necessarily predominate over any individual questions related to liability.  As the members of the Paid Leave Class were all employees who took short-term military leave, their compensation was affected by AAI's violations and common questions related to liability will necessarily predominate over any individual questions related to liability.  As the calculation of payments under the Plan is governed by a written plan document, and as employees' regular compensation is governed by the terms of their employment with AAI, and relief primarily consists of a declaration and order requiring AAG and AAI to calculate and recalculate benefits and compensation consistent with USERRA and the terms of the Plan, common questions as to remedies will likewise predominate over any individual issues.

37.     A class action is superior to other available methods for the fair and efficient resolution of this controversy.  By resolving the common issues in a single class proceeding, the issues will be efficiently resolved in a single proceeding rather than multiple proceedings.  Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' obligations under USERRA and the Plan and of the remedy that should be provided under USERRA.

38.     The following factors set forth in Rule 23(b)(3) also support certification:

a.     The members of the Classes have an interest in a unitary adjudication of the issues presented in this action and, for this reason, this case should be certified under Rule 23(b)(1).  Additionally, many members of the Classes are unlikely to have sufficient damages to justify pursuing an individual federal court action or to obtain counsel to pursue an individual action, but

all members of both Classes would benefit from a class action that obtains

relief for all members of the Classes.

b.    No other litigation concerning this controversy has been filed by any other

members of either Class.

c.    This is an appropriate forum for these claims because, among other

reasons, jurisdiction and venue are proper, Philadelphia is hub for the

AAG Airlines, and a significant portion of the Classes work and/or reside

in this District.

d.    There are no difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

### The Plan

39.    AAG and/or the Board of Directors of AAG on behalf of AAG adopted and

implemented the American Airlines Group Inc. Global Profit Sharing Plan effective January 1,

2016.

40.    Section K of the Plan defines participant to include certain regular full-time and

part-time employees of AAG Airlines who are in the union or non-union groups in the Plan

(denominated as Work Groups) as the employees eligible to participate in the Plan.  The union

groups include pilots, flight attendants, mechanics, and passenger service employees of the AAG

Airlines.  The non-union groups include non-union-represented management and non-

management employees.

41.    Pursuant to Section B of the Plan, each participant is eligible to receive a profit

sharing award with respect to each Plan Year.

42.     Section K of the Plan defines "Plan Year" to mean a designated fiscal year.  Upon information and belief, the Plan Year is AAG's fiscal year, which is the calendar year.

43.     Section H of the Plan provides that AAG has the authority to modify, amend, annul or terminate the Plan at any time for any reason.

**Calculation and Payment of Profit Sharing Awards Under the Plan**

44.     Pursuant to Section C of the Plan, AAG is obligated to pay profit sharing awards equal to 5% of AAG's pre-tax earnings with respect to each Plan Year.  According to Section C of the Plan, profit sharing awards paid pursuant to the Plan are paid from AAG's general assets.

45.     Pursuant to Section C of the Plan, the amount of a participant's profit sharing award with respect to each Plan Year is calculated and determined by dividing 5% of AAG's pre-tax earnings by the aggregate amount of all participants' earnings and multiplying the resulting quotient by the participant's eligible earnings.  In other words, each participant is allocated with respect to each Plan Year a *pro rata* amount of 5% of the AAG's pre-tax earnings based on his or her individual earnings compared to the aggregate earnings of all participants.

46.     Section K of the Plan defines "Eligible Earnings" under the Plan in relevant part to mean "Compensation" as that term is defined for purposes of employer contributions in the qualified defined contribution plan that is intended to comply with Section 401(k) of the Code, that is sponsored by the Employee's Participating Employer, and in which such Employee is eligible to participate at the time the profit sharing award is paid."  For Plaintiff Scanlan and the American Pilot Profit Sharing Subclass, that Plan was the American Airlines, Inc. 401(k) Plan for Pilots.

47.     According to the Summary Plan Description of the American Airlines, Inc. 401(k) Plan for Pilots, the employer contributions are based on a pilot's "Eligible Compensation" as

defined in the 401(k) Plan.  The 40l(k) Plan defines "Eligible Compensation" to include not only

"all amounts reported as wage on the IRS W-2 after [the employee] become[s] an active

Participant in the Plan" but explains that for "authorized military and non-military leaves of

absence" a participant is entitled to "receive Pilot Company Contributions that are made to the

Plan based on Eligible Compensation earned during [the participant's] leave of absence.

48.     The American Airlines, Inc. 401(k) Plan for Pilots also provides:

**3.5     Qualified Military Service.**  Notwithstanding any other provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service shall be provided in accordance with Code section 414(u). For these purposes, during a period of qualified military service, an Eligible Employee will be considered to have received Compensation from the Employer at the same annual rate as the Eligible Employee's average rate of Compensation from the Employer during the 12 months immediately preceding the qualified military service (or, if shorter, the period of employment preceding the qualified military service).

49.     From the inception of the Profit Sharing Plan through the present, AAG has

adopted a policy or practice whereby it credits leave and imputes income for calculating awards

under the Plan for leave for jury duty and bereavement leave.  During that same time (*i.e.*, from

inception of the Plan through the present), AAG has adopted a policy or practice whereby it has

refused to credit leave for military service when calculating awards under the Plan, and thus fails

to include earnings or imputed earnings from military leave when calculating awards under the

Plan—even for participants in the American Airlines, Inc. 401(k) Plan for Pilots, who pursuant

to the terms of the Profit Sharing Plan and the 401(k) Plan are explicitly entitled to receive profit

sharing credit during periods of qualified military service.

50.     Pursuant to AAG's policy and practice, with respect to calculating the profit

sharing awards of participants who have taken long-term or short-term military leave from their

employment at the AAG Airlines, Defendant AAG has not included in the participants' eligible

earnings the amount that they would have earned from their employment had they not taken such

military leave.  Pursuant to the same policy or practice, for participants who have taken non-military forms of leave that are comparable to short-term military leave, such as jury duty leave or bereavement leave, from their employment at the AAG Airlines, Defendant AAG credited earnings for those non-military leaves.

51.     Pursuant to Section D of the Plan, each profit sharing award allocated to a participant under Section C of the Plan is paid in the form of a lump-sum cash payment by March 15 of the immediately following Plan Year or such other date as required by applicable law.  However, employees are allowed to designate the amount of their profit sharing awards under the Plan that they want to deposit into their retirement plans and thereby defer their profit sharing awards to the termination of their employment and/or have the awards paid as retirement income.

52.     Section J.7  of the Profit Sharing Plan Document provides in relevant part that the "Plan shall be construed in accordance with the laws of the State of Texas to the extent federal law does not supersede and preempt Texas law.

53.     AAG's Form 10-Ks for the fiscal years ended December 31, 2016, December 31, 2017, December 31, 2018, and December 31, 2019, respectively, stated that AAG was obligated to pay profit sharing awards under the Plan in the amounts of $316 million for 2016, $241 million for 2017. $175 million for 2018, and $213 million for 2019.

54.     AAG's Form 10-K for the fiscal year ended December 31, 2019, stated that profit sharing awards for 2019 under the Plan would be distributed to participants in the first quarter of 202018.

**Plaintiff's USERRA-Protected Military Leave & Awards Under the Plan**

55.     Throughout 2016 and 2017, Plaintiff Scanlan took various periods of leave that qualified as a service in the uniformed services within the meaning of USERRA, 38 U.S.C. § 4303(13).  Those periods of military leave ranged approximately between two days and fourteen days.  Plaintiff's qualified military service in 2016 totaled 128 days.  Plaintiff's qualified military service in 2017 totaled 132 days.

56.     Plaintiff performed military service in 2016 and 2017 on the dates listed below:

| **2016** (128 days) | **2017** (132 days) | |
|---|---|---|
| Feb 7-20, 2016 (14) | Jan 6, 2017 (1) | Jul 6-8, 2017 (3) |
| Mar 7-18, 2016 (12) | Jan 12, 2017 (1) | Jul 19-29, 2017 (11) |
| Mar 21-25, 2016 (5) | Feb 7-9, 2017 (3) | Aug 1-5, 2017 (5) |
| Apr 10-17, 2016 (8) | Feb 13-14, 2017 (2) | Aug 7-11, 2017 (5) |
| Apr 24-29, 2016 (6) | Feb 23-24, 2017 (2) | Aug 21-23, 2017 (3) |
| May 3-16, 2016 (14) | Feb 27, 2017 (1) | Aug 29-30, 2017 (2) |
| May 25-28, 2016 (4) | Mar 2-3, 2017 (2) | Sep 4-15, 2017 (12) |
| Jun 12-15, 2016 (4) | Mar 13-17, 2017 (5) | Sep 18-22, 2017 (5) |
| Jul 9-15, 2016 (7) | Mar 20-22, 2017 (3) | Sep 25, 2017 (1) |
| Jul 19-21, 2016 (3) | Mar 28-29, 2017 (2) | Oct 4-5, 2017 (2) |
| Jul 30 – Aug 4, 2016 (6) | Apr 7, 2017 (1) | Oct 10-13, 2017 (4) |
| Aug 15-27, 2016 (13) | Apr 15, 2017 (1) | Nov 7-9, 2017 (3) |
| Sep 4-15, 2016 (12) | Apr 17-21, 2017 (5) | Nov 13-17, 2017 (5) |
| Oct 3-7, 2016 (5) | May 9-12, 2017 (4) | Nov 19-21, 2017 (3) |
| Nov 14-18, 2016 (5) | May 16-19, 2017 (4) | Dec 4-9, 2017 (6) |
| Dec 5-9, 2016 (5) | May 21-26, 2017 (6) | Dec 12-13, 2017 (2) |
| Dec 19-23, 2016 (5) | Jun 3-16, 2017 (14) | |
| | Jun 26-28, 2017 (3) | |

57.     During the time that Plaintiff took military leave to engage in qualified military service in 2016, 2017, 2018 and 2019, Plaintiff was a participant in the Plan.

58.     In calculating profit sharing awards for the 2016, 2017 and  2018 Plan Years, Defendant AAG did not include, credit or impute the individual eligible earnings of participants who took long-term or short-term military leave.

59.     In the first quarter of 2017, 2018 and 2019, Defendant AAG was required under the Plan to pay and distribute and did pay and distribute profit sharing awards under the Plan for the 2016, 2017 and 2018 Plan Years, respectively and is expected to pay a profit sharing award in March 2020 for the 2019 Plan Year.  As a result of Defendant AAG's failure to include in his eligible earnings an imputed income for his periods of military leave in 2016, 2017 and 2018, Plaintiff received profit sharing awards from AAG in substantially lower amounts than he would have had Defendant calculated his profit sharing awards based on eligible earnings that included imputed income for his periods of military leave or otherwise credited him for military leave.

**AAG Confirms its Policy and is Informed That its Policy and Practice Violates USERRA**

60.     After Plaintiff Scanlan failed to receive a profit sharing award under the Plan in 2016 that included, credited, or imputed earnings for periods of his qualified short-term military leave, he inquired with the representative of his union, the Allied Pilots Association, whether the failure to credit or include imputed earnings from military leave under the Plan was a mistake unique to him or whether this was AAG's policy.  Specifically, Plaintiff Scanlan advised the Allied Pilots Association in early 2017 that AAG's failure to credit his military service under the Plan violated USERRA.

61.     In early February 2017, the Allied Pilots Association informed Mr. Scanlan that AAG's policy is that any time away from the company where there is not income generation will not be included in the calculation under the Profit Sharing Plan.  The Allied Pilots Association also explained that AAG's policy regarding the Profit Sharing Plan was different than AAG's 401(k) plan, and that the Profit Sharing Plan was a benefit that was not negotiated between AAG and the Allied Pilots Association.

62.     In mid-February 2017, the Allied Pilots Association informed Mr. Scanlan that it had asked AAG to confirm whether or not military service qualifies for profit sharing and it was waiting on AAG to respond.  The Allied Pilots Association also informed Mr. Scanlan that AAG was consulting with its legal department before delivering its response.

63.     At the end of February 2017, the Allied Pilots Association had additional discussions with AAG and was informed by AAG that *only* the actual earnings listed on a pilot's W-2 would be considered as eligible earnings for the purposes of computing profit sharing awards under the Plan.  In the course of those discussions, AAG was advised that other major airlines compute their employees' profit sharing awards by including imputed earnings associated with periods of military leave.

64.     At the end of March 2017, the Allied Pilots Association informed Mr. Scanlan that AAG's final position was that it will not adjust profit sharing awards based upon imputed earnings associated with any military leave.  The Allied Pilots Association confirmed that AAG's Board of Directors (which has the power to interpret the Plan) had decided that imputed income for military leave of absence is not and will not be used in the calculation of profit sharing awards under the Plan.

65.     As a result of AAG's policy, each participant in the Plan who took military leave did not have his or her imputed earnings from military leave credited in the calculation of his or her profit sharing awards for the 2016 and 2017 Plan Years.  And each employee who takes military leave in the future will not have his or her imputed earnings from military leave credited for the purpose of calculating his or her profit sharing award in future Plan Years.

66.     As a result of its policy, Defendant AAG did not credit leave for military service or include imputed earnings in the individual eligible earnings for at least hundreds of participants who had taken military leave in 2016 or 2017.

67.     By at least early 2017, if not before, Defendant AAG knew that its policy and practice of calculating the profit sharing awards of participants in the Plan who took military leave violated USERRA, but failed to bring its policy or practice into compliance with federal law.  As such, Defendant's violations of USERRA were willful.

68.     Based on references on its web sites, Defendant AAG and/or the AAG Airlines are parties to contracts with the United States government, which prohibits Defendant AAG and the AAG Airlines from discriminating against veterans and military service members.

69.     Defendant AAG and/or the AAG Airlines maintained workplace posters that set out employer responsibilities under USERRA as required by 38 U.S.C. § 4334 similar to those found on American Airlines' web site.

**Defendant AAI's Failure to Pay Its Employees During Short-Term Military Leave**

70.     When Defendant AAI's employees take short-term leave from their employment because of jury duty, AAI pays the employee on leave an amount that is equivalent to the difference between the total compensation that the employee normally receives from AAI and the amount, if any, that the employee receives from the government for his or her jury duty service.  Similarly, Defendant AAI's Collective Bargaining Agreement ("CBA") with the Allied Pilots Association requires AAI to provide employees with up to three days of paid leave in the event of the death of an immediate family member ("bereavement leave").

71.     Jury duty and bereavement leave are comparable to short-term military leave in terms of the duration of the leave.  Like jury duty and bereavement leave, short-term military

leave occurs on a short-term basis.  Pursuant to the Allied Pilots Association's CBA with AAI, bereavement leave that triggers AAI's obligation to continue to pay employees' compensation is temporary and part-time in duration, much like military leave.  Each of these types of leave commonly lasts several days.

72.     Jury duty and bereavement leave are also comparable to short-term military leave in terms of their involuntary nature.  For both types of leave, the employee's absence from work is involuntary, due to legal requirement (in the case of jury duty) or death (in the case of bereavement leave).

73.     Despite the similarity of short-term military leave to other forms of leave during which Defendant AAI pays its employees' regular compensation or a differential between their AAI pay and pay from an alternative source, Defendant AAI refused to pay the regular compensation of military service members who take short-term military leave or the difference between their regular AAI pay and their military pay during such short-term military leave.

## COUNT I

**VIOLATION OF USERRA, 38 U.S.C. § 4316(b)(1), AGAINST DEFENDANT AAG**
**(On Behalf of the Profit Sharing Class)**

74.    Plaintiff hereby repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

75.    USERRA, 38 U.S.C. § 4316(b)(1), provides that "a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service."  The rights and benefits that servicemembers are entitled to receive under USERRA § 4316(b)(1) include rights under Defendant AAG's profit sharing plan.

76.    The U.S. Department of Labor regulation that implement and interpret USERRA § 4316(b)(1), 20 C.F.R. § 1002.150(b), provides that "[i]f the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services."

77.    Pursuant to its policy or practice, Defendant AAG credited participants who had taken jury duty leave or bereavement leave from their employment at the AAG Airlines with earnings for those periods of leave each year since the Plan's inception in 2016 for the purpose of calculating their profit sharing awards in the Plan.

78.     For the purpose of calculating the profit-sharing awards of participants in the Plan who had taken short-term military leave from their employment at the AAG Airlines for each Plan Year, Defendant AAG did not include in the participants' eligible earnings any imputed income that they would have earned from their employment had they not taken short-term military leave.

79.     The types of non-military leave for which AAG provides credit under the Plan – jury duty leave and bereavement leave – are comparable to short-term military leave in terms of the duration, purpose, and/or the ability of the employee to determine whether to take the leave. The typical duration of each of these types of leave is comparable to short-term military leave. Jury duty, bereavement leave, and short-term military leave commonly last only several days and usually not more than a few weeks.  Furthermore, jury duty is compulsory and taken to perform a public service, similar to how servicemembers are often required to take military leave to perform a public service in the Armed Forces.

80.     By adopting and applying a policy or practice of not including imputed earnings for Class Members' periods of short-term military leave to calculate their profit sharing awards under the Plan, Defendant AAG denied Class members the same rights and benefits provided to employees on comparable forms of non-military leave, including jury duty leave and bereavement leave, and failed to provide employees who took short-term military leave the most favorable treatment accorded to employees on comparable forms of non-military leave.  By doing so, AAG violated and continues to violate USERRA § 4316(b)(1).

81.     Due to Defendants' failure to comply with USERRA § 4316(b)(1), Plaintiff and other members of the Class received lower profit sharing awards than they would have received had Defendants complied with USERRA and the Department of Labor's regulations.

82.     Upon information and belief, Defendant's violation of USERRA § 4316(b)(1)

was willful.

## COUNT II

### BREACH OF CONTRACT & DECLARATORY JUDGMENT
### AGAINST DEFENDANT AAG
### (On Behalf of the American Pilot Profit Sharing Subclass)

83.     Plaintiff hereby repeats and incorporates the allegations contained in the

foregoing paragraphs as if fully set forth herein.

84.     The Profit Sharing Plan Document provides that a profit sharing award for a

Participant with respect to any Plan Year is calculated as follows:

> An amount equal to five percent (5%) of the dollar amount of AAG's Pre-Tax
> Earnings with respect to the applicable Plan Year will be divided by the amount of
> the Total Population's Eligible Earnings, and the resulting quotient is the "Payout
> Percentage." The amount of the profit sharing award for each Participant is the
> product of the Payout Percentage multiplied by such Participant's Individual
> Eligible Earnings.

85.     Under Section K of the terms of the Profit Sharing Plan Document, "Eligible

Earnings" means, and has been defined since 2016 in respect of Employees subject to taxation in

the United States as follows (emphasis added):

> "Compensation" as that term is *defined for purposes of employer contributions, in
> the qualified defined contribution plan* that is intended to comply with Section
> 401(k) of the Code that is sponsored by the Employee's Participating Employer and
> in which such employee is eligible to participate at the time the profit sharing award
> is paid....

86.     For Plaintiff and the members of the American Pilot Profit Sharing Subclass, the

qualified defined contribution plan for purposes of the Profit Sharing Plan's definition of Eligible

Earnings is the American Airlines, Inc. 401(k) Plan for Pilots.

87.     Section 3.5 of the American Airlines, Inc. 401(k) Plan for Pilots specifically provides with respect to term compensation for employer contributions as follows (emphasis added):

> Notwithstanding any other provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service shall be provided in accordance with Code section 414(u). For these purposes, during a period of qualified military service, an *Eligible Employee will be considered to have received Compensation from the Employer at the same annual rate as the Eligible Employee's average rate of Compensation from the Employer during the 12 months immediately preceding the qualified military service (or, if shorter, the period of employment preceding the qualified military service).*

88.     In determining and calculating awards under the Profit Sharing Plan AAG has not included in the Participants' Eligible Earnings for purposes of the Profit Sharing Plan any credit or imputed income reflecting the definition of Compensation set forth in Section 3.5 of the American 401(k) Plan for Pilots or considered the Participant who took qualified military service during the Plan Year of the Profit Sharing Plan to have received Compensation from the Employer at the same annual rate as the Eligible Employee's average rate of Compensation from the Employer during the last 12 months for purposes of calculating awards under the Profit Sharing Plan.

89.     As AAG interprets the term Eligible Earnings under the Profit Sharing Plan to not include or apply the term Compensation expressed in Section 3.5 of the American Airlines, Inc. 401(k) Plan for Pilots, AAG will continue to calculate awards under the Profit Sharing Plan that do not reflect Compensation set forth in Section 3.5 of the American 401(k) Plan for Pilots.

90.     Plaintiff and the other members of the American Pilot Profit Sharing Subclass members' work for AAG constituted consideration for the promises contained in the Profit Sharing Plan Document.

91.     The American Profit Sharing Plan Document constitutes an enforceable contract between AAG and each of the members of the Pilot Profit Sharing Subclass and/or an implied contract with respect to the terms of their compensation.

92.     By continuing to work for AAG, Plaintiff and the other members of the Pilot Profit Sharing Subclass performed their obligations under the contract and satisfied the condition of AAG to calculate awards consistent with the terms of the Profit Sharing Plan.

93.     AAG breached its obligations under the Profit Sharing Plan Document by failing to credit periods of qualifying military leave under the Profit Sharing Plan as Compensation within the meaning set forth in Section 3.5 of the American 401(k) Plan for Pilots.

94.     Due to AAG's failure to comply with the terms of the Profit Sharing Plan Document and its interpretation of the Profit Sharing Plan, Plaintiff and other members of the American Pilot Profit Sharing Subclass have received and will continue to receive lower profit sharing awards than they would have received had AAG credited periods of qualifying military leave under the Profit Sharing Plan as Compensation within the meaning set forth in Section 3.5 of the American 401(k) Plan for Pilots.

## COUNT III

**VIOLATION OF USERRA, 38 U.S.C. § 4316(b)(1), AGAINST AAI**
**(On Behalf of the Paid Leave Class)**

94.     Plaintiff hereby repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

95.     USERRA, 38 U.S.C. § 4316(b)(1), provides that "a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the

person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service."

96.     The U.S. Department of Labor regulation that implements and interprets USERRA § 4316(b)(1), 20 C.F.R. § 1002.150(b), provides that "[i]f the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services."

97.     AAI paid its employees an amount equal to the difference between their regular compensation while working at AAI and the amount of compensation, if any, that they received from third parties for various forms of comparable non-military leave, including jury duty and bereavement leave.  However, pursuant to its policy or practice of failing to pay employees when they take short-term military leave, AAI refused to make equivalent payments to Plaintiff and Paid Leave Class Members during their short-term military leave periods.

98.     The types of leave for which AAI paid employees their regular compensation – including jury duty leave and bereavement leave – are comparable to short-term military leave in terms of the duration, purpose, and/or the ability of the employee to determine whether to take the leave.

99.     By adopting and applying a policy or practice of not paying employees when they take short-term military leave, AAI denied Plaintiff and the Paid Leave Class the same rights and benefits, which include compensation, provided to employees who take comparable forms of non-military leave, including jury duty leave, and thus failed to provide the most favorable

treatment accorded to employees on comparable forms of non-military leave.  By doing so, AAI violated and continues to violate USERRA § 4316(b)(1).

100.     Due to AAI's failure to comply with USERRA § 4316(b)(1), Plaintiff and other members of the Paid Leave Class received lower compensation than they would have received had Defendant complied with USERRA and the Department of Labor's regulations.

101.     Upon information and belief, Defendant's violation of USERRA § 4316(b)(1) was willful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and respectfully requests that this Court award the following relief:

A.     Declare that Defendant AAG's policy or practice by which AAG failed to include imputed income for or credit toward participants' periods of military leave to calculate their profit sharing awards under the Plan violated the rights of Plaintiff and the Class under USERRA § 4316 and USERRA § 4318;

B.     Declare that Defendant AAI's policy or practice by which AAI failed to pay servicemember-employees when they took short-term military leave, while paying employees who took other, comparable forms of non-military leave, violated the rights of Plaintiff and the Paid Leave Class under USERRA § 4316;

C.     Declare Defendants' violations of USERRA were willful under 38 U.S.C. § 4323(d)(1)(C).

D.     Declare that the eligible earnings under the Profit Sharing Plan for Plaintiff and the Profit Sharing Class for their profit sharing awards must be based on amounts that include imputed income for their periods of military leave;

E.     Declare that the term Eligible Earnings under the Profit Sharing Plan with respect to the American Pilot Profit Sharing Subclass includes the definition of Compensation set forth in Section 3.5 of the American 401(k) Plan for Pilots;

F.     Require Defendant AAG to recalculate and pay profit sharing awards to the Pilot Paid Leave Subclass consistent with the Court's declaration;

G.     Declare that Defendant AAI must pay employees who take short-term military leave on the same basis as employees who take leave for jury duty, bereavement leave, and other forms of comparable short-term, non-military leave, namely an amount equal to the difference between their regular compensation while working at AAI and the amount of compensation received from the government for their military service during periods of short-term military leave;

H.     Require Defendant AAG to recalculate the profit sharing awards that Plaintiff and the Class and the Subclass are entitled to receive under the Plan in accordance with the Court's declarations;

I.     Require Defendant AAG to calculate and pay profit sharing awards that participants in the Plan are entitled to receive in the future to include imputed income for or credit for their periods of military leave;

J.     Require Defendant AAI to recalculate and pay the compensation that Plaintiff and the Paid Leave Class are entitled to receive in accordance with the Court's declaration;

K.     Order Defendants AAG and AAI to pay all members of the Classes liquidated damages in an amount to be determined at trial pursuant to 38 U.S.C. § 4323(d)(1)(C);

L.     Award pre-judgment and post-judgment interest on any monetary relief awarded or required by order of this Court;

M.      Require Defendants AAG and AAI to pay attorneys' fees, expert witness fees, litigation expenses and costs pursuant to 38 U.S.C. § 4323(h) and/or order the payment of reasonable fees and expenses in this action to Plaintiff's Counsel on the basis of the common benefit and/or common fund doctrine out of any money or benefit recovered for the Class in this Action; and

N.      Grant such other and further relief as the Court deems proper, just, and/or equitable.

### JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38 or any similar rule or law, Plaintiff demands a trial by jury for all causes of action and issues for which trial by jury is available.

Dated: February 27, 2020                    Respectfully submitted,

_____
R. Joseph Barton (admitted *pro hac vice*)
Colin M. Downes (admitted *pro hac vice*)
BLOCK & LEVITON LLP
1735 20th Street NW
Washington D.C. 20009
Telephone: (202) 734-7046
Fax:    (617) 507-6020
Email: jbarton@blockesq.com
Email: colin@blockesq.com

Peter Romer-Friedman (admitted *pro hac vice*)
GUPTA WESSLER PLLC
1900 L St., NW, Ste. 312
Washington, D.C. 20036
Telephone: (202) 888-1741
Email: peter@guptawessler.com

Michael J. Scimone (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone (212) 245-1000
Email: mscimone@outtengolden.com

Hannah Cole-Chu (admitted *pro hac vice*)
OUTTEN & GOLDEN LLP
601 Massachusetts Avenue NW, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Email: hcolechu@outtengolden.com

Matthew Z. Crotty (admitted *pro hac vice*)
CROTTY & SON LAW FIRM, PLLC
905 W. Riverside Ave. Suite 404
Spokane, WA 99201
Tel: (509) 850-7011
Email: matt@crottyandson.com

Thomas G. Jarrard (admitted *pro hac vice*)
LAW OFFICE OF

34

THOMAS G. JARRARD LLC
1020 N. Washington St.
Spokane, WA 99201
Tel: (425) 239-7290
Fax: (509) 326-2932
Email: Tjarrard@att.net

Adam Garner
THE GARNER FIRM LTD.
1515 Market St. Suite 1200
Philadelphia PA 19102
Telephone: (215) 645-5955
Facsimile: (215) 645-5960
Email: adam@garnerltd.com

*Attorneys for Plaintiff*

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES P. SCANLAN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| -vs.- | Civil Action No. 2:18-cv-04040-HB |
| AMERICAN AIRLINES GROUP INC., and AMERICAN AIRLINES, INC., | |
| Defendants. | |

**DEFENDANTS AMERICAN AIRLINES GROUP INC. AND
AMERICAN AIRLINES, INC.'S THIRD AMENDED OBJECTIONS AND
<u>RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendants

American Airlines Group Inc. ("AAG") and American Airlines, Inc. ("American") (together,

"Defendants") respond to Plaintiff's First Set of Interrogatories (the "Interrogatories"), as

follows:

**INTERROGATORY NO. 1**: For each WORK GROUP employed from January 1, 2013 to the present by AMERICAN, set forth each type of leave that was offered to employees in that WORK GROUP (including military leave, sick leave, jury duty leave, union duty leave, bereavement leave, disability leave, parental leave, or medical leave), whether that leave is or was paid and, if paid, on what terms (e.g., whether the employee received full pay, differential pay, partial pay, or compensation on some other basis), and to the extent the type of leave offered or terms of the leave changed from January 1, 2012 to the present, state the dates during which such leave was offered those terms and the nature of the changes.

**RESPONSE TO INTERROGATORY NO. 1**:

The answer to Interrogatory No. 1 may be determined, with substantially the same burden

for Plaintiff as for Defendants, by examining the following collective bargaining agreements and

employee handbooks setting forth military and other leave policies that have applied to

American employees since January 1, 2013:

1

| Employee Group | CBA/Handbook/Policy | Bates |
|---|---|---|
| Pilots | 1998 US Airways, Inc. ("US Airways")–Air Line Pilots Association ("ALPA") CBA | AA-SCANLAN-0002368 |
| Pilots | 2003 American–Allied Pilots Association ("APA") CBA | AA-SCANLAN-0013499 |
| Pilots | 2004 America West–ALPA CBA | AA-SCANLAN-0019331 |
| Pilots | 2013 American-APA Merger Transition Agreement ("MTA") | AA-SCANLAN-0003261 |
| Pilots | 2013 US Airways–US Airways Pilots Association ("USAPA") MTA | AA-SCANLAN-0005123 |
| Pilots | 2013 AA-APA-USAPA Contingent CBA Memorandum of Understanding (*see* AA-SCANLAN-0003713 discussing sick leave) | AA-SCANLAN-0003701 |
| Pilots | 2013 (January) American–APA CBA | AA-SCANLAN-0003719 |
| Pilots | 2013 (March) American–APA CBA | AA-SCANLAN-0004234 |
| Pilots | 2013 (May) American–APA CBA | AA-SCANLAN-0004673 |
| Pilots | 2015 (January) American–APA Joint CBA | AA-SCANLAN-0005557 |
| Pilots | 2015 (November) American–APA Joint CBA | AA-SCANLAN-0006012 |
| Pilots | American Military Leave of Absence Policy – Pilots posted to Jetnet in 2015 | AA-SCANLAN-0006647 |
| Flight Attendants | 2001 American–Association of Professional Flight Attendants ("APFA") Foundation Document | AA-SCANLAN-0000383 |
| Flight Attendants | 2012 American–APFA Conditional Labor Agreement (*see* AA-SCANLAN-0000860 discussing sick leave) | AA-SCANLAN-0000849 |
| Flight Attendants | 2013 US Airways–Association of Flight Attendants-CWA, AFL-CIO ("AFA") CBA | AA-SCANLAN-0000865 |
| Flight Attendants | 2014 American–APFA CBA | AA-SCANLAN-0001295 |
| Passenger Service | 2005 US Airways–Communications Workers of America ("CWA")-International Brotherhood of Teamsters ("IBT") CBA | AA-SCANLAN-0011147 |
| Passenger Service | 2015 American–CWA-IBT CBA | AA-SCANLAN-0002209 |
| Fleet Service | 2008 US Airways–International Association of Machinists and Aerospace Workers ("IAM") CBA | AA-SCANLAN-0011383 |
| Fleet Service | 2012 American–Transport Workers Union, AFL-CIO ("TWU") CBA | AA-SCANLAN-0000001 |
| Fleet Service | 2014 US Airways–IAM CBA | AA-SCANLAN-0000204 |
| Material Logistics Specialists and Related | 2012 American–TWU CBA | AA-SCANLAN-0012069 |

2

| Flight Simulator Engineers | 2004 US Airways–TWU CBA | AA-SCANLAN-0022401 |
|---|---|---|
| Flight Simulator Engineers | 2016 American–TWU-IAM CBA | AA-SCANLAN-0002071 |
| Flight Simulator Technicians and Related | 2012 American–TWU CBA | AA-SCANLAN-0011678 |
| Aviation Maintenance Technicians and Plant Maintenance Employees | 2012 American–TWU CBA | AA-SCANLAN-0001578 |
| Maintenance Control Technicians | 2012 American–TWU CBA | AA-SCANLAN-0011938 |
| Maintenance Control Technicians and Related | 2014 US Airways–IAM CBA | AA-SCANLAN-0001845 |
| Maintenance Training Instructors | 2014 US Airways–IAM CBA | AA-SCANLAN-0020021 |
| Dispatchers and Related | 2011 US Airways–TWU CBA | AA-SCANLAN-0022485 |
| Dispatchers and Related | 2012 American–TWU CBA | AA-SCANLAN-0011542 |
| Dispatchers and Related | 2016 American–TWU CBA | AA-SCANLAN-0021090 |
| Ground School and Pilot Simulator Instructors | 1999 US Airways–TWU CBA | AA-SCANLAN-0022582 |
| Ground School and Pilot Simulator Instructors | 2012 American–TWU CBA | AA-SCANLAN-0011810 |
| Ground School and Pilot Simulator Instructors | 2016 American–TWU CBA | AA-SCANLAN-0020976 |

3

| All Employees* | 2013 US Airways Employee Handbook | AA-SCANLAN-0006468 |
|---|---|---|
| All Employees* | 2014 US Airways Employee Handbook | AA-SCANLAN-0006500 |
| All Employees* | 2015 US Airways Employee Handbook | AA-SCANLAN-0006530 |
| All Employees* | 2016 US Airways Employee Handbook | AA-SCANLAN-0006590 |
| Various Identified Employee Groups | American Military Leave of Absence Policy posted to Jetnet in 2015 | AA-SCANLAN-0006648 |
| All Employees* | American Military Leave Policy posted to Jetnet in 2016 | AA-SCANLAN-0019326 |
| All Employees* | American Additional Leaves Policy posted to Jetnet in 2017 | AA-SCANLAN-0019251 |

To the extent Interrogatory No. 1 seeks information beyond that, Defendants object to Interrogatory No. 1 as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information for a time period that has no relevance to the parties' claims or defenses.  The Amended Complaint only seeks relief for alleged USERRA violations for military leaves taken from January 1, 2013 to present; information on American employees' leaves of absence in effect before that date are thus irrelevant.  Defendants also object to this Interrogatory as vague and ambiguous in its use the term "work group" because it does not specify what constitutes a work group (e.g., whether the groups are based on job title, union representation, etc.).  Defendants also object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks documents related to "each type of leave," even though Plaintiff has not alleged that all leaves of absence are comparable to military leave. Defendants also object to this Interrogatory as vague and ambiguous in its use of the terms "sick leave, "union duty leave," "disability leave," "parental leave," and "medical leave" in a manner that assumes each term has a uniform definition and application for all employees.

---

* The policy applied unless it differed from an applicable provision of a CBA.

4

**INTERROGATORY NO. 2**:  For each WORK GROUP employed from January 1, 2016 to the present by any PARTICIPATING EMPLOYER (other than AMERICAN), set forth each type of leave that was offered to the employees of that WORK GROUP by that PARTICIPATING EMPLOYER (military leave, sick leave, jury duty leave, union duty leave, bereavement leave, disability leave, parental leave, or medical leave), whether that leave is or was paid, and if paid, on what terms (e.g., whether the employee receives full pay, differential pay, partial pay, or compensation on some other basis), and to the extent the type of leave or terms of leave changed from January 1, 2016 to the present, set forth the dates during which such leave was offered on those terms and describe the changes.

**RESPONSE TO INTERROGATORY NO. 2**:

The answer to Interrogatory No. 2 may be determined, with substantially the same burden for Plaintiff as for Defendants, by examining the following collective bargaining agreements and employee handbooks setting forth military and other leave policies that have applied to Envoy Air Inc. ("Envoy"), Piedmont Airlines, Inc. ("Piedmont"), and PSA Airlines, Inc. ("PSA") employees since January 1, 2016:

| ENVOY | | |
|---|---|---|
| **Employee Group** | **CBA/Handbook/Policy** | **Bates** |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 5 | AA-SCANLAN-0010471 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 6 | AA-SCANLAN-0015562 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 7 | AA-SCANLAN-0007881 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 8 | AA-SCANLAN-0008545 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 9 | AA-SCANLAN-0009853 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 10 | AA-SCANLAN-0016852 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 11 | AA-SCANLAN-0014916 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 12 | AA-SCANLAN-0017490 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 13 | AA-SCANLAN-0018140 |
| Pilots | 2013 American Eagle–ALPA CBA Rev. 14 | AA-SCANLAN-0021747 |
| Flight Attendants | 2012 Envoy–AFA CBA | AA-SCANLAN-0006713 |
| Flight Attendants | 2016 Amendment to 2012 Envoy–AFA CBA | AA-SCANLAN-0021223 |
| Ground School Instructors | 2013 Envoy–TWU CBA | AA-SCANLAN-0014827 |
| Aircraft Maintenance Technicians and Related | 2013 Envoy–TWU CBA | AA-SCANLAN-0007572 |
| Fleet Service | 2013 American Eagle–TWU CBA | AA-SCANLAN-0018913 |

5

| Dispatchers and Related | 2013 American Eagle–TWU CBA | AA-SCANLAN-0018800 |
| Passenger Service | 2019 Envoy–CWA CBA | AA-SCANLAN-0019253 |
| All Employees* | Envoy Military Leave of Absence Policy posted to intranet in 2016 | AA-SCANLAN-0014912 |

**PIEDMONT**

| Employee Group | CBA/Handbook/Policy | Bates |
| --- | --- | --- |
| Pilots | 2013 Piedmont–ALPA CBA | AA-SCANLAN-0012699 |
| Flight Attendants | 2014 Piedmont–AFA CBA | AA-SCANLAN-0012565 |
| Mechanics and Related | 2009 Piedmont–IBT CBA | AA-SCANLAN-0012478 |
| Mechanics and Related | 2016 Piedmont–IBT CBA | AA-SCANLAN-0009769 |
| Stores Clerks | 2009 Piedmont–IBT Tentative Agreement | AA-SCANLAN-0012977 |
| Stores Clerks | 2016 Piedmont–IBT CBA | AA-SCANLAN-0012995 |
| Fleet and Passenger Service | 2012 Piedmont–CWA CBA | AA-SCANLAN-0012363 |
| Fleet and Passenger Service | 2018 Piedmont–CWA CBA | AA-SCANLAN-0012288 |
| Dispatchers | 2015 Piedmont–IBT CBA | AA-SCANLAN-0012420 |
| All Employees* | 2014 Piedmont Employee Handbook | AA-SCANLAN-0013107 |
| All Employees* | 2017 (August) Piedmont Employee Handbook | AA-SCANLAN-0013052 |
| All Employees* | 2017 (December) Piedmont Employee Handbook | AA-SCANLAN-0013371 |
| All Employees* | 2019 Piedmont Employee Handbook | AA-SCANLAN-0013426 |

**PSA**

| Employee Group | CBA/Handbook/Policy | Bates |
| --- | --- | --- |
| Pilots | 2013 PSA–ALPA CBA | AA-SCANLAN-0019731 |
| Pilots | 2018 PSA–ALPA Letter of Agreement #12-18 (*see* AA-SCANLAN-0019968 discussing treatment of leaves) | AA-SCANLAN-0019967 |
| Pilots | 2019 PSA–ALPS Memorandum of Understanding #2 for Letter of Agreement #12-18 | AA-SCANLAN-0019978 |

---

* The policy applied unless it differed from an applicable provision of a CBA.

6

| Flight Attendants | 2012 PSA–AFA CBA | AA-SCANLAN-0014539 |
|---|---|---|
| Flight Attendants | 2019 PSA–AFA CBA | AA-SCANLAN-0007761 |
| Mechanics and Related | 2011 PSA-IAM CBA | AA-SCANLAN-0006679 |
| Dispatchers | 2014 PSA–TWU CBA | AA-SCANLAN-0019983 |
| Dispatchers | 2017 PSA-TWU CBA | AA-SCANLAN-0014643 |
| All Employees | 2016 PSA Military Leave Program Policy | AA-SCANLAN-0014695 |

To the extent Interrogatory No. 2 seeks information beyond that, Defendants object to Interrogatory No. 2 as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information concerning leaves of absence that are not material or necessary for the resolution of either party's claims or defenses.  Defendants also object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information for a time period that has no relevance to the parties' claims or defenses.  The Amended Complaint only seeks relief for alleged USERRA violations for military leaves taken from January 1, 2013 to present; information on American employees' leaves of absence in effect before that date are thus irrelevant.  Defendants also object to this Interrogatory as vague and ambiguous in its use of the term "work group" because it does not specify what constitutes a work group (e.g., whether the groups are based on job title, union representation, etc.).  Defendants also object to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks documents related to "each type of leave," even though Plaintiff has not alleged that all leaves of absence are comparable to military leave.  Defendants also object to this Interrogatory as vague and ambiguous in its use of the terms "sick

leave, "union duty leave," "disability leave," "parental leave," and "medical leave" in a manner that assumes each term has a uniform definition and application for all employees.

American further objects to this Interrogatory because it seeks documents not in American's possession, custody, or control.

**INTERROGATORY NO. 3**:  With respect to your Second Affirmative Defense in which YOU allege that, "[t]he claims in the Complaint are barred in whole or in part by the doctrine of laches," explain the basis for this defense, including by setting forth the claims in the AMENDED COMPLAINT that YOU contend are barred by the doctrine of laches, whether the claim is barred in whole or in part, and the facts that support YOUR Second Affirmative Defense and to the extent that YOU contend that the claim is barred by laches, YOU should set forth any facts that explain how PLAINTIFF delayed the bringing this action, how YOU changed YOUR position or were otherwise prejudiced by such delay, and identify any evidence that has been lost or is otherwise unavailable and how what that lost or unavailable evidence is relevant to the claims or defenses (and specifically which claims or defenses).

**RESPONSE TO INTERROGATORY NO. 3**:

Defendants object to Interrogatory No. 3 as an overbroad, unduly burdensome, and premature contention interrogatory.  Defendants are currently not aware of facts supporting the affirmative defense that the claims are barred in whole or in part by the doctrine of laches and reserve the right to amend these responses and assert the affirmative defense after conducting discovery and completing their own investigation into the claims and defenses in this action.

**INTERROGATORY NO. 4**:  With respect to your Third Affirmative Defense in which YOU allege that, "[t]he claims in the Complaint are barred in whole or in part by the applicable statute of limitations," explain the basis for this defense, including by setting forth the claims in the AMENDED COMPLAINT that YOU contend are barred by the applicable statute of limitations, whether the claim is barred in whole or in part, the statute of limitation that YOU contend bars the claim and the facts that support YOUR Second Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 4**:

Defendants object to Interrogatory No. 4 as an overbroad, unduly burdensome, and premature contention interrogatory.  Defendants are currently not aware of facts supporting the affirmative defense that the claims are barred by an applicable statute of limitations and reserve

8

the right to amend these responses and assert the affirmative defense after conducting discovery and completing their own investigation into the claims and defenses in this action.

**INTERROGATORY NO. 5**:  With respect to your Fourth Affirmative Defense in which YOU allege that, "[t]his lawsuit is not appropriate for class certification, and Plaintiff cannot meet his burden to show that the claims for which class treatment is sought meet the requirements of Federal Rule of Procedure 23," explain the basis for this defense, including by setting forth the claims in the AMENDED COMPLAINT that YOU contend are not appropriate for class certification, the subsection(s) of Rule 23(a) and/or (b) under which you contend that the claim cannot be certified, and describe the basis for or facts that support your contention that the claim does not meet the requirements for certification under that subsection of Rule 23(a) or (b).

**RESPONSE TO INTERROGATORY NO. 5**:

Defendants object to Interrogatory No. 5 as an overbroad, unduly burdensome, and premature contention interrogatory.  Subject to, and notwithstanding the foregoing objections, Defendants state that their bases for alleging that this action is not appropriate for class certification include the following:

Plaintiff's putative Profit-Sharing Class includes employees of four separate entities whose terms and conditions of employment have been and are governed by separate collective bargaining agreements and policies.

Plaintiff cannot show that he suffered an injury typical to all putative Profit-Sharing Class and putative Paid Leave Class members because he has only ever been employed as a pilot by American and covered by the collective bargaining agreements and policies applicable to American pilots.  He has never been employed by or subject to any collective bargaining agreement or policy applicable only to non-pilot American employees or employees of Envoy Air, Piedmont, or PSA.  Thus, his alleged injuries are not determined by or suffered under any of those collective bargaining agreement or policies.

Plaintiff cannot show that there are common questions of law and fact that can be resolved in one stroke among members of the putative Profit-Sharing Class or putative Paid

9

Leave Class because a determination of liability as to each class member is contingent upon which carrier and which leave and/or pay provisions and policies were applicable to that class member.

Plaintiff cannot show that common issues predominate over individual ones. For the putative Profit-Sharing Class and putative Paid Leave Class, a determination of liability and damages would require an individualized examination of each putative class member's military leaves of absence, work schedules, and annual earnings to determine whether such employee suffered the injury alleged by Plaintiff and to calculate their damages. These individualized issues would swamp any class-wide issues.

Defendants reserve the right to amend these responses after conducting discovery and completing their own investigation into class certification issues.

**INTERROGATORY NO. 6**: With respect to YOUR Reservation of Rights to Assert Affirmative Defenses in which You allege that "Defendants reserve the right to assert, and hereby gives notice that it intends to rely upon, any other defense that may become available or appear during discovery proceedings or otherwise in this case and hereby reserves the right to amend its Answer to assert any such defense," set forth any additional affirmative defenses to the claims in the AMENDED COMPLAINT that YOU have identified or intend to assert and the facts that support each such affirmative defense.

**RESPONSE TO INTERROGATORY NO. 6**:

Defendants object to Interrogatory No. 6 as a premature contention interrogatory. Defendants also object to Interrogatory No. 6 as overbroad, unduly burdensome, and premature because it seeks legal conclusions and all factual bases regarding Defendants' defenses before Defendants have conducted any discovery or completed their own investigation into the claims and defenses in this action.

## **GENERAL RESPONSES TO ALL INTERROGATORIES**

1.      To the extent that Defendants respond to any Interrogatory, Defendants do not concede that the information requested is relevant, material, competent, or admissible. Any

inadvertent production of documents not related to the issues raised by this action shall not waive this objection.

2.       Defendants reserve: (i) the right to object on any ground to the use of information disclosed or documents produced pursuant to the response in this or any other action or proceeding; (ii) the right to object on any and all grounds to other requests for information or other discovery proceedings regarding, involving, or relating to the subject matter of each Interrogatory; and (iii) the right at any time to revise, correct, or supplement these responses.

3.       Defendants have not completed their factual and legal investigation, discovery, or trial preparation.  Accordingly, their objections and responses represent only information currently available and known following a reasonable and diligent investigation in responding to each Interrogatory with the time and resources available and do not preclude Defendants from later relying upon facts discovered pursuant to further investigation or discovery.  Defendants reserve the right to supplement or revise these objections and responses at any time, as required under any applicable rule.

4.       Any statement in these responses and objections that Defendants will search for and produce responsive documents is not a representation that responsive documents exist or are in Defendants' possession, custody, or control, but instead reflects Defendants' intention, subject to their objections and the scope of any agreement reached with Plaintiff, to conduct a reasonable search for responsive documents in files maintained by or on behalf of persons who are reasonably believed to have responsive documents.

5.       Defendants object to the definition of "Defendant" to the extent that it includes any entity other than AAG or American.

6.       Defendants object to Instruction No. 6 and Part III of the Interrogatories to the extent that they purport to unilaterally impose requirements on the production of electronically stored information.  To the extent Defendants produce documents in response to any Interrogatory, Defendants will do so pursuant to an ESI protocol agreed to by the parties.

7.      Defendants object to the definition of "Profit-Sharing Plan" as vague and ambiguous.  American interprets "Profit-Sharing Plan" to refer to the American Airlines Group Inc. Global Profit Sharing Plan effective January 1, 2016 (the "2016 Plan") and the American Airlines Group Inc. Amended and Restated Global Profit Sharing Plan effective January 1, 2017 (the "2017 Plan").

Dated:  February 19, 2020

Respectfully submitted,

By:  *Mark W. Robertson*

Mark W. Robertson (*admitted pro hac vice*)
Anton Metlitsky (*admitted pro hac vice*)
Stephanie Drotar (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
mrobertson@omm.com
ametlitsky@omm.com
sdrotar@omm.com

M. Tristan Morales (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
tmorales@omm.com

Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines Group Inc. and American Airlines, Inc.*

12

## CERTIFICATE OF SERVICE

I certify that on February 19, 2020, the foregoing *Defendants American Airlines Group*

*Inc. and American Airlines, Inc.'s Third Amended Objections and Responses to Plaintiff's First*

*Set of Interrogatories* was served by electronic mail on counsel for Plaintiff:

R. Joseph Barton
BLOCK & LEVITON LLP
1735 - 20th Street NW
Washington, DC 20009
jbarton@blockesq.com

Colin M. Downes
BLOCK & LEVITON LLP
1735 - 20th Street NW
Washington, DC 20009
colin@blockesq.com

Matthew Zachary Crotty
CROTTY & SON LAW FIRM, PLLC
905 W. Riverside Avenue, No. 404
Spokane, WA 99201
matt@crottyandson.com

Adam Harrison Garner
THE GARNER FIRM LTD
1515 Market Street Suite 1200
Philadelphia, PA 19102
adam@garnerltd.com

Peter Romer-Friedman
Hannah Cole-Chu
OUTTEN & GOLDEN LLP
601 Massachusetts Ave NW Suite 200W
Washington, DC 20001
prf@outtengolden.com
hcolechu@outtengolden.com

Michael J. Scimone
OUTTEN & GOLDEN LLP
685 Third Ave. 25th Floor
New York, NY 10017
mscimone@outtengolden.com

Thomas G. Jarrard
1020 N. Washington Street
Spokane, WA 99201
tjarrard@att.net

By: _/s/ Stephanie Drotar_____

13

# VERIFICATION

I, Todd F. Jewett, am an employee of American Airlines, Inc. ("American"). My title is Managing Director – Labor Relations, Flight. In that capacity, I have certain knowledge of the collective bargaining agreements and policies applicable to American employees since January 1, 2013, and the employees of Envoy Air, Inc., Piedmont Airlines, Inc., and PSA Airlines, Inc. since January 1, 2016, as well as certain knowledge of Plaintiff James P. Scanlan's employment. I am authorized to make this verification for and on behalf of American and American Airlines Group Inc., and I make this verification on their behalf.

I have read and know the contents of **Defendants American Airlines Group Inc. and American Airlines, Inc.'s Third Amended Objections and Responses to Plaintiff's First Set of Interrogatories.** I hereby verify that the facts in the Responses to Interrogatory Nos. 1, 2, 3, 4, and 5 were accurate as of February 19, 2020, based on personal knowledge or information supplied to me by others on whom I rely to supply such information in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ____24th____ day of February, 2020, in ___Fort Worth___, Texas.

_____
Todd F. Jewett

# Exhibit 10

**AMERICAN AIRLINES, INC. 401(k) PLAN FOR PILOTS**

**Effective October 27, 2015**

AA-SCANLAN-0013858

# AMERICAN AIRLINES, INC. 401(k) PLAN FOR PILOTS

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARTICLE I DEFINITIONS .................................................................................................. 1
| | | |
|---|---|---|
| 1.1 | Account | 1 |
| 1.2 | Account Balance | 1 |
| 1.3 | Active Participant | 1 |
| 1.4 | Actual Deferral Percentage | 1 |
| 1.5 | Adjustment Date | 1 |
| 1.6 | ADP | 2 |
| 1.7 | ADP Contribution Percentage Amounts | 2 |
| 1.8 | Affiliate | 2 |
| 1.9 | After-Tax Contributions | 2 |
| 1.10 | Agreement | 2 |
| 1.11 | Alternate Payee | 2 |
| 1.12 | Association | 2 |
| 1.13 | Before-Tax Contributions | 2 |
| 1.14 | Beneficiary | 2 |
| 1.15 | Catch-Up Contributions | 2 |
| 1.16 | Code | 3 |
| 1.17 | Committee | 3 |
| 1.18 | Company | 3 |
| 1.19 | Compensation | 3 |
| 1.20 | Designated Beneficiary | 8 |
| 1.21 | Direct Rollver | 8 |
| 1.22 | Disability | 8 |
| 1.23 | Disabled Participant | 8 |
| 1.24 | Distributee | 8 |
| 1.25 | Distribution Calendar Year | 8 |
| 1.26 | Eligible Employee | 8 |
| 1.27 | Eligible Retirement Plan | 10 |
| 1.28 | Eligible Rollover Distribution | 10 |
| 1.29 | Employee | 10 |
| 1.30 | Employer | 10 |
| 1.31 | Employment Commencement Date | 10 |
| 1.32 | ERISA | 10 |
| 1.33 | Excess Contributions | 10 |
| 1.34 | Excess Deferrals | 10 |
| 1.35 | 5-Percent Owner | 10 |
| 1.36 | Grandfathered Disabled East Pilot | 10 |
| 1.37 | Highly Compensated Employee | 10 |
| 1.38 | Hour of Service | 11 |

AA-SCANLAN-0013859

| | | |
|---|---|---:|
| 1.39 | Investment Fund | 11 |
| 1.40 | Leased Employee | 11 |
| 1.41 | Life Expectancy | 11 |
| 1.42 | Limitation Year | 11 |
| 1.43 | Named Fiduciary | 11 |
| 1.44 | Non-Elective Employer Contribution | 11 |
| 1.45 | Non-highly Compensated Employee | 11 |
| 1.46 | Normal Retiremet Date | 11 |
| 1.47 | Participant | 11 |
| 1.48 | Periods of Service | 12 |
| 1.49 | Period of Severance | 12 |
| 1.50 | Pilots System Seniority List | 12 |
| 1.51 | Plan | 12 |
| 1.52 | Plan Administrator | 12 |
| 1.53 | Plan Year | 12 |
| 1.54 | Prior Plan | 13 |
| 1.55 | Qualified Domestic Relations Order | 13 |
| 1.56 | Qualified Non-Elective Employer Contributions | 13 |
| 1.57 | Reemployment Commencement Date | 13 |
| 1.58 | Required Beginning Date | 13 |
| 1.59 | Rollover Contributions | 13 |
| 1.60 | Roth 401(k) Contributions | 14 |
| 1.61 | Salary Reduction Agreement | 14 |
| 1.62 | Severance From Service Date | 14 |
| 1.63 | Spouse | 15 |
| 1.64 | Termination From Employment | 15 |
| 1.65 | Testing Compensation | 15 |
| 1.66 | Trust or Trust Fund | 15 |
| 1.67 | Trust Agreement | 15 |
| 1.68 | Trustee | 15 |
| 1.69 | Valuation Date | 15 |
| **ARTICLE II** | **ELIGIBILITY AND PARTICIPATION** | **16** |
| 2.1 | Eligibility | 16 |
| 2.2 | Active Participant | 16 |
| 2.3 | Plan Participation | 16 |
| 2.4 | Special Provisions for Employees Who Enter the Armed Forces | 17 |
| **ARTICLE III** | **PLAN CONTRIBUTIONS AND FUNDING** | **18** |
| 3.1 | Employee Contributions | 18 |
| 3.2 | Salary Reduction Agreement | 22 |
| 3.3 | Employer Contributions | 23 |
| 3.4 | Rollover Contributions | 23 |
| 3.5 | Qualified Military Service | 23 |
| 3.6 | Limit Under Code Section 415 | 24 |
| 3.7 | Limit Under Code Section 401(k) | 25 |

AA-SCANLAN-0013860

| 3.8 | Limit on Before-Tax and Roth 401(k) Contributions Under Code Section 402(g) | 28 |
| 3.9 | Nonreversion | 29 |

**ARTICLE IV  PLAN INVESTMENTS AND ACCOUNTING** ....................................**31**
| 4.1 | Establishment of Accounts | 31 |
| 4.2 | Valuation of Trust Fund and Accounts | 32 |
| 4.3 | Plan Investments | 32 |
| 4.4 | Participant Directed Investments | 32 |

**ARTICLE V  VESTING** .......................................................................**36**
| 5.1 | Vesting of Employee Contribution Accounts | 36 |
| 5.2 | Vesting of Employer Contribution Accounts | 36 |
| 5.3 | Change in Vesting Schedule | 36 |
| 5.4 | Vesting Schedules Applicable to Transferred Accounts | 36 |

**ARTICLE VI  IN-SERVICE WITHDRAWALS AND LOANS** ...........................**37**
| 6.1 | In-Service Withdrawals in Accordance with Procedures Adopted by the Plan Administrator | 37 |
| 6.2 | In-Service Withdrawals Upon Attaining Age 59½ | 37 |
| 6.3 | In-Service Withdrawal of After-Tax and Rollover Contributions | 37 |
| 6.4 | In-Service Withdrawal for Disabled Participants | 37 |
| 6.5 | In-Service Withdrawal For Hardship | 37 |
| 6.6 | Direct Rollover of In-Service Withdrawal | 39 |
| 6.7 | Plan Loans | 39 |
| 6.8 | In-Plan Rollover to Roth Rollover Contributions Sub Account | 40 |
| 6.9 | Qualified Military Service Distribution | 41 |

**ARTICLE VII  DISTRIBUTIONS UPON TERMINATION FROM EMPLOYMENT** .......................................................................**42**
| 7.1 | Distributions Upon Termination From Employment | 42 |
| 7.2 | Participant Elected Benefit Payments | 42 |
| 7.3 | Small Benefits | 43 |
| 7.4 | Minimum Required Distributions Under Code Section 401(a)(9) | 43 |
| 7.5 | Required Commencement Under Code Section 401(a)(14) | 47 |
| 7.6 | Rollover to Another Plan or IRA | 48 |

**ARTICLE VIII  BENEFICIARIES AND QDROS** ......................................**50**
| 8.1 | Designation of Beneficiary | 50 |
| 8.2 | Amount of Death Benefit | 51 |
| 8.3 | Form of Death Benefit | 51 |
| 8.4 | Death of Beneficiary | 51 |
| 8.5 | Qualified Domestic Relations Order | 51 |
| 8.6 | Pre-Retirement Death Benefit for a Participant Who Dies During Military Service | 52 |

iii

AA-SCANLAN-0013861

**ARTICLE IX  OTHER PAYMENT PROVISIONS** ................................................................ **53**
   9.1     Payments to Minors and Incompetents ............................................ 53
   9.2     Discharge of Obligation .................................................................. 53
   9.3     Nonalienation ................................................................................. 53
   9.4     Withholding Taxes .......................................................................... 53
   9.5     Missing Persons ............................................................................. 53
   9.6     Clerical Errors or Omissions ......................................................... 54

**ARTICLE X  PLAN ADMINISTRATION** ............................................................................ **55**
   10.1    Allocation of Responsibilities Among Fiduciaries ......................... 55
   10.2    Plan Administrator ......................................................................... 55
   10.3    Powers and Responsibilities of the Committee .............................. 55
   10.4    Trust Agreement ............................................................................. 56
   10.5    Actions Taken in Good Faith .......................................................... 56
   10.6    Plan Expenses ................................................................................ 56
   10.7    Claims and Review Procedures ...................................................... 56
   10.8    Discretionary Authority .................................................................. 58
   10.9    Indemnification .............................................................................. 59
   10.10  Plan Interpretation ......................................................................... 59
   10.11  Duty to Furnish Information ........................................................... 60
   10.12  No Guarantees ................................................................................ 60
   10.13  No Commitment as to Employment ................................................ 60

**ARTICLE XI  AMENDMENT, MERGER, AND TERMINATION** ...................................... **61**
   11.1    Amendment .................................................................................... 61
   11.2    Termination .................................................................................... 61
   11.3    Plan Merger or Consolidation ........................................................ 63
   11.4    Plan to Plan Transfers .................................................................... 63
   11.5    Distribution Restrictions Under Code Section 401(k) ..................... 63

**APPENDIX A – SPECIAL RULES FOR EMPLOYEES SUBJECT TO
PUERTO RICO INCOME TAX** ............................................................................ **A-1**
   A.1     Intent of Company ......................................................................... A-1
   A.2     Definitions ..................................................................................... A-1
   A.3     Annual Deferral Limitation ........................................................... A-3
   A.4     Limitations on Employee Contributions
           Following a Hardship Withdrawal ................................................. A-3
   A.5     Catch-Up Contributions ................................................................. A-3
   A.6     Employee Designated Roth Contributions ..................................... A-3
   A.7     After-Tax Contributions ................................................................. A-3
   A.8     Actual Deferral Percentage Test .................................................... A-3
   A.9     Hardship Withdrawals ................................................................... A-4
   A.10   Annual Additions ........................................................................... A-5
   A.11   Rollovers from Another Plan .......................................................... A-5
   A.12   Puerto Rico Direct Rollover Distributions from the Plan ............... A-5
   A.13   Employer Contributions ................................................................. A-5
   A.14   Payment of Contributions .............................................................. A-6

AA-SCANLAN-0013862

A.15   Plan Merger, Consolidation or Transfer .............................................A-6
A.16   Governing Law ...................................................................................A-6
A.17   Other Permissible Methods of Applying Rules ..................................A-6
A.18   Other Plan Provisions ........................................................................A-6

**APPENDIX B – COMPANY STOCK ...............................................................B-1**
B.1   Purpose ................................................................................................B-1
B.2   Definitions ...........................................................................................B-1
B.3   Frozen Company Stock Fund ..............................................................B-1
B.4   No In-Service Withdrawal For Hardship.............................................B-3
B.5   Distribution of AAL Stock ..................................................................B-3

**APPENDIX C – VESTING SCHEDULE FOR ENVOY MATCHING**
    **CONTRIBUTIONS ..................................................................................C-1**
C.1   Purpose ................................................................................................C-1
C.2   Definitions ...........................................................................................C-1
C.3   Vesting of Envoy Matching Contributions..........................................C-1
C.4   Forfeiture and Restoration of Non-Vested Benefits............................C-2

**APPENDIX D – VESTING SCHEDULE FOR COMPANY MATCHING**
    **CONTRIBUTIONS ..................................................................................D-1**
D.1   Purpose ................................................................................................D-1
D.2   Definitions ...........................................................................................D-1
D.3   Vesting of Company Matching Contributions......................................D-1
D.4   Forfeiture and Restoration of Non-Vested Benefits............................D-2

**APPENDIX E – FORMS OF PAYMENT FOR ANNUITY PROTECTED**
    **CONTRIBUTIONS ..................................................................................E-1**
E.1   Purpose ................................................................................................E-1
E.2   Definitions ...........................................................................................E-1
E.3   Normal Form of Payment for Annuity Protected Contributions.........E-3
E.4   Optional Form of Payment for Annuity Protected Contributions .......E-3
E.5   Change of Election ..............................................................................E-4
E.6   Notice Regarding Forms of Payment ..................................................E-4
E.7   Qualified Preretirement Survivor Annuity Requirements ...................E-4

AA-SCANLAN-0013863

## AMERICAN AIRLINES, INC. 401(K) PLAN FOR PILOTS

## INTRODUCTION

Effective October 27, 2015, American Airlines, Inc. (the "Company") establishes the American Airlines, Inc. 401(k) Plan for Pilots (the "Plan"). The Plan was created by the merger of certain assets from the American Airlines, Inc. 401(k) Plan sponsored by the Company with all of the assets from the Future Care 401(k) Plan and the US Airways, Inc. 401(k) Savings Plan for Pilots sponsored by US Airways, Inc.

The purpose of the Plan is to provide Eligible Employees of participating Employers an opportunity to further their financial independence and provide for their retirement, disability and future financial needs by systematically investing their contributions.

It is intended that the Plan qualify as a profit-sharing plan under Code section 401(a), and includes a cash or deferred arrangement that is intended to qualify under Code section 401(k). The Plan is established and maintained for the exclusive benefit of Eligible Employees and their Beneficiaries.

The assets of the Plan are held, administered and managed in accordance with the terms and conditions of the Trust Agreement, which is an integral part of the Plan. The Company intends the trust established pursuant to the Trust agreement to be exempt from taxation under Code section 501(a).

## ARTICLE I
## DEFINITIONS

Whenever used in the Plan, the following terms, when capitalized, have the respective meanings set forth below unless otherwise expressly provided herein.

1.1    "**Account**" means the separate account maintained pursuant to Section 4.1 for each Participant with a benefit under the Plan for the purpose of accounting for the Participant's beneficial interest in the Trust Fund, which Account consists of sub-accounts, as provided for and described in Section 4.1.

1.2    "**Account Balance**" has the meaning set forth in Section 7.4(a).

1.3    "**Active Participant**" means an Eligible Employee who satisfies the requirements of Sections 2.1 and 2.2.

1.4    "**Actual Deferral Percentage**" has the meaning set forth in Section 3.7(a).

1.5    "**Adjustment Date**" means March 31, June 30, September 30, and December 31 of each Plan Year.

AA-SCANLAN-0013864

1.6     **"ADP"** has the meaning set forth in Section 3.7(a).

1.7     **"ADP Contribution Percentage Amounts"** has the meaning set forth in Section 3.7(a).

1.8     **"Affiliate"** means:

    (a)     Any corporation which, together with the Employer, is a member of a "controlled group" of corporations, in accordance with Code section 414(b);

    (b)     Any organization which, together with the Employer, is under "common control," in accordance with Code section 414(c);

    (c)     Any organization which, together with the Employer, is an "affiliated service group," in accordance with Code section 414(m); and

    (d)     Any entity required to be aggregated with the Employer pursuant to regulations promulgated under Code section 414(o).

1.9     **"After-Tax Contributions"** means amounts deducted from Compensation and contributed to the Plan on an after-tax basis, as contributions described in Section 3.1(b)(3). After-Tax Contributions are credited to After-Tax Contributions sub-accounts.

1.10    **"Agreement"** means the collective bargaining agreement among the Company, US Airways, Inc. and the Association, as it may be amended from time to time.

1.11    **"Alternate Payee"** means any person so designated under a Qualified Domestic Relations Order.

1.12    **"Association"** means the Allied Pilots Association or such successor organization as may be designated as the bargaining representative for the Eligible Employees.

1.13    **"Before-Tax Contributions"** means amounts deducted from Compensation and contributed to the Plan on a pre-tax basis, as contributions described in Section 3.1(b)(1). Before-Tax Contributions are credited to Before-Tax Contributions sub-accounts.

1.14    **"Beneficiary"** means the person or persons, including a trust or the Participant's estate, designated by a Participant, or deemed pursuant to Article VIII, to receive any death benefits payable after the death of the Participant, in accordance with Article VIII.

1.15    **"Catch-Up Contributions"** means contributions described in Section 3.1(b)(4) and deducted from Compensation and contributed to the Plan on either a pre-tax basis, as contributions described in Section 3.1(b)(1), or on an after-tax basis, as contributions described in Section 3.1(b)(2). Catch-Up Contributions are credited to Before-Tax Contributions sub-accounts or Roth 401(k) Contributions sub-accounts, as applicable. Catch-Up Contributions are not taken into account for purposes of the provisions of the Plan implementing the required limitations of Code sections 402(g) and 415. The Plan is

AA-SCANLAN-0013865

not treated as failing to satisfy the provisions of the Plan implementing the requirements of Code sections 401(k)(3), 410(b), and 416, as applicable, by reason of allowing Catch-Up Contributions.

1.16   **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

1.17   **"Committee"** means the Employee Benefits Committee appointed by the Company whose authority and responsibilities are described in Article X.

1.18   **"Company"** means American Airlines, Inc. or any successor thereto.

1.19   **"Compensation"** means, unless a different definition expressly applies pursuant to Section 3.6:

    (a)   **Employee Contributions:** For purposes of determining Employee contributions under Section 3.1, the sum of:

        (1)   Amounts paid to an Employee for a Plan Year that are required to be reported by the Employer pursuant to Code sections 6041(a) and 6051(a)(3), less:

            (A)   Co-terminal expenses;

            (B)   Moving expenses;

            (C)   Company-paid life insurance premiums;

            (D)   Value of Non-Revenue Space Available ("NRSA") Passes for Relatives;

            (E)   Disability payments, except as provided in subsection (c) below;

            (F)   Severance pay;

            (G)   Company-paid employee expenses;

            (H)   Benefit pay;

            (I)   Tips;

            (J)   Relocation related compensation

            (K)   Incentive payments funded through a third party;

            (L)   Cost of living pay adjustments; and

3

AA-SCANLAN-0013866

(M)   Imputed income, including any amounts grossed up to account for the taxes on such imputed income;

(2)   Contributions, if any, made to the Plan on behalf of the Participant pursuant to Section 3.1(b)(1) for that Plan Year and amounts contributed for that Plan Year by the Employer pursuant to a Salary Reduction Agreement that are not includible in gross income of the Employee under Code sections 125, 132(f)(4), 402(h), or 403(b);

(3)   Differential wage payments as defined in Code section 3401(h)(2) that are paid by the Employer during a period of qualified military service as defined in Code section 414(u); and

(4)   Payments made after a "severance from employment" (within the meaning of Code section 401(k)(2)(B)(i)(1)), if such amounts are paid by the later of (A) 2½ months after, or (B) the end of the Limitation Year that includes the date of the Employee's severance from employment with the Employer, and the payment constitutes regular compensation for services during the Employee's regular working hours, compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar compensation, and absent a severance from employment, the payment would have been paid to the Employee while the Employee continued in employment with the Employer; payments for accrued bona fide sick, vacation or other leave, but only if the Employee would have been able to use the leave if employment had continued; or payment of nonqualified unfunded deferred compensation if such amount would have been paid at the same time if the Employee had not experienced a severance from employment, but only to the extent includible in gross income, provided that such amounts will be included only if otherwise described in items (1) and (2) above; provided, however, that any furlough pay paid after the Employee's severance from employment shall not be considered Compensation for purposes of determining Employee contributions.

Except as provided in subparagraph (4) above, Compensation shall only include amounts paid to an Eligible Employee during the portion of the Plan Year during which he was eligible to participate in the Plan.

In no event shall Compensation include amounts that are not compensation within the meaning of Code section 415 and the regulations thereunder.

(b)   **Employer Contributions – General Rule:**  Except as provided in subsection (c) below, for purposes of determining Employer contributions under Section 3.3, the sum of:

4

AA-SCANLAN-0013867

(1)     Amounts paid to an Employee for a Plan Year that are required to be reported by the Employer pursuant to Code sections 6041(a) and 6051(a)(3), less:

    (A)     Co-terminal expenses;

    (B)     Moving expenses;

    (C)     Company-paid life insurance premiums;

    (D)     Value of NRSA Passes for Relatives;

    (E)     Disability payments, except as provided in subsection (c) below;

    (F)     Severance pay;

    (G)     Company-paid employee expenses;

    (H)     Benefit pay;

    (I)     Tips;

    (J)     Relocation related compensation

    (K)     Incentive payments funded through a third party;

    (L)     Cost of living pay adjustments;

    (M)     Approved expense allowances;

    (N)     Expense reimbursements;

    (O)     Gain sharing payments;

    (P)     Overtime meal allowance;

    (Q)     Pilot profit sharing payment;

    (R)     Sick bank payout;

    (S)     Uniform cleaning allowance; and

    (T)     Imputed income, including any amounts grossed up to account for the taxes on such imputed income;

(2)     Contributions, if any, made to the Plan on behalf of the Participant pursuant to Section 3.1(b)(1) for that Plan Year and amounts contributed

5

AA-SCANLAN-0013868

for that Plan Year by the Employer pursuant to a Salary Reduction Agreement that are not includible in gross income of the Employee under Code sections 125, 132(f)(4), 402(h), or 403(b);

(3)     Differential wage payments as defined in Code section 3401(h)(2) that are paid by the Employer during a period of qualified military service as defined in Code section 414(u);

(4)     Payments made after a "severance from employment" (within the meaning of Code section 401(k)(2)(B)(i)(1)), if such amounts are paid by the later of (A) 2½ months after, or (B) the end of the Limitation Year that includes the date of the Employee's severance from employment with the Employer, and the payment constitutes regular compensation for services during the Employee's regular working hours, compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar compensation, and absent a severance from employment, the payment would have been paid to the Employee while the Employee continued in employment with the Employer; payments for accrued bona fide sick, vacation or other leave, but only if the Employee would have been able to use the leave if employment had continued; or payment of nonqualified unfunded deferred compensation if such amount would have been paid at the same time if the Employee had not experienced a severance from employment, but only to the extent includible in gross income, provided that such amounts will be included only if otherwise described in items (1) and (2) above; provided, however, that any furlough pay paid after the Employee's severance from employment shall not be considered Compensation for purposes of determining Employer contributions; and

(5)     For Eligible Employees who are on a union leave,

(A)     Type 1 Flight Pay Loss, which covers union paid leave, consisting of regularly scheduled work assignments missed by Eligible Employees due to service performed for the Association; and

(B)     Type 2 Flight Pay Loss, which covers pay beyond regularly scheduled work assignments missed by Eligible Employees due to service performed for the Association.

Except as provided in subparagraph (4) above, Compensation shall only include amounts paid to an Eligible Employee during the portion of the Plan Year during which he was eligible to participate in the Plan.

In no event shall Compensation include amounts that are not compensation within the meaning of Code section 415 and the regulations thereunder.

6

AA-SCANLAN-0013869

(c) **Employer Contributions – Grandfathered Disabled East Pilots:** For purposes of determining Employer Contributions under Section 3.3 for Eligible Employees who are Grandfathered Disabled East Pilots:

    (1) Compensation, for such Eligible Employees who were disabled prior to April 1, 2003, shall be the compensation the Grandfathered Disabled East Pilot would have received for the year if the Grandfathered Disabled East Pilot was paid at the rate of compensation paid immediately before becoming disabled (within the meaning of Code section 22(e)(3)); and

    (2) Compensation, for such Eligible Employees who incurred a disability between April 1, 2003 and March 31, 2014, shall include amounts paid by the Employer as long-term disability pay (standard payment) pursuant to the disability programs provided to such Eligible Employees by the Employer pursuant to the Agreement.

In no event shall Compensation include amounts that are not compensation within the meaning of Code section 415 and the regulations thereunder.

(d) **Other Plan Purposes.** For other purposes of the Plan (including ADP testing, Code section 415, and the rules for determining the identity of Highly Compensated Employees), amounts paid to an Employee for the Plan Year (or Limitation Year for purposes of Section 3.6) that are required to be reported by the Employer pursuant to Code sections 6041(d) and 6051(a)(3). Compensation for these purposes shall include:

    (1) Any elective deferral as defined in Code section 402(g)(3);

    (2) Any amount which is contributed or deferred by the Employer at the election of the Employee and which is not includible in the gross income of the Employee and which is not includible in the gross income of the Employee by reason of Code sections 125, 457 or 132(f)(4);

    (3) Payments made after a "severance from employment" (within the meaning of Code section 401(k)(2)(B)(i)(1), if such amounts are paid by the later of (A) 2½ months after, or (B) the end of the Limitation Year that includes, the date of the Employee's severance from employment with the Employer, and the payment constitutes: regular compensation for services during the Employee's regular working hours, compensation for services outside the Employee's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar compensation, and absent a severance from employment, the payment would have been paid to the Employee while the Employee continued in employment with the Employer; payments for accrued bona fide sick, vacation or other leave, but only if the Employee would have been able to use the leave if employment had continued; or payment of nonqualified unfunded deferred

7

AA-SCANLAN-0013870

compensation if such amount would have been paid at the same time if the Employee had not experienced a severance form employment, but only to the extent includible in gross income; and

(4) For purposes of Section 3.6, differential wage payments as defined in Code section 3401(h)(2) that are paid by the Employer during a period of qualified military service as defined in Code section 414(u).

(e) **Limit on Compensation.** The Compensation taken into account for an Eligible Employee will not exceed the annual limit in effect for the calendar year under Code section 401(a)(17), as adjusted annually to reflect cost-of-living increases. The limitation on Compensation described in the preceding sentence shall be referred to herein as the "Compensation Limitation." For any Plan Year which is shorter than twelve months, the Compensation Limitation applicable for such Plan Year shall be determined by multiplying the Compensation Limitation by a fraction, the numerator of which is the number of months in the short Plan Year and the denominator of which is twelve.

1.20 **"Designated Beneficiary"** has the meaning set forth in Section 7.4(a).

1.21 **"Direct Rollover"** has the meaning set forth in Section 7.6(b).

1.22 **"Disability"** means either:

(a) Receiving qualifying disability benefits under the Social Security Act as evidenced by a valid award letter from the Social Security Administration, or

(b) Receiving disability benefits for a period of at least 6 months under a long-term disability program sponsored by the Company or an Affiliate.

1.23 **"Disabled Participant"** means a Participant with a Disability.

1.24 **"Distributee"** has the meaning set forth in Section 7.6(b).

1.25 **"Distribution Calendar Year"** has the meaning set forth in Section 7.4(a).

1.26 **"Eligible Employee"** means an Employee who is in one of the categories of eligible positions listed in subsection (a) below:

(a) **Eligible Positions.** Any individual in any of the following categories shall be eligible to participate in the Plan:

(1) Employees of an Employer who are listed on the Pilots System Seniority List for such periods they are on such list;

8

AA-SCANLAN-0013871

(2)     Grandfathered Disabled East Pilots, until such time as they cease to receive long-term disability benefits; and

(3)     Individuals permitted to participate in the Plan provided under the Agreement between the Company and the Association.

(b)     **Ineligible Positions.** Notwithstanding anything in the Plan to the contrary, any individual in any of the following categories shall not be an Eligible Employee while he is in that category:

(1)     A Leased Employee;

(2)     Any person (regardless of how such person is characterized, for wage withholding purposes or any other purpose, by the Internal Revenue Service, or any other agency, court, authority, individual, or entity) who is classified, in the sole and absolute discretion of the Employer, as a temporary worker, including any of the following classifications:

(A)     Temporary employee;

(B)     Provisional employee;

(C)     Associate employee;

(3)     Any person who is not reported as a common law employee on the payroll of the Company or any Affiliate, even if a court or administrative agency determines such person is a common law employee of the Company or any Affiliate;

(4)     Any non-resident alien who receives no earned income from the Employer that constitutes income from United States sources within the meaning of Code sections 861(a)(3) and 911(d)(2);

(5)     Employees of Affiliates that have not adopted the Plan;

(6)     Any person who is eligible to participate in another 401(k) plan maintained by the Company or any Affiliate;

(7)     Any person:

(A)     Who is not on the Employer's salaried or hourly employee payroll (the determination of which shall be made by the Employer in its sole and absolute discretion);

(B)     Who has agreed in writing that he or she is not an Employee or is not otherwise eligible to participate in the Plan;

9

AA-SCANLAN-0013872

      (C)      Whose compensation is reported to the Internal Revenue Service on a form other than a Form W-2, regardless of whether such person is treated as an employee for Federal income tax purposes; or

      (D)      Who does not have either:

            (i)      A valid Social Security Number; or

            (ii)      A valid Individual Tax Identification Number.

1.27    **"Eligible Retirement Plan"** has the meaning set forth in Section 7.6(b).

1.28    **"Eligible Rollover Distribution"** has the meaning set forth in Section 7.6(b).

1.29    **"Employee"** means a common law employee on the U.S. payroll of the Employer, as well as a Leased Employee, to the extent required under the Code.

1.30    **"Employer"** means the Company and any Affiliate that has adopted the Plan, with the Company's consent.

1.31    **"Employment Commencement Date"** means the first day for which the Employee is entitled to be credited with an Hour of Service.

1.32    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

1.33    **"Excess Contributions"** has the meaning set forth in Section 3.7(a).

1.34    **"Excess Deferrals"** has the meaning set forth in Section 3.8(b).

1.35    **"5-Percent Owner"** means any person who owns (or is considered as owning within the meaning of Code section 318) more than five percent (5%) of the outstanding stock of the corporation or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer.

1.36    **"Grandfathered Disabled East Pilot"** means any individual classified as a "Grandfathered Disabled East Pilot" pursuant to the terms of section 13.c of the Defined Contribution Retirement Benefits Transition Letter of Agreement dated July 30, 2013 among the Company, the Association, US Airways, Inc. and US Airline Pilots Association.

1.37    **"Highly Compensated Employee"** means an employee who performs services for the Employer or an Affiliate during the determination year and who (a) during the determination year or the look-back year was at any time a 5-Percent Owner, or (b) for

AA-SCANLAN-0013873

the look-back year received Section 415 Compensation (as defined in Section 3.6)) in excess of the amount stated in Code section 414(q)(1)(B)(i), as adjusted for cost-of-living increases. The determination year will be the Plan Year, and the look-back year will be the 12-month period immediately preceding the determination year.

1.38 **"Hour of Service"** means each hour for which an Employee is paid or entitled to payment for the performance of duties for the Employer or an Affiliate.

1.39 **"Investment Fund"** means one or more of the investment options selected by the Plan Administrator in which Participant Accounts are invested.

1.40 **"Leased Employee"** means any person who provides service to the Employer pursuant to an agreement between such recipient and any other person ("leasing organization"), regardless of (1) the length of time the person has performed such services for the recipient (or for the recipient and related persons), (2) whether or not the person is an employee of the recipient, (3) whether or not the person has performed such services for the recipient (or for the recipient and related persons) on a part-time or full-time basis, and (4) whether or not the person performed services under the primary direction or control by the recipient. This definition of leased employee includes any person who under an agreement between the recipient and any other person has performed services for the recipient (or for the recipient and related persons determined under Code section 414(n)(6)) on a substantially full-time basis for a period of at least one (1) year, and the services are performed under the primary direction or control of the recipient without limitation, as provided for in Code section 414(n)(2).

1.41 **"Life Expectancy"** has the meaning set forth in Section 7.4(a).

1.42 **"Limitation Year"** means the twelve-month period ending on the last day of the Plan Year.

1.43 **"Named Fiduciary"** has the meaning set forth in ERISA section 402(a)(2).

1.44 **"Non-Elective Employer Contributions"** means Employer contributions made to the Plan pursuant to Section 3.3(a). Non-Elective Employer Contributions are credited to a Participant's Pilot Company Contributions sub-account.

1.45 **"Non-highly Compensated Employee"** means an Employee who is not a Highly Compensated Employee.

1.46 **"Normal Retirement Date"** means the date an Employee attains the federally mandated retirement age for pilots.

1.47 **"Participant"** means an individual, including an Active Participant, inactive Participant, Alternate Payee, or Beneficiary, who has a balance credited to his Account. "Participant" means all of such types of individuals, unless the context indicates otherwise.

AA-SCANLAN-0013874

1.48 **"Periods of Service"** is calculated using the elapsed time method of counting service in accordance with Treas. Reg. section 1.410(a)-7 and the following rules:

    (a)    The Employee's Period of Service includes all of the Employee's periods of service with the Employer or an Affiliate. A Period of Service begins on the Employee's Employment or Reemployment Commencement Date, includes any authorized military or non-military leave of absence, and ends on the Employee's Severance From Service Date or the Employee's next Severance From Service Date.

    (b)    The Employee's Period of Service includes a Period of Severance if the Employee has a Reemployment Commencement Date within 12 months of the date on which the Employee quits, retires, is furloughed, or is discharged.

    (c)    All days included in the Employee's Period of Service are aggregated. The Employee's Period of Service is expressed in whole years and decimal fractions of a year by dividing the aggregate number of days included in the Employee's Period of Service by 365. An Employee's Period of Service is not rounded to the nearest whole number.

    (d)    An Employee is credited with periods of service credited under a Prior Plan. If a Prior Plan credited service under the general method described in ERISA Reg. section 2530.200b-2, an Employee's Period of Service under the Plan will be determined in accordance with Treas. Reg. section 1.410-7(f).

1.49 **"Period of Severance"** begins on an Employee's Severance From Service Date and ends on the Employee's Reemployment Commencement Date.

1.50 **"Pilots System Seniority List"** means a list which contains:

    (a)    The names of all pilot Employees arranged in the order of system seniority, whether active or inactive;

    (b)    The seniority date of each pilot Employee; and

    (c)    The Normal Retirement Date of each pilot Employee.

1.51 **"Plan"** means the American Airlines, Inc. 401(k) Plan for Pilots, as amended from time to time.

1.52 **"Plan Administrator"** means the Committee, which shall be the "administrator" as defined in ERISA section 3(16) and the Named Fiduciary of the Plan.

1.53 **"Plan Year"** means the calendar year. Notwithstanding the foregoing, the first Plan Year will be a "short Plan Year," beginning on October 27, 2015 and ending on December 31, 2015.

AA-SCANLAN-0013875

1.54   **"Prior Plan"** means each tax-qualified defined contribution retirement plan maintained by the Company or an Affiliate (or by a predecessor to the Company or an Affiliate) which has been merged into this Plan. As of October 27, 2015, the term "Prior Plan" includes the Future Care 401(k) Plan, the US Airways, Inc. 401(k) Savings Plan for Pilots, and the American Airlines, Inc. 401(k) Plan (but only as it relates to the assets that were transferred to the Plan).

1.55   **"Qualified Domestic Relations Order"** means a domestic relations order that the Plan Administrator or its delegate has determined to be a qualified domestic relations order because it meets the requirements of Code section 414(p).

1.56   **"Qualified Non-Elective Employer Contributions"** means contributions made pursuant to Section 3.3(b) that are:

    (a)   Nonforfeitable; and

    (b)   Distributable only in accordance with the distribution provisions applicable to Before-Tax Contributions (unless such contributions are made in relation to a correction of Non-Elective Employer Contributions under Section 3.3(a)).

Qualified Non-Elective Employer Contributions are credited to a Participant's Qualified Non-Elective Employer Contributions sub-account. No distribution of Qualified Non-Elective Employer Contributions may be made on account of hardship.

1.57   **"Reemployment Commencement Date"** means the first date following a Severance From Service Date on which an Employee is credited with an Hour of Service.

1.58   **"Required Beginning Date"** has the meaning set forth in Section 7.4(a).

1.59   **"Rollover Contributions"** means amounts rolled over to this Plan as provided herein and in Sections 3.4 and 6.8:

    (a)   **Direct Rollovers.** The Plan may accept a direct rollover of an eligible rollover distribution from:

        (1)   A qualified plan described in Code section 401(a) or 403(a);

        (2)   An annuity contract described in Code section 403(b); and

        (3)   An eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

    (b)   **Employee Rollover Contributions from Other Plans.** The Plan may accept an Eligible Employee's contribution of an eligible rollover distribution from:

        (1)   A qualified plan described in Code section 401(a) or 403(a);

AA-SCANLAN-0013876

      (2)     An annuity contract described in Code section 403(b); and

      (3)     An eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

  (c)    **Employee Rollover Contributions from IRAs.**  The Plan will accept an Eligible Employee's rollover contribution of the portion of a distribution from an individual retirement account or annuity described in Code section 408(a) or 408(b) (including SEPs and SIMPLE IRAs after two (2) years of participating in the SIMPLE IRA) that is eligible to be rolled over.

  (d)    **Roth Rollovers.**  The Plan will accept a direct rollover of designated Roth contributions described in Code section 402A(c)(1) to the extent the rollover is permitted under the rules of Code section 402(c).  The Plan will also accept a direct rollover of Roth in-plan conversion amounts, either pursuant to Section 6.8 or as a direct rollover from another plan qualified under Code section 401(k), 403(b) or 457(b), to the extent the rollover is permitted under the rules of Code section 402(c).  The Plan will not accept a rollover of designated Roth contributions in any other manner.  Such Rollover Contributions shall be separately accounted for and credited to the Participant's Roth Rollover Contributions sub-account.  Roth rollovers accepted from another qualified plan shall be subject to the distribution rules that apply to Rollover Contributions.

1.60    **"Roth 401(k) Contributions"** means contributions made to the Plan pursuant to Section 3.1(b)(2) by an Employer on behalf of an Active Participant that are included in the Active Participant's gross income and irrevocably designated as Roth 401(k) Contributions by the Active Participant in his Salary Reduction Agreement.  Salary Reduction Agreements for Roth 401(k) Contributions are made in accordance with the rules applicable to Before-Tax Contributions under Section 3.2.  Roth 401(k) Contributions, and applicable earnings, are fully vested at all times and credited to a Participant's Roth 401(k) Contributions sub-account.  Except as stated elsewhere in this Plan, Code section 402A, or applicable IRS guidance, Roth 401(k) Contributions are treated as Before-Tax Contributions for purposes of Code sections 401(a), 401(k), 402, 404, 409, 411, 415, 416, and 417.  Roth 401(k) Contributions are credited to a Participant's Roth 401(k) Contributions sub-account.

1.61    **"Salary Reduction Agreement"** means an agreement by which a Participant elects, either in writing, by voice-response, electronically, or in any other manner approved by the Plan Administrator, to defer or reduce the receipt of a percentage of Compensation, and directs the Employer to make contributions to the Plan on his behalf pursuant to Sections 3.1 and 3.2.

1.62    **"Severance From Service Date"** means, for the purpose of determining a Period of Service, the date the employee quits, retires, is discharged, is furloughed, or dies.  A

AA-SCANLAN-0013877

transfer of service among the Employers or Affiliates will not result in a Severance From Service Date.

1.63    **"Spouse"** means any spouse of a legal marriage that is validly entered into under state law. For this purpose, the term "state" means any domestic or foreign jurisdiction having the legal authority to sanction marriages. For all Plan purposes, a Participant is "married" if the Participant has a Spouse. A former Spouse is treated as the Spouse to the extent provided under a Qualified Domestic Relations Order.

1.64    **"Termination From Employment"** means an employee severs employment, including as a result of being furloughed, with the Employer and all Affiliates within the meaning of Code section 401(k)(2)(B)(i)(I).

1.65    **"Testing Compensation"** has the meaning set forth in Section 3.7(a).

1.66    **"Trust"** or **"Trust Fund"** means the funds or assets of the Plan that are held and administered by the Trustee.

1.67    **"Trust Agreement"** means the agreement or agreements between the Plan Administrator and the Trustee, as the same may be amended from time to time, under which the assets of the Plan are held, administered and managed by the Trustee. The provisions of the Trust Agreement shall be considered an integral part of this Plan as if set forth fully herein.

1.68    **"Trustee"** means the trustee or any successor trustee appointed by the Plan Administrator to serve as Trustee of the Trust Fund under the Trust Agreement.

1.69    **"Valuation Date"** means each day of each Plan Year that the New York Stock Exchange is open.

AA-SCANLAN-0013878

## ARTICLE II
## ELIGIBILITY AND PARTICIPATION

2.1   **Eligibility.**  An Employee must satisfy the requirements of subsections (a) and (b) to participate in the Plan:

(a)   **Eligible Employee.**  The Employee must be an Eligible Employee, as defined in Article I; and

(b)   **Service Requirements.**  The Employee has completed the following service requirements:

(1)   **Employee Contributions.**  An Eligible Employee will be eligible to make employee contributions described in Section 3.1 as soon as administratively possible following the Employee's Employment Commencement Date or Reemployment Commencement Date.

(2)   **Non-Elective Employer Contributions.**  An Eligible Employee will be eligible for the Non-Elective Employer Contributions described in Section 3.3(a) after the Employee completes a twelve-month Period of Service. Notwithstanding the foregoing, if an Eligible Employee was receiving non-elective employer contributions under the American Airlines, Inc. 401(k) Plan, the Future Care 401(k) Plan, or the Retirement Savings Plan for Pilots of US Airways, Inc. as of October 26, 2015, then such Eligible Employee will be immediately eligible for the Non-Elective Employer Contributions described in Section 3.3(a).

2.2   **Active Participant.**  An Eligible Employee is an Active Participant with respect to the employee contributions described in Section 3.1 only if he has either been automatically enrolled in the Plan or filed a Salary Reduction Agreement with the Plan Administrator, and the Plan Administrator has accepted the Agreement, in accordance with Article III.  An Eligible Employee need not be automatically enrolled in the Plan or enter into a Salary Reduction Agreement in order to be considered an Active Participant who is eligible to be credited with the Employer contributions described in Section 3.3.

2.3   **Plan Participation.**

(a)   **Entry Date For New Participants.**  An Eligible Employee who is not a Participant becomes an Active Participant as soon as administratively practicable following the date he has satisfied the requirements of Sections 2.1 and 2.2.

(b)   **Change in Status After Becoming a Participant.**

(1)   During any period when a Participant is not an Eligible Employee, he may not have contributions made on his behalf under the Plan based on Compensation earned while he is not an Eligible Employee, but he will be

AA-SCANLAN-0013879

credited with any earnings or losses on his Account and may receive distributions for which he qualifies.

(2)     If a Participant ceases to be an Active Participant because of a transfer to an ineligible position and is subsequently transferred back into an eligible position, he becomes an Active Participant immediately upon meeting the requirements of Sections 2.1 and 2.2, taking into account his Period of Service credited before the transfer, or as soon as administratively practicable thereafter.

(3)     If a Participant ceases to be an Active Participant because of Termination of Employment and he is subsequently rehired by an Employer, he becomes an Active Participant immediately upon meeting the requirements of Sections 2.1 and 2.2, taking into account his Period of Service credited before the termination or period of furlough, or as soon as administratively practicable thereafter.

(4)     Notwithstanding anything in the Plan to the contrary, if a Participant was receiving Non-Elective Employer Contributions as of the date the Participant ceases to be an Active Participant because of termination of Employment, then he will be immediately eligible for the Non-Elective Employer Contributions described in Section 3.3(a) upon his Reemployment Commencement Date, or as soon as administratively practicable thereafter..

2.4     **Special Provisions for Employees Who Enter the Armed Forces.**  Notwithstanding any provision of this Plan to the contrary, eligibility to participate in the Plan for Eligible Employees engaged in qualified military service is determined in accordance with Code section 414(u).

AA-SCANLAN-0013880

## ARTICLE III
## PLAN CONTRIBUTIONS AND FUNDING

3.1     **Employee Contributions.**

    (a)    **Automatic Enrollment On or After January 1, 2016.**

        (1)    **Eligibility.**

            (A)    **General Rule.** After meeting the requirements of Section 2.1(b)(1), an Eligible Employee hired or rehired on or after January 1, 2016 shall be automatically enrolled in the Plan for purposes of making Before-Tax Contributions as of the Automatic Enrollment Date specified in subsection (2) below at the deemed rate of Before-Tax Contributions specified in subsection (6) below if he fails to affirmatively elect to designate how much, if any, of his Compensation is to be deferred in accordance with subsection (b) below.

            (B)    **January 1, 2016 Special Rule.** Notwithstanding subsection (1)(A) above, an Eligible Employee, other than an Eligible Employee whose Employee contributions have been suspended pursuant to Section 6.5(e) as of December 1, 2015, who has met the requirements of Section 2.1(b)(1), shall be automatically enrolled in the Plan as of the first pay date after January 1, 2016 for purposes of making Before-Tax Contributions as of the Automatic Enrollment Date specified in subsection (2) below at the deemed rate of Before-Tax Contributions specified in subsection (6) below if he has failed to affirmatively elect to designate how much, if any, of his Compensation is to be deferred in accordance with subsection (b) below.

        (2)    **Automatic Enrollment Date.** An Eligible Employee subject to the rules set forth in this Section 3.1(a) shall be automatically enrolled in the Plan no later than the later of:

            (A)    Thirty (30) days after the Eligible Employee's Employment Commencement Date, or

            (B)    The date that is as soon as administratively practicable following the end of the 30-day period that begins on the date the Eligible Employee receives written notification of his automatic enrollment (collectively the "Automatic Enrollment Date").

        (3)    **Notice.** Within a reasonable period before the beginning of the Plan Year or a reasonable period before first becoming covered under this Section

18

AA-SCANLAN-0013881

3.1(a), as applicable, the Employer will provide each Eligible Employee covered under this Section 3.1(a) with a notice of the Eligible Employee's rights and obligations under the automatic contribution arrangement. Such notice will describe:

(A)   The deemed rate of Before-Tax Contributions under the Plan in the absence of an affirmative election,

(B)   The Eligible Employee's right to elect to have no deemed Before-Tax Contributions made on his or her behalf or to have a different amount of Before-Tax Contributions made,

(C)   How deemed Before-Tax Contributions will be invested in the absence of the Eligible Employee's investment instructions, and

(D)   The Eligible Employee's right to make a withdrawal of deemed Elective Deferral Contributions and the procedures for making such a withdrawal.

(4)   **Opt-Out.** Each Eligible Employee will have a reasonable opportunity after receipt of the notice described in subsection (3) above to make an affirmative election to have no deemed Before-Tax Contributions made on his behalf or to have a different amount of Before-Tax Contributions made on his behalf. Deemed Before-Tax Contributions being made on behalf of an Eligible Employee will cease as soon as administratively practicable after the Eligible Employee makes an affirmative election.

(5)   **Withdrawals of Deemed Before-Tax Contributions.** An Eligible Employee for whom deemed Before-Tax Contributions have been made under this Section 3.1(a) may elect, in accordance with procedures established by the Plan Administrator, to have the deemed Before-Tax Contributions, adjusted for investment experience and any applicable fees, returned to him; provided, however, any such election must be made no later than ninety (90) days after the date of the Eligible Employee's first deemed Before-Tax Contribution under this Section 3.1(a). The amount to be distributed from the Plan upon the Eligible Employee's withdrawal request is equal to the amount of deemed Before-Tax Contributions made through the earlier of:

(A)   The pay date for the second payroll period that begins after the Eligible Employee's withdrawal request, and

(B)   The first pay date that occurs after thirty (30) days after the Eligible Employee's withdrawal request,

plus attributable earnings or losses through the date of distribution.

19

AA-SCANLAN-0013882

(6)     **Deemed Rate of Before-Tax Contributions.** An Eligible Employee who is automatically enrolled shall be deemed to have elected to reduce his Compensation by four percent (4%) per payroll period as Before-Tax Contributions for all payroll periods beginning with the Eligible Employee's Automatic Enrollment Date.

(7)     **Deemed Investment Fund.** Any Before-Tax Contributions made pursuant to this Section 3.1(a) shall be invested at the Eligible Employee's direction pursuant to Section 4.4(b); provided, however, that if an Eligible Employee fails to make an investment election, such Eligible Employee's Before-Tax Contributions shall be invested in the default Investment Fund(s) in accordance with Section 4.4(e), until such Eligible Employee directs otherwise.

(b)     **Salary Reduction Agreement.** Notwithstanding subsection (a) above, after meeting the requirements of Section 2.1(b)(1), an Eligible Employee may file a Salary Reduction Agreement with the Plan Administrator and have the following contributions made to the Plan on his behalf:

(1)     **Before-Tax Contributions.** An Active Participant may elect to contribute up to one hundred percent (100%) of his Compensation in one-half percent (.5%) increments as Before-Tax Contributions to the Plan. Before-Tax Contributions are credited to a Participant's Before-Tax Contributions sub-account.

(2)     **Roth 401(k) Contributions.** An Active Participant may elect to contribute up to one hundred percent (100%) of his Compensation in one-half percent (.5%) increments as Roth 401(k) Contributions to the Plan. Roth 401(k) Contributions are credited to a Participant's Roth 401(k) Contributions sub-account.

(3)     **After-Tax Contributions.** An Active Participant may elect to contribute up to one hundred percent (100%) of his Compensation in one-half percent (.5%) increments as After-Tax Contributions to the Plan. After-Tax Contributions are credited to a Participant's After-Tax Contributions sub-account.

(4)     **Catch-Up Contributions.** An Active Participant who would attain age fifty (50) before the close of his tax year may elect to contribute up to the maximum dollar amount permitted under Code section 414(v) from his Compensation as Catch-Up Contributions for the related Plan Year in accordance with, and subject to the limitations of, Code section 414(v). If the amount of an Active Participant's Before-Tax Contributions and/or Roth Contributions have not exceeded the limit in effect under Code section 402(g) for the taxable year as described in Section 3.8, then all or a portion of such Active Participant's Catch-Up Contributions will be

20

AA-SCANLAN-0013883

recharacterized to the extent necessary to satisfy such limit. Catch-Up Contributions are accounted for separately in a Participant's Before-Tax Contributions sub-account or Roth Contributions sub-account, as applicable.

The salary deferral election of a Participant whose Prior Plan account was transferred to the Plan from a Prior Plan that was in effect under the Prior Plan immediately prior to the transfer shall apply to Compensation paid after October 26, 2015, unless the salary deferral election is changed in accordance with Section 3.2.

The Code and ERISA imposed limits on contributions made to the Plan pursuant to this Section are described in this Article III. To the extent necessary to satisfy these limits, the Plan Administrator may limit, adjust, or return the contributions, as described in Article III, without regard to the terms of a Salary Reduction Agreement.

(c)     **Automatic Increase Programs.**

    (1)     **Default Annual Automatic Increase.** A Participant shall, unless he has affirmatively elected to (A) set his contribution rate of Before-Tax Contributions to zero percent (0%), (B) opt-in to or opt-out of the automatic increase feature described in Section 3.1(c)(3), or (C) opt-out of the automatic increase feature in this Section 3.1(c)(1), be deemed to have elected, in accordance with the rules established by the Plan Administrator, to automatically increase his rate of Before-Tax Contributions annually by one percent (1%) of Compensation until the total combined rate of his Employee contributions (excluding Catch-Up Contributions and Roth Catch-Up Contributions) made to the Plan on his behalf equals ten percent (10%) of his Compensation, effective as soon as administratively practicable on or after January 1 of each Plan Year.

        The foregoing annual automatic increase shall only apply to a Participant if he has been an Eligible Employee for at least six (6) months prior to the January 1 automatic increase trigger date.

        In no case shall the foregoing annual automatic increase occur before January 1, 2017.

    (2)     **January 1, 2016 Special Rule.** Notwithstanding subsection (1) above, a Participant, other than a Participant whose Employee contributions have been suspended pursuant to Section 6.5(e) as of December 1 2015, who has met the requirements of Section 2.1(b)(1), shall, unless he affirmatively elects between December 1, 2015 and December 31, 2015 to (A) set his total contribution rate of Employee contributions to a rate below four percent (4%), or (B) opt-in to or opt-out of the automatic

21

AA-SCANLAN-0013884

increase feature described in Section 3.1(c)(3), be deemed to have elected, in accordance with the rules established by the Plan Administrator, to automatically increase his rate of Before-Tax Contributions so that the total combined rate of his Employee contributions made to the Plan on his behalf equals four percent (4%) effective as soon as administratively practicable on or after January 1, 2016.

(3)   **Voluntary Automatic Increase.**  A Participant may elect to have his rate of Before-Tax Contributions automatically increased on a periodic basis. A Participant who makes such an election will be not be subject to the provisions of subsections (1) or (2) above during the period he is subject to the provisions of this Section 3.1(c)(3).

The rules governing the election, modification, and cancellation of the automatic increase elections shall be established by the Plan Administrator.

3.2   **Salary Reduction Agreement.**  A Salary Reduction Agreement is subject to the following provisions:

(a)   **In General.**  A Salary Reduction Agreement must be made in accordance with procedures prescribed by the Plan Administrator.

(1)   **Content.**  A Salary Reduction Agreement must designate the contribution rate for the payroll period and provide such other information as the Plan Administrator may require.

(2)   **Effective Period of Salary Reduction Agreement.**  Except as provided in Section 3.1(a)(1)(B), a Salary Reduction Agreement becomes effective as soon as administratively practicable after it is accepted by the Plan Administrator and will remain in effect so long as the Active Participant continues as an Eligible Employee or until he makes a change with respect to such contributions, as provided in Section 3.2(b) or Section 3.2(c). Notwithstanding the preceding sentence, the portion of a Salary Reduction Agreement filed prior to January 1, 2016 that represents an election to make Catch-Up Contributions pursuant to Section 3.1(b) by an Active Participant who is employed by the Company shall expire at 11:59 p.m. Eastern on December 31, 2015. The Plan Administrator, or its delegate, may require a separate Salary Reduction Agreement to apply to an eligible form of Compensation (*e.g.*, bonuses or awards) in a non-discriminatory manner.

(b)   **Changes in Type and Amount of Contributions.**  An Active Participant may change the contribution rate and type of contributions that he directs the Employer to make to the Plan on his behalf at any time, in accordance with procedures prescribed by the Plan Administrator. An Active Participant's election change becomes effective as of the pay period that begins immediately following the date

22

AA-SCANLAN-0013885

on which his election change is accepted by the Plan Administrator, or as soon thereafter as administratively practicable in accordance with administrative procedures. Changes in the investment of contributions are made in accordance with Section 4.4.

(c)     **Suspension of Contributions.** An Active Participant may elect to suspend all contributions described in Section 3.1 at any time, in accordance with procedures prescribed by the Plan Administrator. A suspension of contributions is effective as of the pay period that begins immediately following the date on which the suspension election is accepted by the Plan Administrator, or as soon thereafter as administratively practicable. An Active Participant who suspends his contributions may file a new Salary Reduction Agreement at any time.

3.3     **Employer Contributions.** The following Employer contributions are provided for under the Plan.

(a)     **Non-Elective Employer Contributions.** Non-Elective Employer Contributions shall be made to the Plan for each pay period equal to the relevant percentage set forth below of each Eligible Employee's Compensation paid during such pay period.

| Eligible Employees | Percentage of Compensation |
|---|---|
| Grandfathered Disabled East Pilots | 10% |
| All Other Eligible Employees | 16% |

For this purpose, only Compensation received by an Eligible Employee after he becomes eligible for Non-Elective Employer Contributions in this Plan under Section 2.1 shall be considered. An Eligible Employee shall be eligible for Non-Elective Employer Contributions regardless of whether he has been automatically enrolled in the Plan or has entered into a Salary Reduction Agreement.

(b)     **Qualified Non-Elective Employer Contributions.** Solely to the extent required to meet the test described in Section 3.7 or to correct an operational failure, the Employer may contribute Qualified Non-Elective Employer Contributions to the Plan. Such contributions are allocated to the Accounts of affected Eligible Employees in a manner that satisfies applicable IRS guidance.

3.4     **Rollover Contributions.** In accordance with rules and procedures approved by the Plan Administrator, an Eligible Employee may request that the Plan accept a Rollover Contribution. The Plan Administrator may require that the Eligible Employee submit, or cause the administrator of the eligible plan or other account from which a Rollover Contribution is being made to submit, satisfactory evidence that the Rollover Contribution will not jeopardize the tax qualification of the Plan or the exempt status of the Trust.

3.5     **Qualified Military Service.** Notwithstanding any other provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military

23

AA-SCANLAN-0013886

service shall be provided in accordance with Code section 414(u). For these purposes, during a period of qualified military service, an Eligible Employee will be considered to have received Compensation from the Employer at the same annual rate as the Eligible Employee's average rate of Compensation from the Employer during the 12 months immediately preceding the qualified military service (or, if shorter, the period of employment preceding the qualified military service).

3. 6    **Limit Under Code Section 415.**

(a)    **Application of Code Limits on Contributions.**  The amount of annual additions, defined in Treas. Reg. section 1.415(c)-1(b), allocated to a Participant's Account for any Limitation Year shall not exceed the lesser of (i) the amount stated in Code section 415(c)(1)(A), as adjusted for increases in the cost-of-living under Code section 415(d), or (ii) one hundred percent (100%) of the Participant's Section 415 Compensation for the Limitation Year. If a short Limitation Year is created because of an amendment changing the Limitation Year to a different 12-consecutive month period, maximum annual allocations shall not exceed the otherwise applicable limit multiplied by the following fraction:

$$\frac{\text{Number of months in the short Limitation Year}}{12}$$

The limit described in clause (ii) shall not apply to any contribution for medical benefits after separation from service (within the meaning of Code section 401(h) or section 419A(f)(2)) which is otherwise treated as an annual addition.

In applying this limitation on annual additions, the Plan incorporates the limitation on allocations described in Code section 415, and the regulations thereunder, by reference.

Notwithstanding anything in the Plan to the contrary, if the annual additions made to the Plan on behalf of an Eligible Employee (including Before-Tax Contributions, After-Tax Contributions, Roth 401(k) Contributions, and Non-Elective Employer Contributions) for a Plan Year exceed the limits set forth in this subparagraph (a) for the Plan Year, then the excess annual additions shall be returned to the affected Eligible Employee no later than two and one-half (2½) months after the end of the Plan Year, first from the Eligible Employee's After-Tax Contributions, and then (if necessary) from his Roth 401(k) Contributions, and then (if necessary) from his Before-Tax Contributions.

(b)    **Definition of Section 415 Compensation.**  "Section 415 Compensation" means Compensation as defined in Article I; provided, however, that if an Employee becomes an Eligible Employee after the first day of the Plan Year or ceases to be an Eligible Employee before the end of the Plan Year, then the limit for the

AA-SCANLAN-0013887

Employee for that Plan Year must be determined in accordance with the Treas. Reg. section 1.401(a)(17)-1 or other applicable IRS guidance.

(c) **Plan Aggregation.** In applying the limits of this Section 3.6, the benefits of, and contributions to, all other retirement plans sponsored by the Employer or any affiliate shall be taken into consideration, except for benefits and contributions provided by any multiemployer plan. For purposes of this Section 3.6, "affiliate" means a member of the Employer's controlled group, as defined in Code sections 414(b) and (c), as modified by Code section 415(h). Except as noted in this Section 3.6, all tax-qualified defined contribution plans sponsored by the Employer or any affiliate are treated as a single plan. Benefits payable under any other such plan with respect to a Participant shall be reduced to the extent possible before any reduction will be made to his benefits payable under this Plan, if necessary to observe these limits.

3.7 **Limit Under Code Section 401(k).** If, during a Plan Year, the Plan Administrator projects that the Plan will not meet the Actual Deferral Percentage Test described in subsection (b) below, the Plan Administrator will reduce the amount of Before-Tax Contributions and/or Roth 401(k) Contributions that Highly-Compensated Employees may be credited with during the remainder of the Plan Year, to the extent it deems necessary to meet the test.

(a) **Definitions.** For purposes of this Section 3.7, these terms are defined as follows:

(1) **"Actual Deferral Percentage" and "ADP"** mean, for a specified group of Eligible Employees for a Plan Year, the average of the ratios, calculated separately for each Eligible Employee in such group, of:

(A) The ADP Contribution Percentage Amounts to

(B) The Eligible Employee's Testing Compensation for such Plan Year.

When expressed as a percentage, this ratio for an individual Eligible Employee is the "individual deferral percentage."

(2) **"ADP Contribution Percentage Amounts"** means Before-Tax Contributions and/or Roth 401(k) Contributions actually paid over to the Plan for the Plan Year on behalf of an Active Participant and any Qualified Non-Elective Employer Contributions made to the Plan pursuant to Section 3.3(b) and used in performing the test described in subsection (b) below. Contributions taken into account for purposes of the ADP test must be made before the last day of the twelve-month period immediately following the Plan Year to which the contributions relate. An Eligible Employee who would be an Active Participant but for the failure to make Before-Tax Contributions and/or Roth 401(k) Contributions is treated as

AA-SCANLAN-0013888

an Active Participant on whose behalf zero Before-Tax Contributions and/or Roth 401(k) Contributions are made.

ADP Contribution Percentage Amounts include Before-Tax Contributions and/or Roth 401(k) Contributions of Highly Compensated Employees that are in excess of the maximum elective deferral limit of Section 3.8. They exclude Before-Tax Contributions and/or Roth 401(k) Contributions of Non-Highly Compensated Employees made to this Plan that are in excess of the maximum elective deferral limit of Section 3.8.

For any Plan Year, the ADP Contribution Percentage Amount for any Eligible Employee who is a Highly Compensated Employee eligible to have Before-Tax Contributions and/or Roth 401(k) Contribution (and Qualified Non-Elective Employer Contributions if available under another plan and if treated as elective deferrals for purposes of the test set forth in subsection (b) below) allocated to his accounts under two (2) or more cash or deferred arrangements that are maintained by the Employer, is determined as if such Before-Tax Contributions and/or Roth 401(k) Contributions (and, if applicable, such Qualified Non-Elective Employer Contributions) were made under a single arrangement. If a Highly Compensated Employee participates in two (2) or more cash or deferred arrangements that have different plan years, elective deferral contributions made during the Plan Year under all such plans and arrangements shall be aggregated. Notwithstanding the foregoing, certain plans shall be treated as separate if mandatorily disaggregated under regulations under Code section 401(k).

In the event that this Plan satisfies the requirements of Code section 401(k), 401(a)(4), or 410(b) only if aggregated with one (1) or more other plans, or if one (1) or more other plans satisfy the requirements of such Code sections only if aggregated with this Plan, then ADP Contribution Percentage Amounts are determined as if all such plans were a single plan. Plans may be aggregated in order to satisfy Code section 401(k) only if they have the same plan year and use the same ADP testing method.

(3)   **"Testing Compensation"** means Compensation as defined in Article I for the Limitation Year that ends in the Plan Year being tested.

(4)   **"Excess Contributions"** means, with respect to any Plan Year, the excess of:

(A)   The aggregate ADP Contribution Percentage Amounts actually made on behalf of Highly Compensated Employees for such Plan Year, over

26

AA-SCANLAN-0013889

(B)    The maximum amount of such contributions permitted by the ADP test (determined by hypothetically reducing contributions made on behalf of Highly Compensated Employees in order of the ADPs, beginning with the highest of such percentages).

Such determination is made after first determining excess deferrals under Section 3.8.

(b)    **Actual Deferral Percentage Test.**  In any Plan Year, ADPs for Eligible Employees must satisfy one of the following ADP tests of Code section 401(k)(3):

(1)    The ADP for Eligible Employees who are Highly Compensated Employees must not exceed the current Plan Year's ADP for Eligible Employees who are Non-highly Compensated Employees multiplied by 1.25; or

(2)    The ADP for Eligible Employees who are Highly Compensated Employees must not exceed the current Plan Year's ADP for Eligible Employees who are Non-highly Compensated Employees multiplied by 2.0, and that the ADP for Eligible Employees who are Highly Compensated Employees must not exceed the ADP for Eligible Employees who are Non-highly Compensated Employees by more than two (2) percentage points.

The election to base the ADP of Non-highly Compensated Employees on the current year can only be changed if the Plan meets the requirements for changing to prior year testing set forth in Treas. Reg. section 1.401(k)-2(c) or subsequent IRS guidance.

(c)    **Separate Application of ADP Test to Certain Eligible Employees.**  The Plan Administrator may elect to apply the ADP test described in subsection (b) above separately to each of two (2) groups of Eligible Employees:

(1)    Eligible Employees who have not completed a one (1) year Period of Service, or have not attained age 21; and

(2)    All other Eligible Employees.

If an Eligible Employee is described in both (1) and (2) above for different portions of the Plan Year, the Eligible Employee, together with his Compensation, Before-Tax Contributions, and Roth 401(k) Contributions are taken into account under (1) above as if he were an Eligible Employee solely for pay periods beginning prior to attainment of age 21 and completion of the one (1) year Period of Service, whichever occurs later, and will be taken into account under (2) above as if he were an Eligible Employee solely for pay periods beginning after

27

AA-SCANLAN-0013890

attainment of age 21 and completion of a one (1) year Period of Service, whichever occurs later.

(d) **Correction of Excess Contributions.** If, for any Plan Year, the ADP Contribution Percentage Amounts of Highly Compensated Employees fail to satisfy the ADP test described in subsection (b) above, then by the last day of the following Plan Year the Plan Administrator may (i) recharacterize Before-Tax Contributions and/or Roth 401(k) Contributions as Catch-Up Contributions, to the extent permissible, (ii) distribute any Excess Contributions, plus allocable earnings, no later than the last day of the following Plan Year, or (iii) to the extent Excess Contributions remain after taking the prior steps, make Qualified Non-Elective Employer Contributions to the Plan. Roth 401(k) Contributions shall be distributed before Before-Tax Contributions, unless the Participant elects otherwise in a timely manner, in accordance with procedures adopted by the Plan Administrator. If Excess Contributions are distributed more than six (6) months (two and one-half (2½) months for the 2015 Plan Year) after the last day of the Plan Year in which they arose, a ten percent (10%) excise tax is imposed on the Employer with respect to such amounts.

(1) **Allocation of Excess.** Excess Contributions are allocated to the Highly Compensated Employees with the largest amounts of Before-Tax Contributions and/or Roth 401(k) Contributions taken into account in calculating the ADP test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest amount of such Contributions and continuing in descending order until all the Excess Contributions have been allocated. For purposes of the preceding sentence, the "largest amount" is determined after distribution of any Excess Contributions.

(2) **Income or Loss.** Excess Contributions shall be adjusted for any income or loss, through the end of the Plan Year with respect to which the Excess Contributions are distributed.

3.8 **Limit on Before-Tax and Roth 401(k) Contributions Under Code Section 402(g).**

(a) **Application of the Limit.** In no event may the amount of Before-Tax Contributions and/or Roth 401(k) Contributions made on behalf of a Participant under this Plan for a Plan Year, when added to any other elective deferrals made on behalf of the Participant under other plans or arrangements of the Employer or an Affiliate, exceed the limit in effect under Code section 402(g) for the taxable year of the Participant beginning in the Plan Year, except in accordance with, and subject to the limitations of, Code section 414(v).

(b) **Return of Excess Deferrals.** Notwithstanding any other provision of the Plan, if a Participant has made elective deferrals or Roth 401(k) contributions during a Plan Year in excess of the limit described in subsection (a) above ("Excess Deferrals"), a distribution of some or all of the Excess Deferrals is made in

AA-SCANLAN-0013891

accordance with the following provisions if the Participant makes a proper and timely request for the distribution to the Plan Administrator.

(1) **Participant Request for Distribution.** The Participant's request must:

    (A) Be submitted to the Plan Administrator no later than March 1;

    (B) Specify the amount of the Excess Deferrals for the preceding year, and the portion of the Excess Deferral requested to be distributed; and

    (C) Be accompanied by written proof that, if the amount requested is not distributed, the amount, when added to amounts deferred under this Plan and other plans or arrangements described in Code sections 401(k), 408(k), or 403(b) exceeds the limit imposed by Code section 402(g) for the year in which the deferral occurred.

Roth 401(k) Contributions shall be distributed before Before-Tax Contributions, unless the Participant elects otherwise.

(2) **Plan Administrator Action.** The Plan Administrator may direct the Trustee to refund to the Participant the requested amount (or the amount of the Before-Tax Contributions and/or Roth 401(k) Contributions for the year, if less), together with allocable earnings. The amount to be refunded is calculated taking into account any Excess Contributions previously distributed for the Plan Year beginning with or within the same year, and, if appropriate, the amount to be refunded is reduced by the amount previously distributed.

(3) **Income or Loss.** Excess Deferrals shall be adjusted for any income or loss through the end of the Plan Year with respect to which the Excess Deferrals are distributed.

3.9 **Nonreversion.** No Employer has any right, title or interest in the assets of the Trust Fund, and no part of the Trust Fund may be used for, or diverted to, purposes other than the exclusive benefit of Participants and Beneficiaries and the payment of reasonable expenses of administering the Plan and Trust, except that, to the extent permitted by applicable law:

(a) **Mistake of Fact.** If contributions are made to the Trust Fund by an Employer by a mistake of fact, then such contributions may be returned to the Employer within one (1) year after their payment.

(b) **Contributions Conditioned on Deductibility.** If any contributions are disallowed as a deduction under Code section 404, then to the extent such deduction is disallowed, the contributions may be returned to the Employer within one (1) year after the disallowance.

AA-SCANLAN-0013892

(c)     **Limits on Amount Returned.**

    (1)     **Earnings.**  In the case of a contribution returned to the Employer pursuant to Section 3.9(a) or (b), earnings attributable to the returned contribution may not be returned, but losses attributable thereto must reduce the amount to be returned.

    (2)     **Account Balance Limit.**  In the case of a contribution returned to the Employer pursuant to Section 3.9(a) or (b), no amount may be returned to the Employer to the extent it would cause a Participant's Account to be reduced to less than the Account would have been if the mistaken amount had not been contributed.

(d)     **Plan Termination.**  In the event the Plan terminates at a time when there are unallocated amounts, then, subject to the requirements of ERISA, the amounts so credited are returned to the Employer upon its request.

AA-SCANLAN-0013893

## ARTICLE IV
## PLAN INVESTMENTS AND ACCOUNTING

4.1 **Establishment of Accounts.**  As of the date an Eligible Employee first becomes a Participant, there shall be established by the recordkeeper an Account in his name reflecting separately any contributions invested in each Investment Fund and the earnings and losses attributable to each.  All contributions made under the provisions of the Plan shall be credited to Accounts in the Trust by the Trustee either when received or on the succeeding business day.  The balance of each Account as of any date shall be the balance of the account after all credits and charges thereto, for and as of such date, have been made as provided herein.  The recordkeeper shall adjust the Account of each Participant on each Valuation Date to reflect (i) any withdrawals made from the Participant's Account, (ii) any contributions made on the Participant's behalf, (iii) any payments of principal and interest made on an outstanding loan, and (iv) any transfers among the Investment Funds or any separate loan fund.  Within thirty (30) days after each Adjustment Date, the recordkeeper shall deliver to each Participant a statement showing the balance at fair market value and allocations within his Account as of the Adjustment Date.  Each Account consists of the following sub-accounts:

(a) **Before-Tax Contributions Sub-Account:**  For recording Before-Tax Contributions and Catch-Up Contributions, and related earnings, credited to the Account.

(b) **Roth 401(k) Contributions Sub-Account:**  For recording Roth 401(k) Contributions and Roth Catch-Up Contributions, and related earnings, credited to the Account.

(c) **After-Tax Contributions Sub-Account:**  For recording After-Tax Contributions, and related earnings, credited to the Account.

(d) **Pilot Company Contributions Sub-Account:**  For recording Non-Elective Employer Contributions, and related earnings, credited to the Account.

(e) **Rollover Contributions Sub-Account:**  For recording amounts transferred from another company's qualified plan or an individual retirement account, except for rollovers of Roth amounts described in paragraph (d) of the definition of Rollover Contributions in Article I and after-tax amounts, which, along with related earnings, are credited to a Participant's Roth Rollover Contributions sub-account and After-Tax Rollover Contributions sub-account, respectively.

(f) **Roth Rollover Contributions Sub-Account:**  For recording amounts rolled over pursuant to Section 6.8, as well as Rollover Contributions described in paragraph (d) of the definition of Rollover Contributions in Article I, and related earnings.

31

AA-SCANLAN-0013894

(g) **After-Tax Rollover Contributions Sub-Account:** For recording after-tax amounts transferred from another company's qualified plan or an individual retirement account, and related earnings.

(h) **Qualified Non-Elective Employer Contributions Sub-Account:** For recording Qualified Non-Elective Employer Contributions, and related earnings, credited to the Account.

Gains, losses, credits and charges are separately allocated to each sub-account on a reasonable and consistent basis. The Trustee may establish additional sub-accounts for a Participant, as necessary for Plan administration, including accounts for amounts transferred to the Plan from a Prior Plan.

4.2 **Valuation of Trust Fund and Accounts.** The Trustee must value the Trust Fund as of each Valuation Date.

(a) **Fair Market Value.** The Trustee must value the Trust Fund on the basis of the fair market value of the assets held in the Trust Fund. Fair market value and all methods of adjustments to and allocations among Accounts are based on the terms of the Trust.

(b) **Earnings on Investment Funds.** Gains and losses relating to each Investment Fund are allocated to each Account invested in an Investment Fund in a reasonable and consistent manner and otherwise pursuant to the terms of the Trust.

4.3 **Plan Investments.**

(a) **Investment Fund Elections.** Each Participant's Account is invested in the available Investment Funds in accordance with the Participant's investment election, as provided in Section 4.4(b). Until such Participant shall make an effective election under this Section, such contributions shall be invested in the default Investment Fund(s) in accordance with Section 4.4(e).

(b) **Loans.** In any case where an Eligible Employee has taken a Plan loan in accordance with Section 6.7, the Eligible Employee is deemed to have directed the investment of the outstanding balance of such loan in a loan fund in the Eligible Employee's Account.

4.4 **Participant Directed Investments.**

(a) **Section 404(c) Provisions.** The Plan is intended to constitute a plan described in ERISA section 404(c) and the regulations thereunder. As a result, with respect to elections described in the Plan and any other exercise of control by a Participant or his Beneficiary over assets in the Participant's Account, such Participant or Beneficiary shall be solely responsible for such actions, and neither the Company,

AA-SCANLAN-0013895

the Plan Administrator, any investment manager nor any other person or entity shall be liable for any loss or liability that results from such Participant's or Beneficiary's exercise of control.  In order to satisfy the requirements of ERISA section 404(c):

(1)     The Company shall provide each Participant or Beneficiary the information described in DOL Reg. section 2550.404c-1(b)(2)(i)(B)(1). Upon request by a Participant or Beneficiary, the Company shall provide the information described in DOL Reg. section 2550.404c-1(b)(2)(i)(B)(2).

(2)     The Company may take such other actions or implement such other procedures as it deems necessary or desirable in order that the Plan comply with ERISA section 404(c).

(b)     **Investment Elections.**  Each Participant shall make an investment election pursuant to procedures prescribed by the Plan Administrator directing the manner in which any contributions made to the Plan on his behalf shall be invested.  A Participant's investment election shall specify the percentage, in one percent (1%) increments, of such contributions that shall be allocated to one (1) or more of the Investment Funds selected by the Plan Administrator, with the sum of such percentages equaling one hundred percent (100%).  A Participant may change his investment election at any time pursuant to procedures prescribed by the Plan Administrator.  A Participant's change of investment election may be made effective as soon as reasonably practicable after the Plan Administrator or its designated representative receives the Participant's instructions.

(1)     **Investment of Loan Proceeds.**  Amounts received in repayment of a loan will be invested according to procedures prescribed by the Plan Administrator.

(2)     **Legally Incompetent Participant.**  If a Participant is legally incompetent, the guardian or conservator of his estate has the right to direct the investment of his Account on his behalf pursuant to procedures prescribed by the Plan Administrator.

(3)     **Investment Election Remains in Effect.**  Any Participant investment election filed with the Plan Administrator or its designed representative, as applicable, remains in effect until a new investment election is accepted by the Plan Administrator or its designated representative, as applicable.

(c)     **Investment Funds.**  Subject to rules set forth in Appendix B, the Plan Administrator shall determine the number and type of Investment Funds and select the investments for such Investment Funds.  The Plan Administrator shall communicate the same and any changes therein in writing to the Trustee.  Each Investment Fund shall be held and administered as a separate, trust fund,

33

AA-SCANLAN-0013896

including a common trust fund.  The interest of each Participant or Beneficiary under the Plan in an Investment Fund shall be an undivided interest.

(d)     **Election to Transfer Between Funds.**  Subject to the restrictions pertaining to the Frozen Company Stock Fund set forth in Appendix B, a Participant may elect at any time to transfer investments from any Investment Fund to any other Investment Fund pursuant to procedures prescribed by the Plan Administrator.  Subject to any restrictions pertaining to a particular Investment Fund, a Participant's transfer election may be made effective as soon as reasonably practicable after the Plan Administrator or its designated representative receives the Participant's instructions in accordance with procedures prescribed by the Plan Administrator.

(e)     **Deposit of Contributions.**  All contributions made to the Plan on a Participant's behalf shall be deposited in the Trust and allocated among the Investment Funds in accordance with the Participant's currently effective investment election.  Until such Participant shall make an effective election under this Section, such contributions shall be invested in the default Investment Fund(s) selected by the Plan Administrator.

(f)     **Right to Override Investment Election.**  The Plan Administrator is authorized to establish rules and procedures that impose or implement restrictions or limitations on Participant investment elections and/or directions (such as rules restricting the number of times a Participant may move in and out of an Investment Fund within a particular period or rules implementing redemption fees).  For example, the Plan Administrator or Trustee may decline to implement investment instructions that might (1) result in a prohibited transaction under ERISA section 406 or Code section 4975, (2) generate taxable income to the Trust, (3) violate applicable federal securities laws, or (4) violate the policies or procedures of a registered mutual fund or other investment option under the Plan.

(g)     **Self-Directed Brokerage Account.**  A self-directed brokerage account shall be made available to Participants.  A Participant may invest up to ninety-five percent (95%) of his Account balance through a self-directed brokerage account, subject to such rules and restrictions as the Plan Administrator, or its authorized representative, may establish from time to time on a uniform and nondiscriminatory basis.  Neither the self-directed brokerage account nor any investment selected by a Participant as an investment under the self-directed brokerage account is a "designated investment alternative" for purposes of ERISA section 404(c) and DOL Reg. sections 2550.404a-5 and 2550.404c-1.  To the extent that a Participant directs the investment of any portion of his or her Account in an investment available under a self-directed brokerage account, the Participant is the named fiduciary of the Plan (within the meaning of ERISA sections 402 and 403(a)(1)) with respect to selecting and monitoring the investments, directing the Plan Administrator, or its authorized representative, with respect to such investments, and exercising voting or other rights with respect to such investments.

34

AA-SCANLAN-0013897

(h)     **Managed Accounts.** A managed account program shall be made available to participants. In accordance with procedures prescribed by the Plan Administrator, Participants may elect to take advantage of services provided by an investment adviser independent of the Company and its affiliates who may provide advice to Participants as to the investment of their Accounts or who may exercise investment discretion over the investment of the Account as directed by the Participant.

35

AA-SCANLAN-0013898

# ARTICLE V
# VESTING

5.1 **Vesting of Employee Contribution Accounts.** A Participant is always fully vested in his Before-Tax Contributions (including Catch-Up Contributions), Roth 401(k) Contributions (including Roth Catch-Up Contributions), After-Tax Contributions, Rollover Contributions, and Roth Rollover Contributions sub-accounts.

5.2 **Vesting of Employer Contribution Accounts.** A Participant is always fully vested in his Pilot Company Contributions and Qualified Non-Elective Employer Contributions sub-accounts.

5.3 **Change in Vesting Schedule.** If the Plan's vesting schedule is amended or the Plan is amended in any way that directly or indirectly affects the computation of a Participant's vesting percentage, each Participant who has at least three (3) years of service (without regard to any service disregarded pursuant to Code section 411(a)(4)) may elect to have his vesting percentage determined under the pre-amendment vesting program. Such an election must be made within sixty (60) days after the latest of (1) the amendment adoption date, (2) the amendment effective date, or (3) the date the Participant is given written notice of the amendment by the Employer. No amendment to the Plan may have the effect of decreasing a Participant's vesting percentage determined without regard to such amendment as of the later of the date the amendment is adopted or the date such amendment becomes effective. In the event that a Participant who is eligible to make an election under this Section fails to make such an election, the Participant shall be deemed to have made such an election to have his vesting percentage determined under the pre-amendment vesting schedule if his vested interest under the pre-amendment vesting schedule would be greater than under the post-amendment vesting schedule immediately after the effective date of such amendment. Notwithstanding any provision to the contrary, in no event shall a change in the vesting schedule result in a cutback in violation of Treas. Reg. section 1.411(d)-3(a)(3).

5.4 **Vesting Schedules Applicable to Transferred Accounts.** If an alternate vesting schedule is applicable to the employer contribution portion of any account that is transferred to the Plan from a plan maintained by the Company or an Affiliate, then such vesting schedule, and the rules related thereto, shall be set forth in an appendix to this Plan.

36

AA-SCANLAN-0013899

## ARTICLE VI
## IN-SERVICE WITHDRAWALS AND LOANS

6.1 **In-Service Withdrawals in Accordance With Procedures Adopted by the Plan Administrator.** A request for an in-service withdrawal must be made in accordance with this Article VI and rules and procedures prescribed by the Plan Administrator. An in-service distribution shall be paid in the form of a lump sum.

6.2 **In-Service Withdrawals Upon Attaining Age 59½.** An Employee may withdraw all or any portion of his vested Account after attaining age 59½. Spousal consent is required in order to withdraw any amount that is subject to the provisions of Appendix E.

6.3 **In-Service Withdrawal of After-Tax and Rollover Contributions.** An Employee may withdraw all or any portion of amounts credited to his After-Tax Contributions sub-account, his Rollover Contributions sub-account, his After-Tax Rollover Contributions sub-account and the portion of his Roth Rollover Contributions sub-account attributed to amounts rolled over from another qualified plan or a traditional IRA, at any time.

6.4 **In-Service Withdrawal for Disabled Participants.** An Active Participant who becomes a Disabled Participant may withdraw all or any portion of his vested Account at any time after becoming a Disabled Participant. Spousal consent is required in order to withdraw any amount that is subject to the provisions of Appendix E.

6.5 **In-Service Withdrawal For Hardship.**

    (a) **General Rule.** Subject to the provisions of this Section 6.5 and Section B.4 of Appendix B, an Employee, upon written application, may request a hardship withdrawal from his Before-Tax Contributions, Catch-Up Contributions, Roth 401(k) Contributions, and Roth Catch-Up Contributions (excluding earnings) on account of a hardship if:

        (1) The Employee has an immediate and heavy financial need; and

        (2) The withdrawal is necessary to satisfy the immediate and heavy financial need.

    (b) **Approval of Hardship Withdrawal.** The Plan Administrator or its delegate must approve each hardship withdrawal request.

    (c) **Immediate and Heavy Financial Need.** Under Section 6.5(a)(1), a withdrawal is treated as on account of an immediate and heavy financial need of the Employee if the withdrawal is on account of:

        (1) Deductible medical expenses described in Code section 213(d), determined without regard to whether the expenses exceed seven and one-

37

AA-SCANLAN-0013900

half percent (7.5%) of adjusted gross income, incurred by the Employee, or by the Employee's Spouse, dependents, or primary Beneficiary;

(2)    The purchase (excluding mortgage payments) of a principal residence of the Employee;

(3)    Payment of tuition, related educational fees, and/or room and board for up to the next 12 months of post-secondary education for the Employee, or the Employee's Spouse, children, dependents (as defined in Code section 152, determined without regard to Code sections 152(b)(1), (b)(2), and (d)(1)(B)), or primary Beneficiary;

(4)    The need to prevent the eviction of the Employee from his principal residence or foreclosure on the mortgage of the Employee's principal residence;

(5)    Payment for burial or funeral expenses for the Employee's deceased parent, Spouse, children or dependents (as defined in Code section 152, determined without regard to Code section 152(d)(1)(B)), or primary Beneficiary;

(6)    Expenses for the repair of damage to the Employee's principal residence that would qualify for the casualty deduction under Code section 165, determined without regard to whether the loss exceeds ten percent (10%) of adjusted gross income; and

(7)    Any other financial need considered immediate and heavy under applicable IRS guidance.

(d)    **Necessary to Satisfy Financial Need.** Under Section 6.5(a)(2), a distribution is treated as necessary to satisfy an immediate and heavy financial need of an Employee only if:

(1)    The distribution is not in excess of the amount of the immediate and heavy financial need of the Employee, including amounts necessary to pay any federal, state, or local income taxes or penalties reasonably anticipated to result from the distribution; and

(2)    The Employee has obtained all distributions, other than hardship distributions, and all nontaxable loans currently available under all plans of the Employer.

(e)    **Suspension and Limitation of Employee Contributions.** An Employee's employee contributions described in Section 3.1 of this Plan and all other plans, except Code section 125 plans, maintained by the Employer, must be suspended for six (6) months after receipt of the hardship distribution.

AA-SCANLAN-0013901

(f) **Resumption of Employee Contributions.** At the expiration of the suspension period described in Section 6.5(e),

    (1) The rate of employee contributions described in Plan Section 3.1 in the Plan's records immediately prior to the beginning of the suspension period, if any, will automatically resume, provided the Employee is an Eligible Employee at the expiration of the suspension period; and

    (2) The Employee must affirmatively elect to resume participation in the annual automatic increase programs described in Section 3.1(c) after the expiration of the suspension period, provided the Employee is an Eligible Employee as the time such affirmative election is made.

6.6 **Direct Rollover of In-Service Withdrawal.** An Employee may roll over an in-service withdrawal, other than a withdrawal pursuant to Section 6.5 or 6.7, into another tax-qualified plan or individual retirement account in accordance with the provisions of Section 7.6.

6.7 **Plan Loans.**

(a) **General Rules.** An Employee may take a loan from his Account in accordance with the terms of loan procedures adopted by the Plan Administrator and incorporated into this Plan by reference. Notwithstanding the foregoing, although amounts in a Participant's Account or sub-account that are subject to the qualified joint and survivor annuity rules in Appendix E are not eligible for loans, such amounts are taken into consideration when determining the amount available for taking a loan. A loan is allocated to the Account of the Employee to whom the loan is made and repayment of principal and interest on the loan is allocated to the subaccounts within the Employee's Account in the proportion in which the funds were borrowed. Loan repayments will be suspended under this Plan (a) for up to twelve (12) months during an authorized non-military leave of absence, and (b) as permitted under Code section 414(u)(4) for a military leave of absence.

(b) **Loan Terms and Conditions.** The Plan Administrator shall prescribe the terms and conditions of any Plan loan, but in any event the following shall apply:

    (1) The minimum loan amount available under the Plan shall be no less than $1,000.

    (2) The interest rate on any loan to a Participant shall be a reasonable interest rate commensurate with current interest rates charged for loans made under similar circumstances by banking or financial institutions.

    (3) A Participant shall not have more than two (2) loans outstanding at any given point in time.

AA-SCANLAN-0013902

(4) The term of any loan shall be no greater than five (5) years, except in the case of a loan used to acquire any dwelling unit which within a reasonable time is to be used (determined at the time the loan is made) as a principal residence of the Participant.

(5) The amount of any loan to a Participant (when added to the outstanding balance of all other loans to such Participant from the Plan or any other plan maintained by the Company or a Related Company) shall not exceed the lesser of:

(A) $50,000, reduced by the excess of (i) the highest outstanding balance of any other loan to the Participant from the Plan or any other plan maintained by the Company or an Affiliate during the preceding 12-month period, over (ii) the outstanding balance of loans to the Participant from the Plan or any other plan maintained by the Company or an Affiliate on the date on which such loan was made; or

(B) Fifty percent (50%) of the Participant's vested interest in his Account and his vested interest in all other plans maintained by the Company or an Affiliate.

(6) Except as otherwise permitted under Treasury regulations, substantially level amortization shall be required over the term of the loan with payments made not less frequently than quarterly.

(7) Each loan shall be secured by one-half of the borrowing Participant's entire interest under the Plan, in addition to any other security required by the Plan Administrator. A Participant who is married and has amounts credited to his Account that are subject to the annuity distribution requirements of Code sections 401(a)(11) and 417 must obtain the written consent of his Spouse to pledge such amounts as security for the loan, and, to the extent necessary, if consent of the Spouse is not obtained, no loan will be made to such Participant. The consent of the Spouse must be witnessed by a notary public.

(8) Loans shall not be made available to Highly Compensated Employees in an amount greater than the amount available to other Eligible Employees.

6.8 **In-Plan Rollover to Roth Rollover Contributions Sub-Account.** A Distributee, as defined in Section 7.6(b), may elect to transfer an Eligible Rollover Distribution (excluding outstanding loan balances, Roth 401(k) Contributions, Roth Catch-Up Contributions, and gains and losses thereto) as defined in Section 7.6(b), directly or indirectly to a Roth Rollover Contributions sub-account, in accordance with procedures adopted by the Plan Administrator and Code section 402A(c)(4) and Internal Revenue Service guidance thereunder. In addition, a Distributee may elect to transfer all or a portion of his vested Envoy Matching Contributions, vested Company Matching

40

AA-SCANLAN-0013903

Contributions, Non-Elective Employer Contributions, Before-Tax Contributions, or Catch-Up Contributions to his Roth Rollover Contributions sub-account. Amounts transferred to the Roth Rollover Contributions sub-account pursuant to this Section 6.8 shall be invested in the same Investment Funds in which they were invested prior to the transfer, subject to the Participant's subsequent investment election, and shall be subject to the same distribution rules that applied prior to the transfer. The Plan will maintain such records as are necessary for the proper reporting of such transferred amount.

6.9 **Qualified Military Service Distribution.** In accordance with the Heroes Earnings Assistance and Relief Tax Act of 2008 (the "HEART Act"), in the event that a Participant engages in qualified military service as defined in Code section 414(u), the Participant shall be treated as having severed from employment with the Employer during any period of qualified military service and shall be permitted to receive a distribution from his Account during such period of qualified military service, provided that the Participant may not make contributions to the Plan pursuant to Section 3.1 during the 6-month period beginning on the date of the distribution.

41

AA-SCANLAN-0013904

**ARTICLE VII**
**DISTRIBUTIONS UPON TERMINATION FROM EMPLOYMENT**

7.1 **Distributions Upon Termination From Employment.** Upon a Participant's bona fide Termination From Employment, he becomes eligible to elect a distribution of his vested Account in accordance with this Article VII. However, if a Participant incurs a bona fide Termination From Employment but dies before the date that a distribution is deposited in the mail or otherwise transmitted to him, his vested Account will be paid to his Beneficiary in accordance with Article VIII.

7.2 **Participant Elected Benefit Payments.** As soon as administratively practicable after a Participant's bona fide Termination From Employment, unless the provisions of Sections 7.3, 7.4 or 7.5 apply, he may elect to receive a distribution of his vested Account in accordance with the following provisions:

(a) **Commencement Date.** No distribution may be made without Participant consent prior to his Required Beginning Date. In addition, and to the extent not otherwise required by law, no distribution of benefits from the Plan will commence earlier than thirty (30) days after a Participant incurs a bona fide Termination From Employment.

(b) **Forms of Payment for Amounts Other Than Annuity Protected Contributions.**

(1) **Full Lump Sum.** A Participant who incurs a Termination From Employment may elect a full distribution of his Account in the form of a full lump sum.

(2) **Partial Lump Sum.** A Participant who incurs a Termination From Employment may elect a partial distribution of his Account in the form of a partial lump sum.

(3) **Installments.** A Participant who incurs a Termination From Employment may elect to receive periodic distributions from his Account made in regular intervals, subject to certain limitations as prescribed by the Plan Administrator.

Except as provided in Section B.5 of Appendix B, distributions shall be made in cash.

(c) **Form of Payment for Annuity Protected Contributions.** Any portion of a Participant's Account that is subject to the annuity distribution requirements of Code sections 401(a)(11) and 417 shall be distributed in accordance with the terms and conditions set forth in Appendix E.

(d) **Valuation Date.** The value of the Participant's Account to be distributed is determined, to extent possible, as of the effective date of the distribution.

42

AA-SCANLAN-0013905

7.3   **Small Benefits.** Notwithstanding Section 7.2, if the value of a Participant's vested Account (including Rollover Contributions) as of any Valuation Date following his Termination From Employment is less than or equal to $5,000, the vested Account may be distributed without the Participant's consent. In the event of a distribution pursuant to the preceding sentence of an amount greater than $1,000, if the Participant does not elect to have such distribution paid directly to an Eligible Retirement Plan specified by the Participant, pursuant to Section 7.6, or to receive the distribution directly, pursuant to Section 7.2, then the Plan shall pay the distribution in a direct rollover to an individual retirement plan designated by the Plan Administrator.

7.4   **Minimum Required Distributions Under Code Section 401(a)(9).** The provisions of this article shall apply for purposes of determining required minimum distributions from the Plan, and shall supersede any inconsistent provisions of the Plan.

(a)   **Definitions.** For purposes of this Article, the following terms have the following meanings.

(1)   **"Designated Beneficiary"** means the individual who is designated as the Beneficiary pursuant to the terms of the Plan and is the Designated Beneficiary under Code section 401(a)(9) and Treas. Reg. section 1.401(a)(9)-4, Q&A-4.

(2)   **"Distribution Calendar Year"** means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year that contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under subsection (b)(2), below. The required minimum distribution for the Participant's first Distribution Calendar Year shall be made on or before the Participant's Required Beginning Date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's required beginning date occurs, shall be made on or before December 31 of that Distribution Calendar Year.

(3)   **"Life Expectancy"** of a Participant or the Participant's Designated Beneficiary means the life expectancy as computed by use of the Single Life Table in Treas. Reg. section 1.401(a)(9)-9.

(4)   **"Account Balance"** means the account balance of the Participant's Account as of the last valuation date in the calendar year immediately preceding the Distribution Calendar Year (valuation calendar year) increased by the amount of any contributions made and allocated to the Account Balance as of the dates in the valuation calendar year after the

43

AA-SCANLAN-0013906

valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The Account Balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the Distribution Calendar Year if distributed or transferred in the valuation calendar year.

(5)     **"Required Beginning Date"** means April 1 of the calendar year following the later of (a) the calendar year in which the Participant attains age 70½, or (b) the calendar year in which the Participant Terminates From Employment. However, clause (b) does not apply in the case of a Participant who is a 5-Percent Owner.

(b)     **Time and Manner of Distribution.**

(1)     **Required Beginning Date.** To the extent a Participant's entire interest has not been forfeited pursuant to Section 9.5 prior to the Participant's Required Beginning Date, such interest shall be distributed, or begin to be distributed, to the Participant no later than the Participant's Required Beginning Date.

(2)     **Death of Participant Before Distributions Begin.** If the Participant dies before distributions begin, the Participant's entire interest shall be distributed, or begin to be distributed, no later than as follows:

(A)     If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, then distributions to the surviving Spouse shall begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70 ½, if later.

(B)     If the Participant's surviving Spouse is not the Participant's sole Designated Beneficiary, then distributions to the Designated Beneficiary shall begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(C)     If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest shall be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(D)     If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary and the surviving Spouse dies after the Participant but before distributions to the surviving Spouse begin,

44

AA-SCANLAN-0013907

this subsection (b)(2), other than subsection (b)(2)(A), shall apply as if the surviving Spouse were the Participant.

For purposes of this subsection (b)(2) and subsection (d), unless subsection (b)(2)(D) applies, distributions are considered to begin on the Participant's Required Beginning Date. If subsection (b)(2)(D) applies, distributions are considered to begin on the date distributions are required to begin to the surviving Spouse under subsection (b)(2)(A). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving Spouse before the date distributions are required to begin to the surviving Spouse under subsection (b)(2)(A)), the date distributions are considered to begin is the date distributions actually commence.

(3)     **Forms of Distribution.** Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first Distribution Calendar Year distributions shall be made in accordance with subsections (c) and (d), below. If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder shall be made in accordance with the requirements of Code section 401(a)(9) and the Treasury Regulations thereunder.

Distributions required to commence under this Section shall be determined and made in accordance with Code section 401(a)(9) and the Treasury Regulations issued thereunder.

(c)     **Required Minimum Distributions During Participant's Lifetime.**

(1)     **Amount of Required Minimum Distribution for Each Distribution Calendar Year.** During the Participant's lifetime, the minimum amount that shall be distributed for each Distribution Calendar Year is the lesser of:

(A)     The quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in Treas. Reg. section 1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

(B)     If the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's Spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in Treas. Reg. section

45

AA-SCANLAN-0013908

1.401(a)(9)-9, using the Participant's and Spouse's attained age as of the Participant's and Spouse's birthdays in the Distribution Calendar Year.

(2) **Lifetime Required Minimum Distributions Continue Through Year of Participant's Death.** Required minimum distributions shall be determined under this subsection (c) beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

(d) **Required Minimum Distributions After Participant's Death.**

(1) **Death On or After Distributions Begin.**

(A) **Participant Survived by Designated Beneficiary.** If the Participant dies on or after the date distributions begin (and before his entire interest in the Plan has been distributed) and there is a Designated Beneficiary, the minimum amount that shall be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as follows:

(i) The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

(ii) If the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the surviving Spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the surviving Spouse's age as of the Spouse's birthday in that year. For Distribution Calendar Years after the year of the surviving Spouse's death, the remaining Life Expectancy of the surviving Spouse is calculated using the age of the surviving Spouse as of the Spouse's birthday in the calendar year of the Spouse's death, reduced by one (1) for each subsequent calendar year.

(iii) If the Participant's surviving Spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the Designated Beneficiary in the year following the year

46

AA-SCANLAN-0013909

of the Participant's death, reduced by one (1) for each subsequent year.

> (B) **No Designated Beneficiary.** If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that shall be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

> (2) **Death Before Date Distributions Begin.**

>> (A) **Participant Survived by Designated Beneficiary.** If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that shall be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in subsection (d)(1).

>> (B) **No Designated Beneficiary.** If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest shall be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

>> (C) **Death of Surviving Spouse Before Distributions to Surviving Spouse are Required to Begin.** If the Participant dies before the date distributions begin, the Participant's surviving Spouse is the Participant's sole Designated Beneficiary, and the surviving Spouse dies before distributions are required to begin to the surviving Spouse under subsection (b)(2)(A), this subsection (d)(2) shall apply as if the surviving Spouse were the Participant.

7.5 **Required Commencement Under Code Section 401(a)(14).** If a Participant does not timely elect a different commencement date, and if the Participant's vested Account is not paid sooner under another benefit payment provision, his Account must commence to be paid on or before the sixtieth (60th) day following the close of the Plan Year in which occurs the latest of the following dates: (1) the date the Participant attains his Normal Retirement Date; (2) the tenth (10th)anniversary of the Participant's first participation in the Plan; and (3) the Participant's Termination From Employment. For purposes of this

AA-SCANLAN-0013910

provision, if a Participant does not file a benefit election form, he will be deemed to have elected to defer the payment of his benefit.

7.6   **Rollover to Another Plan or IRA.**

(a)   **General Rule.** A Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have all or any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover. The Plan Administrator is not responsible for assuring that the Distributee is eligible to make a Direct Rollover under this Section. For purposes of this Section, the following definitions apply:

(b)   **Definitions.**

(1)   **"Eligible Rollover Distribution"** means a distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: (1) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's Beneficiary, or for a specified period of ten (10) years or more; (2) any distribution to the extent such distribution is required under Code section 401(a)(9); and (3) a hardship distribution.

A portion of a distribution shall not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax employee contributions which are not includible in gross income. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code section 408(a) or (b), or to a qualified plan described in Code section 401(a) or 403(a), or (ii) directly to an annuity contract described in Code section 403(b), and such plan or contract agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(2)   **"Eligible Retirement Plan"** means an individual retirement account described in Code section 408(a), an individual retirement annuity described in Code section 408(b), an annuity plan described in Code section 403(a), an annuity contract described in Code section 403(b), a Roth IRA described in Code section 408A (subject to the limitations set forth therein), and an eligible plan under Code section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from

48

AA-SCANLAN-0013911

this Plan, or a qualified trust described in Code section 401(a) that accepts the Distributee's Eligible Rollover Distribution.

(3)    **"Distributee"** means a Participant, the Participant's Spouse or surviving Spouse, the Participant's Spouse or former Spouse who is the Alternate Payee, and a non-Spouse Beneficiary (subject to the rules set forth in subsection (c) below).

(4)    **"Direct Rollover"** means a payment by the Plan directly to the Eligible Retirement Plan specified by the Distributee.

(c)    **Special Rule for Non-Spousal Beneficiaries.**  A Participant's non-Spouse Beneficiary is a Distributee and may elect to transfer an Eligible Rollover Distribution via a Direct Rollover to an IRA described in Code section 408(a) or (b) that will be treated as an inherited IRA within the meaning of Code section 408(d)(3)(C).  A trust can be a designated Beneficiary if it meets the requirements of Code section 401(a)(9)(E).

49

AA-SCANLAN-0013912

## ARTICLE VIII
## BENEFICIARIES AND QDROs

8.1    **Designation of Beneficiary.** Each Participant may designate one (1) or more Beneficiaries to receive the Participant's vested Account in the event of the Participant's death.

(a)    **No Designation.** If the Participant dies without having filed a Beneficiary designation, the Trustee will distribute the Participant's Account to the Participant's surviving Spouse or, if none, to the surviving children in equal proportions or, if none, to the Participant's estate.

(b)    **Spouse of a Married Participant.** If a Participant has a Spouse, it is the duty of the Participant to notify the Plan Administrator.

(1)    **Spousal Consent Requirements.** The Spouse must be the sole Beneficiary of a married Participant unless the Spouse has (A) consented in writing to a different non-Spouse Beneficiary (including any class of Beneficiaries or contingent Beneficiaries) that may not be modified without subsequent spousal consent (unless such modification results in the Spouse becoming the sole primary Beneficiary) and (B) acknowledged the effect of such election. The consent and acknowledgement must be witnessed by a notary public. The consent of a Spouse to a non-Spouse Beneficiary is applicable only to that Spouse.

(2)    **Consent of Spouse Unnecessary.** The consent of the Spouse is not necessary if it is established to the satisfaction of the Plan Administrator that there is no Spouse, the Spouse cannot reasonably be located, or for such other reasons as Treasury Regulations may prescribe. If the Spouse of a Participant later becomes locatable, it is the duty of the Participant to bring that fact to the attention of the Plan Administrator. Upon being notified of the existence of a Spouse and subject to the rules in Section 9.2, the Plan Administrator will provide the Spouse with the consent procedures described in this Section.

(c)    **Deemed Revocation of Spousal Beneficiary Designation Upon Divorce.** Upon a Participant's divorce, a Participant's Beneficiary designation is deemed invalid to the extent it designates a Participant's former Spouse as the Beneficiary. This provision does not prohibit a Participant from filing a new Beneficiary designation after his divorce that designates the former Spouse as Beneficiary. Notwithstanding the foregoing, a former Spouse designated as a Beneficiary will be treated as a Beneficiary to the extent provided for in an order described in Section 8.5.

AA-SCANLAN-0013913