# United States Court of Appeals

*for the*

# Third Circuit

Case No. 22-3294

JAMES P. SCANLAN; CARLA RINER,

*Plaintiffs-Appellants,*

– v. –

AMERICAN AIRLINES GROUP INC.; AMERICAN AIRLINES, INC.,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## BRIEF FOR DEFENDANTS-APPELLEES

M. TRISTAN MORALES
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
tmorales@omm.com

L. NICOLE ALLAN
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, CA 94111
(415) 984-8700
nallan@omm.com

ANTON METLITSKY
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
mrobertson@omm.com

JASON ZARROW
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(202) 383-5112
jzarrow@omm.com

*Attorneys for Defendants-Appellees
American Airlines Group Inc. and American Airlines, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

American Airlines, Inc., is a wholly owned subsidiary of American Airlines Group Inc., a publicly held corporation (NASDAQ: AAL).  The Vanguard Group, Inc., owns at least 10 percent of the stock of American Airlines Group Inc.

Dated:  June 20, 2023

/s/ *Anton Metlitsky*
Anton Metlitsky

## TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT..................................i

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION.......................................................4

STATEMENT OF THE ISSUES.............................................................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ............5

STATEMENT OF THE CASE...............................................................5

    A.    Statutory Background And History......................................5

    B.    Factual Background...............................................................9

          1.    Service-member pilots take months of military leave per
              year, but rarely take jury-duty or bereavement leave ..............10

          2.    The military grants service-member pilots significant
              control over when to schedule service....................................12

          3.    American's scheduling flexibility allows many pilots to
              pursue parallel careers............................................................12

    C.    Procedural Background .......................................................13

SUMMARY OF THE ARGUMENT ......................................................16

STANDARDS OF REVIEW ..................................................................19

ARGUMENT ..........................................................................................20

I.    THE DISTRICT COURT CORRECTLY HELD THAT MILITARY
    LEAVE IS NOT COMPARABLE TO JURY-DUTY OR
    BEREAVEMENT LEAVE FOR PILOTS AT AMERICAN .....................20

    A.    The Duration Of Military Leave Is Not Comparable To The
        Duration Of Jury-Duty And Bereavement Leave ...............................20

          1.    The district court correctly evaluated the cumulative
              duration of military leave........................................................21

          2.    The average duration of the "short-term military leave" is
              not the correct measure of duration .........................................33

          3.    Plaintiffs cannot argue that the Court should consider the
              duration of each individual instance of military leave.............39

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.  Pilots' Control Over When They Take Military Leave Is Not Comparable To Their Control Over When They Take Jury-Duty Or Bereavement Leave ............................................................... 42

C.  The Purpose Of Military Leave Is Not Comparable To The Purpose Of Jury-Duty Or Bereavement Leave ................................. 48

II.  PLAINTIFFS' BREACH-OF-CONTRACT CLAIM FAILS ..................... 50

A.  The Plain Text Of The Profit Sharing Plan Unambiguously Forecloses Plaintiffs' Claim ............................................... 50

B.  The District Court Correctly Deferred To AAG's Longstanding Interpretation Of The Profit Sharing Plan .......................... 52

CONCLUSION ...................................................................... 56

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brisbin v. Superior Valve Co.*,
  398 F.3d 279 (3d Cir. 2005) ..................................................51

*CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*,
  734 S.W.2d 653 (Tex. 1987) ..................................................52

*Clarkson v. Alaska Airlines, Inc.*,
  59 F.4th 424 (9th Cir. 2023) ............................................. passim

*Doe v. Brown Univ.*,
  43 F.4th 195 (1st Cir. 2022) ..................................................35

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ..................................................35

*Gibson v. STP Nuclear Operating Co.*,
  2012 WL 761930 (Tex. App. Mar. 8, 2012) .............................. 20, 52

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021) ..................................................26

*Hampshire v. Bard*,
  793 F. App'x 75 (3d Cir. 2019) ..................................................19

*Huntsman v. Sw. Airlines Co.*,
  2021 WL 391300 (N.D. Cal. Feb. 3, 2021) .............................35

*In re Processed Egg Prods. Antitrust Litig.*,
  962 F.3d 719 (3d Cir. 2020) ..................................................39

*Jimenez-Rodriguez v. Garland*,
  996 F.3d 190 (4th Cir. 2021) ..................................................26

*Kern v. Sitel Corp.*,
  517 F.3d 306 (5th Cir. 2008) ..................................................52

*Lapid-Laurel, LLC v. Zoning Bd. of Adjustment*,
   284 F.3d 442 (3d Cir. 2002) ...................................................................19

*Macy v. Waste Mgmt., Inc.*,
   294 S.W.3d 638 (Tex. App. 2009) .....................................................52

*Marx v. Gen. Rev. Corp.*,
   568 U.S. 371 (2013) ...........................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...........................................................................47

*Mauldin v. Worldcom, Inc.*,
   263 F.3d 1205 (10th Cir. 2001) ...........................................................54

*Monroe v. Standard Oil Co.*,
   452 U.S. 549 (1981) ...........................................................................32

*Moore v. City of Philadelphia*,
   461 F.3d 331 (3d Cir. 2006) ......................................................... 27, 30

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ...........................................................................41

*Ohio v. U.S. Dep't of the Interior*,
   880 F.2d 432 (D.C. Cir. 1989) ...........................................................26

*Rogers v. City of San Antonio*,
   392 F.3d 758 (5th Cir. 2004) ..............................................................30

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
   303 U.S. 283 (1938) ...........................................................................38

*Travers v. Fed. Express Corp.*,
   8 F.4th 198 (3d Cir. 2021) ........................................................... passim

*Travers v. FedEx Corp.*,
   473 F. Supp. 3d 421 (E.D. Pa. 2020) .................................................35

*Tully v. Dep't of Justice*,
   481 F.3d 1367 (Fed. Cir. 2007) .........................................................29

v

*United States v. Stokley*,
   881 F.2d 114 (4th Cir. 1989) ...............................................................26

*Waltermyer v. Aluminum Co. of Am.*,
   804 F.2d 821 (3d Cir. 1986) ...................................................... passim

*WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty Advisors, Inc.*,
   844 F.3d 473 (5th Cir. 2016) ..............................................................20

*White v. United Airlines, Inc.*,
   987 F.3d 616 (7th Cir. 2021) ...................................................... 26, 43

**Statutes**

26 U.S.C. § 414(u) ...............................................................................51

38 U.S.C. § 4301(a)(3) ...........................................................................5

38 U.S.C. § 4312(h) ..............................................................................25

38 U.S.C. § 4316(b) ................................................................................5

38 U.S.C. § 4316(b)(1)(A) ....................................................................34

38 U.S.C. § 4316(d) ................................................................................1

**Regulations**

20 C.F.R. § 1002.104 ............................................................................25

20 C.F.R. § 1002.150(b) .............................................................. passim

**Other Authorities**

2 Fletcher Cyclopedia of the Law of Corporations (Sept. 2022)............54

Merriam-Webster, Collegiate Dictionary
   (Frederick C. Mish et al., 11th ed. 2003) ...........................................24

S. Rep. No. 90-1477 (1968) ..................................................................32

**INTRODUCTION**

Over the class period in this case, pilots at Defendant American Airlines, Inc. ("American"), took an average of 106 days of military leave per year. Under the collective bargaining agreement ("CBA") negotiated with the pilots' union, American does not pay pilots when they are away and working for the military. Instead, the military pays for military service, and pilots can use their vacation days for additional pay as Congress provided in 38 U.S.C. § 4316(d) of the Uniformed Services Employment and Reemployment Rights Act ("USERRA").

Plaintiffs nonetheless claim that American discriminates against military service in violation of USERRA because it does not provide paid military leave, although American pays for jury-duty and bereavement leave as required by the CBA. According to Plaintiffs, American's failure to provide paid military leave violates Section 4316(b), which prohibits employers from discriminating against military leave with respect to non-seniority benefits.

The problem for Plaintiffs is that this anti-discrimination provision is triggered only when an employer fails to provide a benefit during military leave that it provides during *comparable* non-military leaves. To discriminate, an employer must treat like leaves differently; treating different leaves differently is not discrimination, so it does not violate Section 4316(b). And for American pilots, jury-duty and bereavement leave are very different than military leave.

1

For one thing, American pilots hardly ever take the former types of leave. On average, American pilots took only two days of jury-duty and three days of bereavement leave *every few years*—compared to 106 days of military leave *each year*. For example, the two class representatives—over the course of their combined 46 years at American—never took a single day of either jury-duty or bereavement leave, but one took 726 days and the other 1,212 days of military leave. And while American pilots have little to no control in choosing the dates they are absent for jury duty or a funeral, the record demonstrates that, unlike some other service members, pilots have unique and significant control over when they perform military service. It is not discrimination against military service for American to pay its pilots for unpredictable, infrequent, and inflexible jury-duty and bereavement leaves but not predictable, recurrent, and flexible military leaves that add up to many months annually.

Plaintiffs' reliance on this Court's decision in *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3d Cir. 1986), is misplaced. Contrary to Plaintiffs' argument, *Waltermyer* did not hold that military leave is automatically comparable to jury-duty or bereavement leave. Like the district court here, *Waltermyer* held that a court cannot compare leaves in a vacuum—a court must evaluate the *reason* for the employer policy applicable during non-military leave and assess whether that reason applies equally to military leave. In *Waltermyer*, there was no reason

for the employer to exempt employees on jury-duty and bereavement leave from the requirement that they work during a holiday week to be eligible for holiday pay but not exempt employees on military leave from that same requirement.  Here, by contrast, there is an obvious reason for the difference in treatment:  providing more than 100 days of paid military leave every year is dramatically different than providing a handful of days of paid jury-duty or bereavement leave once a decade, if ever—especially when pilots have little control over the timing of jury duty or bereavement but substantial control over their military schedules.  *Waltermyer* thus supports American.

 *Waltermyer* also shows why the Court should reject Plaintiffs' argument that the district court was required to ignore how frequently pilots (unlike many other service members) take military leave—and therefore, how many cumulative days of military leave pilots take—when evaluating comparability.  Plaintiffs' theory is that a pilot should be paid by American (and also the military) for every two-day military leave he takes—even if those leaves add up to 100 days each year—just because each one of those leaves, when viewed in isolation, might be comparable to a two-day jury-duty or bereavement leave.

 Like the Ninth Circuit's decision in *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424 (9th Cir. 2023), Plaintiffs' argument that the Court cannot consider frequency ignores reality.  To determine whether American impermissibly

discriminated against military leave, the Court must consider the totality of the circumstances and, as *Waltermyer* instructs, the reason for the differential treatment. That includes, among other things, the fact that Plaintiffs take orders of magnitude more military leave than jury-duty or bereavement leave, and the fact that Plaintiffs have substantially more control over when to take military leave.

By considering the actual undisputed facts—and not the gerrymandered version Plaintiffs presented—the district court properly concluded that American was entitled to summary judgment. And, contrary to Plaintiffs' argument, affirming the district court's judgment here would in no way negate USERRA. The facts here foreclose a comparability claim, but that obviously does not mean that such claims would not survive on different records. When the record shows that an employer discriminated against military leave with respect to non-seniority benefits, then courts will have no trouble finding a violation of Section 4316(b). The undisputed facts demonstrate that there was no such discrimination here, which is why the district court properly granted American summary judgment.

This Court should affirm.

## STATEMENT OF JURISDICTION

American agrees with Plaintiffs' jurisdictional statement.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly concluded, based on the undisputed factual record, that military leave for pilots at American is not comparable to jury-duty or bereavement leave.

2. Whether the district court correctly concluded, based on the undisputed factual record, that Defendant American Airlines Group Inc.'s ("AAG") Profit Sharing Plan does not base awards on imputed earnings for military leave.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously.  There are no related cases or proceedings before this Court.

## STATEMENT OF THE CASE

### A.    Statutory Background And History

1.  Congress enacted USERRA in 1994 to encourage non-career military service and "to prohibit discrimination against persons because of their service." 38 U.S.C. § 4301(a)(3).  Section 4316(b) prohibits discrimination in the provision of non-seniority benefits:  an employee absent for military service is entitled to such non-seniority benefits "as are generally provided by the employer … to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan." *Id*. § 4316(b).

As this Court recognized in *Travers v. Federal Express Corp.*, 8 F.4th 198 (3d Cir. 2021), a claim under Section 4316(b) sounds in "differential treatment."

*Id*. at 203.  To determine whether an employer has engaged in differential treatment on the basis of military service, a court must answer two questions. First, has the employer denied employees absent for military service (Group 1) a right or benefit that it generally provides employees absent for other reasons, such as jury duty or bereavement (Group 2)—i.e., "does Group 2 get something that does Group 1 does not"?  *Id*. at 202-03.  Second, is "military leave taken by Group 1 … comparable to the other types of leaves taken by Group 2?"  *Id*. at 203 n.10. At step two, "a court must … compare the types of leave for sufficient similarity." *Id*. at 204.  The principal issue on appeal concerns this second question.

A Department of Labor ("DOL") regulation guides courts in determining "whether any two types of leave are comparable."  20 C.F.R. § 1002.150(b). Under this regulation, "the duration of the leave may be the most significant factor to compare."  *Id*.  "[O]ther factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered," *id*., although these factors are illustrative, not exhaustive, *see infra* at 27.  The regulation also provides a single example of what is not comparable:  "a two-day funeral leave will not be 'comparable' to an extended leave for service in the uniformed service."  20 C.F.R. § 1002.150(b).

2.  In addition to *Travers*, this Court has considered a benefits-discrimination claim brought by a service member on one other occasion.  In *Waltermyer*, the

question was whether a guardsman was entitled under USERRA's predecessor statute to a single day of holiday pay that fell during his "annual two-week military training period." 804 F.2d at 821-22. The issue arose because the CBA authorized holiday pay only if the employee worked all the other days in the week the holiday fell but exempted from that work requirement employees absent for jury duty or "because of defined illness or layoff." *Id*. at 822, 825. Military leave was not exempted, and the Court held that this differential treatment violated the statute.

In reaching that conclusion, the Court considered the "characteristics" of military leave for training in light "of the reason for the collective bargaining agreement exemptions" from the work requirement for holiday pay. *Id*. at 825. That requirement ensured that employees would not "stretch the holiday by taking a day or two before or after," and its exceptions recognized that it would be inequitable not to provide holiday pay to "workers whose absence during the holiday week [was] involuntary and through no fault of their own." *Id*. It was most significant for the *Waltermyer* Court that employees could "not choose when to" serve on a jury and, accordingly, could "not attempt" to use jury service "to enlarge the holiday." *Id*. Also significant, albeit less so, was the fact that absences "caused by the exempted categories would not generally be of extended duration." *Id*.

7

On the record in *Waltermyer*, these "characteristics" also held "true when the leave of absence [was] for military training." *Id*. The service-member employees had "no individual voice in selecting the weeks they [would] be on active duty." *Id*. And "[m]ilitary superiors set the time for training which [wa]s both compulsory and short." *Id*. In other words, the service-member employees there had no say in whether they were absent during the holiday week, so the concerns motivating the work requirement were just as inapplicable to them as to employees absent for jury duty and the like. The employer violated the statute, the Court held, because there was no non-discriminatory reason to treat the leaves differently in terms of the work requirement for holiday pay.

Contrary to Plaintiffs' suggestion, *Waltermyer* did not establish a rigid checklist of comparability factors. Nor did Congress, in codifying *Waltermyer*'s anti-discrimination principle in Section 4316(b), intend to do so either, or to provide that military leave was comparable to jury-duty and bereavement leave in all cases or in any particular respect. The most "important" fact in *Waltermyer* was "that the guardsmen [had] no individual voice in selecting the weeks they will be on active duty," 804 F.2d at 825, and Congress did not require or even suggest a finding of comparability in cases where the service member *did* have control over when to take leave.

**B.    Factual Background**

Plaintiffs James Scanlan and Carla Riner are pilots at American, an airline owned by AAG.  A644-45.  Scanlan served in the Air Force Reserve until 2020, and Riner currently serves in the Air National Guard.  A644-45.

Over the course of the nine-year class period, Scanlan took 1,212 days of military leave and Riner took 726 days.[1]  A647.  This averages to 151.5 days per year for Scanlan and 106.2 days for Riner.  A647-48.  Both Scanlan and Riner had significant (and sometimes total) control over when they scheduled these leaves.  Scanlan testified that he was able to schedule training at times that worked for him, to the point where "it became a negotiation" with his unit.  A679.  Riner testified that, as a senior officer, she was permitted to sign orders authorizing her *own* military duties.  A713.  Neither Scanlan nor Riner, by contrast, took a single day of jury-duty or bereavement leave during the class period—nor at any other time during their employment at American.  A650-51.  Plaintiffs' experiences are typical of the class of service-member pilots they represent.

---

[1] The parties have only exchanged leave data from the start of the class period, January 1, 2013, through October 31, 2021.

1. *Service-member pilots take months of military leave per year, but rarely take jury-duty or bereavement leave*

a. American's service-member pilots regularly take military leave, and are absent from employment for many days out of the year.  The relevant facts are not disputed.  *See* A17.  Over the class period, American pilots who took military leave took an average of 425 days.  A647-48.  This translates to about 106 days of military leave annually in years leave was taken—in other words, about three months.  A647-48.  Sometimes pilots take a single, long leave.  Other times they take many short leaves.  American's service-member pilots took an average of 6.7 leaves per year, with each leave lasting for an average of 15.8 days.  A648.

Like most reservists, pilots generally attend one drill weekend per month and two weeks of annual training.  A735-36.  But unlike other service members, pilots spend substantial additional time—typically around 144 hours, and sometimes up to 240 hours annually—maintaining "currency and proficiency" in the military aircraft they fly.  A736.

b. Plaintiffs claim that American discriminated against military service because its CBA—negotiated with the pilots' union—provides for paid jury-duty and bereavement leave but not paid military leave.[2]  Pilots receive differential

---

[2] Pilots previously received paid military leave, A1864-65, but they bargained it away because they understood that they did not have "a USERRA trump card" on the issue, A872.

pay—the difference between their pilot's salary and their jury stipend—for jury duty, A649, and up to three days of paid bereavement leave for the death of a qualifying family member, A650-51.

Unlike military leave, however, pilots hardly ever take jury-duty and bereavement leave. Neither Scanlan nor Riner has ever taken one of these leaves in their combined 46 years at American. A644-45; A650-51. American pilots who took jury-duty leave took 3.1 days on average over the entire class period—substantially less than a single day of leave annually, on average. A650. And American pilots who took bereavement leave took an average of four days over the class period—again, significantly less than a single day of leave annually, on average. A651-52.

| | Leave Statistics During the Class Period | | | | |
|---|---|---|---|---|---|
| | Military Leave (Scanlan) | Military Leave (Riner) | Military Leave (Class) | Jury-Duty Leave (Class) | Bereavement Leave (Class) |
| **Total Days Of Leave During Class Period Per Pilot Taking Leave** | 1,212 | 726 | 425.1 | 3.1 | 4 |
| **Annual Days Of Leave Per Pilot (In Years Leave Was Taken)** | 151.5 | 106.2 | 105.8 | 2.3 | 3.1 |
| **Number Of Leaves Per Pilot (In Years Leave Was Taken)** | 17.1 | 9.4 | 6.7 | 1.3 | 1.2 |
| **Average Duration Of Each Leave** | 10.1 | 11.3 | 15.8 | 1.8 | 2.7 |

*See* A647-52; A767-72.

2.     *The military grants service-member pilots significant control over when to schedule service*

The military takes special care to accommodate pilots' scheduling preferences. A737-38. For example, "military commanders schedule short-term duty periods 'with as much advanced notice and flexibility as possible, to lessen the impact of military reserve absences on employers.'" A19-20 (quoting A737). The military also expects, and is "accustomed to[,] modifying planned training itineraries to meet the reservists['] availability." A738. Pilots have the most control over scheduling currency and proficiency training, A736, although "flexibility exists across [all] the various categories of pilot military duties," A737. For currency and proficiency in particular, pilots can often perform service on the day of their choosing, A736, subject to modest constraints like weather and aircraft availability, A676. Pilots can also "make up" drill weekends, "either on later drill weekends or in conjunction with other training events," A735, and they can usually choose between "alternate [annual training] dates," A736. As a result, "pilots have 'unique and significant flexibility ... in how they schedule their military service periods.'" A19 (quoting A737).

3.     *American's scheduling flexibility allows many pilots to pursue parallel careers*

American pilots work atypical schedules that give them the time and flexibility for alternative pursuits, including, as relevant here, a "joint career" in the

military.  A737; *see also* A646-47; A712; A812.  For example, pilots at American do not work traditional Monday through Friday shifts; they work only about half the days in any given month, A645; A709; A718, leaving ample time for additional employment.

Approximately two weeks in advance of each flying month, American pilots submit their scheduling preferences, including known absences, through American's "bidding" system.  A645; A718-19.  They receive a schedule approximately three days later that aims to account for pilot preferences, seniority, and conflicts.  A645-46; A710; A718.  But even after receiving their schedules, pilots can adjust them by trading trips with other pilots or using American's "open time" system, which allows pilots to drop or pick up flights.  A646; A720.  Thus, even when military leave is unilaterally scheduled by the military on short notice (which is unusual for pilots for the reasons above), pilots have the ability to avoid or create conflicts, as Scanlan has done in the past.  A804-07; *see infra* at 48.

## C.    Procedural Background

1. Plaintiffs' complaint asserted three claims.  Counts I and III alleged violations of Section 4316(b).  Count I alleged that American violated Section 4316(b) by imputing earnings for purposes of calculating profit-sharing awards for jury-duty and bereavement leave but not for "short-term military leave."  A156-

58.[3] Count III alleged that American violated Section 4316(b) by providing pay during jury-duty and bereavement leave but not during "short-term military leave." A160-62. The district court's class-certification order defined "short-term military leave" as "consecutive leave that is sixteen days or fewer." A63. Both these claims require Plaintiffs to prove that military leave for pilots at American is comparable to jury-duty or bereavement leave.

Count II alleged a breach-of-contract claim under Texas law. Plaintiffs claim that AAG breached its Profit Sharing Plan by calculating profit-sharing awards based only on a pilot's actual (not imputed) earnings. A158-60. The Profit Sharing Plan, however, bases awards on Compensation as that term is defined in the Pilot 401(k) Plan, A656; A925, and the Pilot 401(k) Plan's definition of Compensation is limited to actual wages earned as reflected on a W2 form; it does not include imputed earnings, A656; A1032; A937-42. Scanlan himself has long been aware of this fact. When AAG first rolled out the Plan, his union representatives specifically told him that "[t]he profit sharing plan … is based on your W2 (eligible earnings)." A1062-63.

2. The district court granted summary judgment to American.

---

[3] As a factual matter, that is not true. American does not impute earnings for any form of leave, A937-42; A1032, so pilots on military leave have not been denied a benefit that pilots on other forms of leave receive. Nevertheless, this Section 4316(b) claim also fails for lack of comparability, as discussed below.

a. On the USERRA claims, the district court held that for pilots at American, jury-duty and bereavement leave are not comparable to "short-term military leave" under Section 1002.150(b).

Duration.  The district court rejected Plaintiffs' argument that it must ignore the frequency with which pilots take military leave.  "[A]nalyzing the duration of the average military leave without considering frequency of military leave," the district court explained, "provides a false impression."  A18-19.  As the district court correctly recognized,  "[t]here is a distinct difference among the three types of leave not only in the average time away from the job in a year but also in the fact that a pilot's military leave generally recurs on a regular basis and often over a number of years while the other forms of leave are generally short-term and sporadic."  A18.  The district court held that the cumulative duration of "short-term military leave"—about 22 days per year on average—is not comparable to the cumulative duration of jury-duty (2.3 days) or bereavement (3.1 days) leave.  A18, A22-23.

Control.  Next, the district court considered pilots' control over timing for each type of leave.  "Even taking the facts in the light most favorable to the plaintiffs," the district court concluded based on the undisputed summary-judgment record that "pilots often have significantly more flexibility in scheduling military leave than they do with respect to jury duty and bereavement leave."  A21.

__Purpose__.  Finally, the district court held that "the purposes of the three types of leave are different" because "[u]nlike bereavement leave and jury duty, those who take military leave do so not only out of a sense of patriotism but also for more than minimal compensation from the Government and sometimes pensions for their service."  A22.

b.  On the breach-of-contract claim, the district court held that the Profit Sharing Plan unambiguously did not require AAG to impute earnings from military leave when calculating awards and that, under Texas law, the court was required to defer to AAG's good-faith interpretation in any event.  A26-27.

## SUMMARY OF THE ARGUMENT

I.  American did not discriminate against military service in violation of Section 4316(b) when it provided a few days of paid jury-duty or bereavement leave every few years but not dozens (or more) of days of paid military leave every year.  As the district court correctly held, the factors in Section 1002.150(b) strongly support this conclusion.  This Court should affirm the district court's well-reasoned decision.

A.  The duration of military leave is not comparable to the duration of jury-duty or bereavement leave.

1.  The district court correctly considered the cumulative duration of the leaves at issue, and the cumulative duration of military leave is not remotely

comparable to the cumulative duration of jury-duty or bereavement leave—even if the Court restricts its focus to so-called "short-term military leaves" lasting 16 days or fewer. Plaintiffs contend that courts cannot consider the "frequency" of leave to calculate its cumulative duration, but their argument is foreclosed by the text of Section 1002.150(b), case law, and common sense. USERRA is an anti-discrimination statute, and anti-discrimination statutes require courts to consider the totality of the circumstances. Here, one critical circumstance is how much leave, in total, service members actually take. A leave that American pilots take dozens of days every year is not comparable to a leave they might take a few days over their entire careers. Plaintiffs' contention that the district court erred in considering that obvious difference should be rejected.

2. There is no support for Plaintiffs' argument that the Court should compare the average duration of "short-term military leave" to the average duration of all comparator leaves. Plaintiffs like this approach because it allows them to manufacture comparability. The average duration of all military leave is about 16 days, whereas the average duration of one "short-term military leave" is two or three days, which starts to look more like an average instance of jury-duty or bereavement leave. But taking the average of a subset of military leaves finds no support in the statute, conflicts with anti-discrimination principles, and would allow plaintiffs to gerrymander comparability through artful pleading. Plaintiffs'

argument is especially meritless because it would again require courts to ignore the totality of the circumstances. Even if the average duration of an individual instance of "short-term military leave" is a few days, the fact that these individual instances happen many times a year cannot reasonably be ignored.

3. At times, Plaintiffs suggest that the correct way to measure duration is by the length of each individual instance of leave, but this approach likewise finds no support in USERRA or anti-discrimination principles. Further, Plaintiffs are estopped from advancing it because they assured the district court at class certification that individualized inquiries into comparability would not be required.

B. The record shows that pilots do not have nearly the same level of control over when they are absent for jury-duty or bereavement leave as they do over the timing of their military leaves. The control-over-timing factor was the most important in *Waltermyer*, and it strongly supports American here. Plaintiffs' sole response is that the record is devoid of evidence showing the degree to which pilots can control the timing of jury duty and bereavement. But to the extent there is a void in the record, that is fatal to Plaintiffs' claim, for they bear the burden of proving comparability.

C. The purposes of the leaves also are not comparable. Unlike military leave, bereavement leave has an intensely private dimension. And unlike jury-duty leave, military leave affords pilots the opportunity to pursue a second career, and to

receive the wages and benefits that accompany it. Nothing in USERRA requires American to subsidize Plaintiffs' second career with another employer.

II. Plaintiffs' breach-of-contract claim fails.

A. The terms of American's Profit Sharing Plan unambiguously foreclose Plaintiffs' argument that American was required to impute earnings for military leave when calculating profit-sharing awards. The Plan bases awards on Compensation as that term is defined in the Pilot 401(k) Plan. And the Pilot 401(k) Plan defines Compensation to mean actual wages reportable on a W2 form, not imputed earnings.

B. Regardless, AAG's longstanding interpretation of the Plan is entitled to deference under settled Texas law.

## STANDARDS OF REVIEW

This Court reviews the district court's summary-judgment decision *de novo*. *See, e.g.*, *Lapid-Laurel, LLC v. Zoning Bd. of Adjustment*, 284 F.3d 442, 449 (3d Cir. 2002). Although comparability is "primarily" a question of fact, Appellants' Opening Brief (AOB) 2, it can permissibly be resolved at summary judgment, like any other question, where no reasonable juror could find in the non-moving party's favor, *see, e.g.*, *Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019); *Waltermyer*, 804 F.2d at 825-26 (reversing for entry of summary judgment).

Under Texas law, which governs the breach-of-contract claim, "the interpretation of an unambiguous contract, including the determination whether the contract is ambiguous, is a legal question reviewed *de novo*." *WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 477 (5th Cir. 2016). But "[w]here an employer retains the right to interpret an incentive compensation plan, the employer's interpretation must stand, absent bad faith on the part of the employer." *Gibson v. STP Nuclear Operating Co.*, 2012 WL 761930, at *4-5 (Tex. App. Mar. 8, 2012).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT MILITARY LEAVE IS NOT COMPARABLE TO JURY-DUTY OR BEREAVEMENT LEAVE FOR PILOTS AT AMERICAN

As the district court correctly concluded, the undisputed facts demonstrate that American did not discriminate against military service by treating military leave differently than jury-duty and bereavement leave because these types of leaves are different. Plaintiffs' Section 4316(b) claims (Counts I and III) thus fail.

### A. The Duration Of Military Leave Is Not Comparable To The Duration Of Jury-Duty And Bereavement Leave

DOL's implementing regulation provides that "the duration of the leave may be the most significant factor to compare." 20 C.F.R. § 1002.150(b). But it does not state how a court should calculate duration. Here, the district court considered the cumulative duration of military leave—its frequency times the duration of

20

individual absences—"to have a complete picture." A17. As the regulation,

binding case law, and common sense all indicate, that was correct.

> 1. *The district court correctly evaluated the cumulative duration of military leave*

American pilots take orders of magnitude more military leave than they take

jury-duty or bereavement leave. Plaintiffs incorrectly argue that the Court should

restrict its focus to "short-term military leaves," *see infra* at 34-40, but whether

Plaintiffs are right makes no difference. Even if the Court were to restrict its focus

to "short-term military leave"—as the district court did—the differences in

cumulative duration between that leave and jury-duty and bereavement leave are

staggering. The numbers speak for themselves:

| | **"Short-Term Military Leave" Statistics** | | |
|---|---|---|---|
| | "Short-Term Military Leave" | Jury-Duty Leave | Bereavement Leave |
| **Total Days Of Leave Taken By Class Members Across Class Period** | 153,902 | 17,866 | 25,271 |
| **Days Of Leave Per Pilot Across Class Period** | 92.7 | 3.1 | 4 |
| **Annual Days Of Leave Per Pilot (In Years Leave Was Taken)** | 21.9 | 2.3 | 3.1 |
| **Average Duration Of Each Leave** | 3.2 | 1.8 | 2.7 |

*See* A647-52; A767; A850.

These are order-of-magnitude differences.  As the district court correctly recognized, there is a "stark" difference between being on leave for three weeks every year and being on leave for three days once every few years, if ever.  A17. And there is also a stark difference from an employer's perspective between providing 150,000 days of paid leave and 25,000 or 18,000 days of paid leave— again, orders of magnitude.  When viewed in their totality, these types of leave are not comparable.

Plaintiffs' main argument is that the district court should not have considered the cumulative duration of military leave, and should instead have focused myopically on the bottom row in the chart above—the average duration of one instance of so-called "short-term military leave."  They do not exactly frame their challenge as such; they challenge the district court's consideration of "frequency."  *See* AOB 37-40.  But the district court incorporated frequency into its duration analysis only in the sense that a leave's frequency is required to determine its cumulative duration.  The district court would not have erred had it considered frequency as a standalone factor, *infra* at 27, but it certainly did not err in utilizing frequency to understand the total amount of time that service-member pilots are absent from work.  Ignoring this fact, the district court recognized, would create "a false impression in any comparison of military leave with jury duty and bereavement leave," A19, because it would blind a court to the way these leaves

22

work in the real world.  Plaintiffs' contrary arguments are not supported by the regulation or case law and would produce anomalous results that are inconsistent with USERRA.

a.  <u>Section 1002.150(b)</u>.  Section 1002.150(b) states that "duration" may be the most important factor in determining comparability.  And that provision makes clear that cumulative duration is the appropriate measure of "duration."  The regulation provides a single example of what would not be comparable:  "a two-day funeral leave will not be 'comparable' to an extended leave for service in the uniformed service."  20 C.F.R. § 1002.150(b).  The example illustrates the overarching principle that an employee absent for work for an extended period is not entitled to non-seniority benefits.  Plaintiffs agree with this principle, recognizing that a long deployment is not comparable to jury-duty or bereavement leave.  *See* AOB 16.  But there is no basis to distinguish between a service member who takes a single 50-day stretch of military leave and a service member who takes 25 two-day leaves in a year.

For all intents and purposes, a service member who takes many short leaves mimics the example in Section 1002.150(b).  From the employee's perspective, the two cases would not be materially different:  he has been called away for duty for a significant portion of the year.  Nor are the two cases materially different from the employer's perspective:  if anything, the many-leaves case is more burdensome

because of operational disruptions associated with an employee who frequently starts and stops work.  There is no plausible argument that the employer's denial of benefits is based on discrimination in one case but not the other.  In both cases, the service member has taken an "extended leave for service in the uniformed service," 20 C.F.R. § 1002.150(b), so the two cases should be treated the same.

Further, the regulation requires a comparison of "two types of leave."  *Id.* (referring also to the "form of leave").  The word "type" means "a particular kind, class, or group."  Merriam-Webster, Collegiate Dictionary 1354 (Frederick C. Mish et al., 11th ed. 2003).  As this Court held in *Travers*, the regulation requires a comparison of "military leave taken" by the group of employees absent "for military service" with "the other types of leaves taken by" the group of employees absent for other reasons.  *Travers*, 8 F.4th at 203 & n.10.  The regulation thus requires a comparison of the general characteristics of the leaves as taken by the two groups—including their cumulative duration—not a comparison of the specific duration of any individual leave as taken by an individual employee.

Plaintiffs' principal argument (AOB 37-38) is that a different regulation forbids consideration of the "frequency" of leave.  Section 1002.104 provides that an "employee is not required to accommodate his or her employer's interests or concerns regarding the timing, frequency, or duration of uniformed service."  20

24

C.F.R. § 1002.104.  Plaintiffs say that this regulation's mention of frequency means that DOL deliberately omitted frequency as a factor in Section 1002.150(b).

Plaintiffs' first problem is that the district court did not consider "frequency" as a standalone factor independent of duration; rather, it considered the leaves' frequency only to get a view of their cumulative duration.  But even if "frequency" were considered as a separate factor apart from duration, Section 1002.104 supports no such deliberate-omission inference.  As Plaintiffs recognize (AOB 37-38), the relevant section of the regulation parrots the text of the statutory provision it implements, 38 U.S.C. § 4312(h).[4]  "The force of any negative implication depends on context," *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013); *Travers*, 8 F.4th at 206 n.18, and the context here shows only that DOL paraphrased a statutory provision unrelated to comparability, not that it consciously chose to omit "frequency" as a factor for courts considering comparability under a different regulation entirely—or that courts should not consider the cumulative duration of the types of leave.

---

[4] Plaintiffs do not argue that this statutory provision bars consideration of frequency in the comparability analysis.  Nor could they without wiping out Section 1002.150(b).  Section 4312(h) forbids employers from denying reemployment rights based on the "duration" and "timing" of service.  If Section 4312(h) was read to limit the factors a court could consider in undertaking the comparability analysis, it would foreclose consideration not only of "frequency" but also of "duration" and control, two of three express factors in Section 1002.150(b).

Moreover, a negative inference is particularly inappropriate because the factors enumerated in Section 1002.150(b) are expressly non-exhaustive. *See Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 446-47 (D.C. Cir. 1989); *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 196-97 (4th Cir. 2021). The regulation provides that "[i]n addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered." 20 C.F.R. § 1002.150(b). "[N]ote the words 'such as.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021). They signify illustrative "example[s]," not a "limitation." *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989); *see also*, *e.g.*, *Google*, 141 S. Ct. at 1197. That is why the Seventh Circuit has held that "frequency" is an appropriate factor for courts to consider when assessing comparability. *See White v. United Airlines, Inc.*, 987 F.3d 616, 625 (7th Cir. 2021) (remanding for fact development about "frequency and duration").

Frequency is obviously similar in kind to the factors expressly enumerated by DOL. Thus, even "plaintiffs are not arguing … that the 'regulation forbids consideration of frequency in determining the issue of comparability.'" AOB 39 (quoting A18). They say that a court cannot give frequency dispositive weight (AOB 38-39), but that is neither what the district court did nor American's argument. American's argument is that any fair assessment of discrimination

26

requires a court to consider the "totality of the circumstances," *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006) (quotations omitted), and a crucial circumstance is how much leave pilots actually take.  Whether the Court measures duration by the leaves' cumulative length or considers frequency as an additional factor, it is clear that the total amount of military leave taken by pilots is not comparable to the total amount of jury-duty or bereavement leave.

b. Case law.  Case law similarly supports the district court's consideration of cumulative duration.

Start with this Court's recent decision in *Travers*.  As mentioned, *Travers* confirmed that comparability focuses on the general characteristics of the types of leave as taken by employees as a group, not the particular characteristics of each separate leave as taken by each specific service member.  *See* 8 F.4th at 203 & n.10.  And as explained above, the cumulative duration of a type of leave is unquestionably an important characteristic of that leave as taken by pilots at American.

Plaintiffs rely on this Court's pre-USERRA decision in *Waltermyer*, but *Waltermyer* strongly supports American.  Duration was not an important factor in *Waltermyer*, nor did the decision decide how properly to measure duration.  It did not matter there whether the employee's absence was for four days or four weeks because the only question was whether he should receive a benefit for four missed

work days during a holiday week. Here, by contrast, Plaintiffs seek a benefit for *every* day they missed—more than 20 days annually, and hundreds of thousands of days for the class. *Waltermyer*'s reasoning shows why the cumulative duration of the leaves matters.

*Waltermyer*'s comparability holding turned on its consideration of the characteristics of the leaves in light of the CBA provisions relieving absent employees from the requirement that they work every day of a holiday week to receive holiday pay. 804 F.2d at 825. The Court held that the same "reason" justifying an exemption for jury-duty leave (for example)—namely, the inability to control whether to serve on a jury during a holiday week—also applied to annual training, because the employees in that case had no control over whether annual training was scheduled during a holiday week. *Id*. ("common thread [was] the lack of choice"). When it came to the work requirement for holiday pay, there was no non-discriminatory reason to treat military leave differently than the comparator leaves, so *Waltermyer* required them to be treated the same.

*Waltermyer*'s principle that a court must evaluate the reason for the policy in question—and hence, the reason for the differential treatment—shows why cumulative duration is the relevant benchmark here. It is one thing to provide a handful of days (if any) of paid jury-duty and bereavement leave during a pilot's entire career; it is another entirely to provide a month of paid military leave every

28

year, as Plaintiffs are requesting.  As *Waltermyer* illuminates, the reason for American's differential treatment is not anti-military animus.  It is the reality that pilots take orders of magnitude more military leave than jury-duty and bereavement leave, so treating them as if they were the same makes no sense.

The Federal Circuit's decision in *Tully v. Department of Justice*, 481 F.3d 1367 (Fed. Cir. 2007), is in accord.  Plaintiffs embrace *Tully*'s holding that a long military absence is not comparable to jury-duty or bereavement leave.  But that should be fatal to their position:  there is no principled basis to distinguish *Tully* from the circumstances here.  *Supra* at 24.  An employee absent for 100-plus days annually should be treated the same regardless of whether he takes that leave in one chunk or many.  *Tully* also prescribes the same holistic analysis as *Waltermyer*:  "Any fair comparison of the benefits available to different groups of employees must not disregard the circumstances in which the benefits are provided."  481 F.3d at 1369.  Here the crucial circumstance is that jury-duty and bereavement leave happen almost never, whereas pilots are absent for military leave and cannot fly for American for weeks or months every year.

To be sure, the Ninth Circuit has taken a different approach.  In *Clarkson*, the Ninth Circuit held or at least strongly suggested that frequency should not be considered in evaluating comparability, even when frequency is used only to calculate cumulative duration.  59 F.4th at 436-37.  Like Plaintiffs, however,

*Clarkson* missed the forest for the trees.  A type of leave that happens for a few days every few years is different than a type of leave that pulls employees away for many weeks every year.  There is no basis for a court to ignore this real-world difference when the question is whether the employer engaged in "differential treatment."  *Travers*, 8 F.4th at 203.[5]  Just "as a play cannot be understood on the basis of some of its scenes but only on its entire performance, … a discrimination analysis must concentrate not on individual incidents, but on the overall scenario."  *Moore*, 461 F.3d at 346 (quotations omitted).

c. <u>USERRA's purpose</u>.  Using the cumulative duration of military leave as the benchmark furthers USERRA's purpose and would result in an administrable and manageable rule.  As this Court recognized in *Travers*, the point of Section 4316(b) is to prohibit discrimination in the provision of non-seniority benefits.  Treating different things differently is not discrimination, and there is no meaningful dispute that military leave for pilots *is* different than jury-duty leave

---

[5] Plaintiffs also rely on *Rogers v. City of San Antonio*, 392 F.3d 758 (5th Cir. 2004), but that decision provides no meaningful guidance.  The court found a factual dispute about "whether involuntary non-military leaves, not generally for extended durations, for jury duty, bereavement, and [other leaves] ... are comparable to each plaintiff's military leaves taken for service in the uniformed services."  *Id*. at 771-72.  *Rogers* did not engage in any detailed analysis of the question here, nor is it clear whether *Rogers* thought the unit of measurement was each individual military leave as taken by each employee or the general characteristics of military leave as taken by each plaintiff.

and bereavement in large part because pilots rarely take the latter and regularly

take the former.  As the district court put it:

> [F]or pilots who took short-term military leave, the average time away
> from the job on military leave annually is over 21 days while absence
> on jury duty is 2.3 days and on bereavement leave is 3.1 days.  These
> figures are no more comparable than the home run records of two
> baseball players, one who hits 21 home runs in a season and the other
> who hits three.  Looking only at the average length of individual
> periods of military leave makes no sense, just as it makes no sense to
> compare the home run records of these two baseball players by
> looking only at the fact that both hit no more than one home run in
> any game.

A22-23.

But even this analysis understates the problem with Plaintiffs' approach.

While each individual instance of jury-duty or bereavement leave averages around

two or three days, most pilots take these leaves once or twice, if at all (for the

named Plaintiffs, never), while military leave is generally taken frequently every

year.  *See supra* at 12.  So the proper analogy would be between a baseball player

who hit 21 home runs every season and a player who hit three home runs in one

season but none the rest of his career.  There is simply no comparison.

Plaintiffs nevertheless assert that considering frequency "makes it virtually

impossible for military leave to ever be comparable to another leave."  AOB 26,

39-40.  Plaintiffs are wrong.  Unlike pilots, most service members take minimal

and manageable amounts of military leave—oftentimes only needing to miss work

for annual training, like the plaintiff in *Waltermyer*.  *Supra* at 8.  Weekend drills

fall on weekends, when many non-pilot employees do not work. And non-pilot service members are not required to perform hundreds of hours of additional service to maintain currency and proficiency in military aircraft. *Supra* at 11. So it simply is not true that considering the cumulative duration of military leave would make comparability impossible. It may be difficult for commercial airline pilots to make this showing because of the unique circumstances of their military service and civilian jobs, but that is the kind of record-based determination Congress required courts to make when it elected not to require benefits for any specific types of service or leave.[6]

Plaintiffs also err in asserting that consideration of cumulative duration is inconsistent with USERRA's purpose because "Congress enacted 4316(b)(1) to protect reservists during" what it knew were "frequent absences from work.'" AOB 39 (quotations omitted). The frequent absences referenced by Plaintiffs are those for "weekend drills [and annual] training." *Monroe v. Standard Oil Co.*, 452 U.S. 549, 557 (1981) (quoting S. Rep. No. 90-1477, at *1-2 (1968)). But if Congress wanted to ensure non-seniority benefits for all such absences, it easily "could have done so expressly," *id.* at 564, so Plaintiffs' observation cuts against

---

[6] This is not to say that there is no type of leave that might be comparable with military leave at American, much less at any other employer. At American, for instance, military leave may well be comparable with personal leave, but Plaintiffs do not allege personal leave as a comparator—no doubt because it is unpaid.

their position.  In any event, weekend drill and annual training in most cases do not require employees to be absent from work for *more than 100 days each year* for the reasons just discussed.  The record in this case is different only because service-member pilots at American are different.  Nothing in USERRA requires courts to ignore the factual record.

        2.     *<u>The average duration of one "short-term military leave" is not the correct measure of duration</u>*

At times, Plaintiffs suggest that the "right" approach under USERRA is to compare the "average duration" of military leave to the average duration of non-military leave.  AOB 26.  If that were the test, American would win as a matter of law—the average duration of military leave taken during the class period was 15.8 days, whereas the average duration of jury-duty and bereavement leave was less than three.  Sixteen days is not comparable to two or three.  *Supra* at 12.

To avoid that result, Plaintiffs ask the Court to engage in mathematical sleight of hand.  Instead of taking the average of all military leaves, Plaintiffs ask the Court to take the average of only a subset—so-called "short-term military leaves."  By doing so, Plaintiffs artificially reduce the average duration from 16 days to three.  AOB 30.  This is a similar move to Plaintiffs' objection to considering cumulative duration—Plaintiffs are attempting to narrow the lens to make leaves that are not remotely comparable look enough alike to get past

summary judgment. This transparent attempt to rig the comparability analysis should be rejected.

a. Comparing the average duration of a subset of military leaves to the average duration of all jury-duty or bereavement leaves is wrong on every level. It finds no support in USERRA, compares apples to oranges, is wildly manipulable, would be impossible to administer, and would produce absurd results.[7]

To start, nothing in USERRA or its implementing regulation suggests that a court should compare a subset of military leaves to the comparator leaves. *See* 38 U.S.C. § 4316(b)(1)(A); 20 C.F.R. § 1002.150(b). Instead, Section 1002.150(b) requires a comparison of "types of leave," *supra* at 25, which in context clearly means a comparison of military leave (one type) to a comparator leave (another type). "Short-term military leave," by contrast, is not a type of leave with any external meaning. It is a fictional category that Plaintiffs have invented for purposes of litigation, as evidenced by the fact that plaintiffs in materially identical

---

[7] All the same problems would result if the Court were to use any other central-tendency measure, like median or mode. The point is that allowing the plaintiff to choose her comparator group will always skew the analysis in her favor, without support in law or logic. *See* A822-25 (demonstrating shortcomings in "relying solely on measures of central tendency").

cases (brought by the same lawyers) have defined it differently.[8]  As this Court

explained in *Travers*, the relevant question is whether there is another "type of

leave [that is] comparable to *military leave*."  8 F.4th at 203 n.10 (emphasis

added).  Military leave—not "short-term military leave" as defined by Plaintiffs—

is the basis for comparison.

Nor would it make sense for an anti-discrimination statute to require

Plaintiffs' proposed comparison.  Comparing the average duration of "*short-term*

*military leave*" with the average duration of *all* jury-duty and bereavement leave is

comparing apples to oranges.  AOB 30 (emphasis added); *see Gen. Motors Corp.*

*v. Tracy*, 519 U.S. 278, 298 (1997) ("Conceptually, of course, any notion of

discrimination assumes a comparison of substantially similar entities." (footnote

omitted)); *Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022) ("apples should

be compared to apples" (quotations omitted)).  Plaintiffs would never suggest

comparing the average of the shortest jury-duty leaves with the average of all

---

[8] *Compare Clarkson*, 59 F.4th at 431 (30 days), *with* this case (16 days), *and*
*Huntsman v. Sw. Airlines Co.*, 2021 WL 391300, at *1 (N.D. Cal. Feb. 3, 2021) (14
days).  Further illustrating the manipulability of "short-term military leave,"
plaintiffs have offered inconsistent definitions within the same litigation, *compare*
Compl. at 14, *White v. United Airlines, Inc.*, No. 1:19-cv-00114 (N.D. Ill. 2019),
ECF No. 1 (30 days), *with* Second Am. Compl. at 12, ECF No. 74 (14 days), and
even against the same employer, *compare* Compl. at 4, *Beanland v. Fed. Express*
*Corp.*, No. 1:22-cv-00672-MAK (D. Del. 2022), ECF No. 1 (14 days), *with*
*Travers v. FedEx Corp.*, 473 F. Supp. 3d 421, 425 (E.D. Pa. 2020) (30 days).

military leaves.  Yet the reverse also makes no sense—comparing the average of all jury-duty leaves with the average of the shortest military leaves tells you nothing about whether military leaves and jury-duty leaves at American are comparable.

What this approach *does* do is artificially lower the average on the military-leave side of the ledger to bring it closer to the average duration of jury-duty and bereavement leave, giving a plaintiff carte blanche to manipulate duration.  All the plaintiff would need to do is cherry pick a definition for "short-term military leave" that results in the "right" average and—presto!—comparability.  That is as wrong as it sounds.  *Cf. Travers*, 8 F.4th at 204 (rejecting definition of benefit that would make USERRA's comparability "calculation [not] work").[9]

Further, allowing the plaintiff to determine how "duration" is calculated would make it impossible for employers to ensure compliance with USERRA and lead to absurd results.  There is no way for an employer to know *ex ante* how a

_____

[9] It is not clear what significance Plaintiffs ascribe to the settlement in *Woodall v. American Airlines, Inc.*, No. 3:06-cv-0072-M (N.D. Tex.), *see* AOB 17, other than that DOJ once argued for a settlement with American where the dividing line was 16 days.  DOJ's settlement position in a single case, of course, does not dictate what the statute and regulation require.  And the basis for the comparison in *Woodall* was not averaging—DOJ did not propose to evaluate duration by taking the average of leaves lasting 16 days or fewer.  Its position was that even a 16-day leave, when evaluated on its own individual merits, might be comparable, while also noting that "Plaintiffs might not recover for leaves as long as 16 days." *Woodall*, ECF No. 58 at 15, and ECF No. 45 at 15-16; *but see infra* at 40-43.

plaintiff will define "short-term military leave" in her complaint (or redefine it in an amended complaint, *see supra* n.8) and thus whether to provide benefits during leaves of certain lengths. Without any fixed meaning, an employer would be left to guess at what leaves might be comparable and thus when it is required to provide benefits. That is no way to administer a federal statute. And it is certainly no way to do so with respect to an industry, like the airline industry, in which collective bargaining is the norm. If employers and employees cannot determine in advance how to evaluate military leave compared to other leaves, they will be unable to bargain consistent with their legal rights and obligations.

This approach, moreover, would lead to bizarre outcomes where the *same leaves* would and would not be comparable depending on the plaintiff's definition of "short-term military leave." Imagine two identical plaintiffs, one who defined "short-term military leave" as leaves lasting 10 days or fewer and the other who defined it as leaves lasting 50 days or fewer. Imagine, now, that based on a low average duration, the first plaintiff wins, but based on the high average duration, the second plaintiff loses. In the first case, the plaintiff recovers for all leaves up to 10 days. But in the second case, an identical plaintiff cannot recover for those same leaves just because she picked a different definition for "short-term military leave." That would be absurd. If a leave is comparable, it is comparable; if not,

then not.  Comparability cannot turn on the plaintiff's *post hoc* definitional choices in litigation.

The master-of-the-complaint rule does not support a contrary conclusion. What it means for the plaintiff to be the master of her complaint is that she can "limit [her] request for recovery," *Clarkson*, 59 F.4th at 433, to something less than what she might *otherwise be entitled to*.  For example, a plaintiff can disavow recovery above a certain threshold to avoid federal diversity jurisdiction.  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 294 (1938) ("[Plaintiff] may resort to the expedient of suing for less than the jurisdictional amount, and *though he would be justly entitled to more*, the defendant cannot remove." (emphasis added)).  Applied in this context, the master-of-the-complaint rule would mean that the plaintiff could seek to recover for leaves lasting 10 days or fewer, when the law might otherwise entitle her to recover even for longer leaves.

But the fact that a plaintiff can seek less than she might otherwise be entitled to by law does *not* mean that the plaintiff's litigation choices determine what the law requires in the first place.  If USERRA does not require a court to restrict its analysis to "short-term military leave," then the fact that Plaintiffs seek relief only for such leaves cannot alter the analysis.  As this Court has explained, just because plaintiffs are "masters of their complaint" does not mean "they are also masters of the District Court in deciding the analytical approach to be taken in their case."  *In*

*re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 727 (3d Cir. 2020).  That principle applies fully here.

b.  In addition, whether the Court evaluates the average duration of all military leave or just "short-term military leave," it is still missing a critical piece of the puzzle—namely, how many days the employee is actually absent from work during any given period.  The average duration of leave only tells the Court how long any one leave is likely to be.  But there is no reason why the average duration of *a single* leave should be dispositive when the question is whether the employer is discriminating against military leaves as a group (or "short-term military leaves" as a group).  Considering the average duration of one leave, in other words, does not reflect the totality of the relevant circumstances and thus cannot be what USERRA requires.  And when the totality of the circumstances are considered, including how many days of even "short-term military leave" pilots actually take, there is no plausible argument that such leave is comparable to jury-duty or bereavement leave.  *See supra* at 12, 22.

3.    *Plaintiffs cannot argue that the Court should consider the duration of each individual instance of military leave*

Finally, Plaintiffs sometimes suggest that the correct approach is to evaluate whether "any given stretch" of military leave is comparable to a type of non-military leave.  AOB 1, 24, 28; *see also id*. at 29 (arguing the court must consider duration of each "particular" military leave).  Under this leave-by-leave approach,

a court would consider the duration, control, and purpose of each leave individually. So, for example, if a pilot took a two-day leave and a 10-day leave, the court would consider duration, control, and purpose for the two-day leave and determine comparability. Then the court would do the same for the 10-day leave. Each leave would be judged on its own individual merits.

a. There are a number of reasons why an individual-leaves approach to comparability is incorrect. For one, evaluating comparability for each individual leave is inconsistent with Section 1002.150(b). The regulation requires courts to compare "types of leave," 20 C.F.R. § 1002.150(b), but an individual-leaves approach would compare actual, specific military leaves, not a "type" or class of leave. *See also Travers*, 8 F.4th at 203 n.10 & 204 ("court must … compare the types of leave for sufficient similarity"). For another, an individual-leaves approach would require an apples-to-oranges comparison: the court apparently would compare the duration of *each* specific military leave to the *average* duration of jury-duty or bereavement leave. *But see supra* at 36. And it would be impossible to administer. An employer could not possibly determine in real time whether each individual leave taken by every service-member employee is comparable to a non-military leave. And parties subject to collective-bargaining obligations—like American and its pilots' union—could not determine

comparability in advance so as to allow them to bargain consistent with their legal rights and obligations.

b.  In any case, this Court need not consider whether USERRA requires an individual-leaves approach because Plaintiffs are judicially estopped from advocating for one.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  At the class-certification stage, Plaintiffs represented to the district court that USERRA did not require "individualized determinations as to specific Class Members."  ECF No. 82-1 at 22.  Instead, they argued, "the relevant evidence about duration (the most significant factor) will be based on overall *averages of employees*."  ECF No. 101 at 28.  The district court certified the class on that understanding.  So Plaintiffs cannot now argue that USERRA actually requires an analysis of each individual leave that each individual class member took.

c.  Plaintiffs remain inconsistent on appeal.  As explained, they sometimes suggest that "duration" means the average duration of leaves.  Other times, they suggest that "duration" means the duration of each individual instance of military leave.  But if USERRA requires a comparison of averages, then the duration of each individual instance of leave does not matter—the court would simply calculate the average duration of military leave (or "short-term military leave") and the average duration of jury-duty and bereavement leave and compare them to one another.  By contrast, if "duration" means the duration of each individual instance

of leave, then averages do not matter.  The court would need to go leave by leave and determine, based on each military leave's duration, control, and purpose whether it was comparable to a comparator leave.  It makes no sense analytically to mix and match methods for calculating "duration," and there is no support for doing so here.

The Ninth Circuit's decision in *Clarkson* suffers from the same problem, which is yet another reason this Court should not follow it.  On one hand, *Clarkson* says that courts should consider the duration of each *individual* stretch of leave.  59 F.4th at 433.  But on the other, *Clarkson* relied on *averages* to find that there was a triable question of fact.  *Id*. at 435-36.  That is obviously incorrect.

**B.    Pilots' Control Over When They Take Military Leave Is Not Comparable To Their Control Over When They Take Jury-Duty Or Bereavement Leave**

Another factor under Section 1002.150(b) is "the ability of the employee to choose when to take the leave."  20 C.F.R. § 1002.150(b).  Although the regulation states that duration may be the most important factor, sometimes the control factor can be dispositive, as it was in *Waltermyer*.  *See supra* at 29 (discussing *Waltermyer*'s reliance on employees' lack of control over whether they took leave during a holiday week).

"[W]hat matters" for this factor is not whether service is voluntary or involuntary, but whether the service member "has the option to choose *when* to

take a given stretch of leave." *White*, 987 F.3d at 625; *see also Clarkson*, 59 F.4th at 439 n.16. The district court held that "[e]ven taking the facts in the light most favorable to the plaintiffs, pilots often have significantly more flexibility in scheduling military leave than they do with respect to jury duty and bereavement leave." A21. The district court was entirely correct. Pilots do not have dozens of jury-duty or bereavement days they schedule each year in coordination with schedulers who aim to arrange mutually-convenient dates for the absences.

1. The record shows that American pilots have significant flexibility in scheduling their military duties, as demonstrated in greater detail above. *See supra* at 13; *see also, e.g.*, A735-38; A802. As Captain J.F. Joseph, a former Naval Aviator with decades of experience, explained, pilots have "unique and significant flexibility in how they schedule their military service periods" and "manage their competing civilian and military schedules." A737. When military units schedule duty periods, they typically do so "with as much advance notice and flexibility as possible, to lessen the impact of military reserve absences on employers." A737. And "military operational schedulers expect, and are accustomed to modifying[,] planned training itineraries to meet the reservists['] availability." A738; *see also* A719; A803. Scanlan, for instance, testified that when he needed "to perform an air refueling mission at least once a month ... I would call the unit and say, hey, I need to do my air refueling mission, and they would say, here are your dates to

pick from. I mean, *it became a negotiation*." A679 (emphasis added); *see also* A675 (pilots "balance" their military and civilian flight schedules). And Riner was even able to sign her own orders for military service. A713.

Plaintiffs assert that "this case involves military leaves that were generally 'unknown to pilots more than a few weeks in advance, rendering pilots' control over the scheduling process irrelevant.'" AOB 42 (quoting *Clarkson*, 59 F.4th at 438). But there is *no record support* for that characterization, which is why Plaintiffs quote almost exclusively from *Clarkson*. Indeed, the summary-judgment record in this case is to the contrary. For instance, currency and proficiency flying can be scheduled on short notice, but it is generally scheduled *by pilots* in negotiation with military schedulers—in other words, it can be set when pilots are not scheduled to fly for American. *Supra* at 13; A736. And monthly drill and annual training are scheduled months in advance, with substantial flexibility for pilots to change their service dates because of their atypical work schedules. *See* A735-38; *supra* at 13. Pilots also have significant flexibility in moving their drill and training dates as well. A735 ("In practice, servicemember attendance at monthly drill weekends was generally well-below 100% of the unit, and often only approximately half of the servicemembers in a unit would be in attendance for a given drill weekend."); A1895 (weekend drill and annual training schedules are "dream sheets," where the military knows that only "50 percent of the unit is going

to be able" to attend on the pre-set dates). The undisputed facts show that pilots have "flexibility" across these "various categories of pilot military duties," A737, and for good reason: "[i]t would be terribly hard ... for ... the military to have folks volunteer if it was entirely rigid," A722.

The only evidence cited by Plaintiffs, by contrast, is their own declarations, where they state that pilots "generally do not need to take short-term military leave to perform military duties that are known to them when they submit their monthly bid," and that "[p]ilots may also need to take short-term military leave to perform military duties when a military service obligation arises on short notice." A1838; *see also* A1834. But that undermines Plaintiffs' position. Annual training and weekend drills are typically known to pilots before they submit their monthly bid, yet they are included in the class of leaves at issue here. And the types of service that typically arise with short notice are currency and proficiency flying, which pilots can schedule *themselves* in negotiation with the military. And even for other service that might arise with late notice, pilots can often avoid (or create) conflicts by trading trips with other pilots or using the airline's "open time" system. A646; A720.

2. The district court correctly concluded that, as a general matter, pilots do not have nearly as much control over when to take jury-duty or bereavement leave. Plaintiffs' only argument is to criticize the district court for citing "no record

evidence" regarding "the flexibility of scheduling jury duty or bereavement leave." AOB 42. But in doing so, Plaintiffs highlight their own default. Plaintiffs carry the burden of proving comparability and they offered no evidence showing how much control pilots have over rescheduling jury-duty and bereavement leave. In other words, Plaintiffs admit that they offered "no record evidence," AOB 42, from which a jury could find for them on this factor.

Plaintiffs observe, "for example, [that] while death is often unexpected, pilots may use bereavement leave to attend planned memorial services, which they can schedule themselves." AOB 34. Maybe. But as Plaintiffs themselves recognize, "[t]here is no data" showing how frequently pilots attend "planned memorial services," AOB 42, so there is no record from which the jury could make the comparability determination. Similarly, Plaintiffs observe that certain states allow "deferred jury service under certain conditions." AOB 34 (citing Idaho and Washington code). That may be true. But again, there is no evidence about how frequently this happens or whether jurors can pick alternate dates (as service members can). *See* AOB 42.

In any event, it is inconceivable that pilots could "negotiat[e]" the timing of jury service or a bereavement event in the way they can negotiate the timing of many of their military duties. *See* A679. Jury duty and bereavement are "intrinsically unpredictable and occur without much notice." A888. But if

Plaintiffs' argument about the record were credited, all it would mean is that American is entitled to summary judgment because Plaintiffs failed to carry their burden of proof. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the factual context renders [the plaintiff's] claim implausible … [the plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.").

3.  Moreover, pilots' control over military and airline scheduling has real practical significance.  It means they can create or avoid conflicts, depending on their incentives. *See* A804-07; A873-74.  Under Plaintiffs' rule, pilots would have an incentive to intentionally schedule military leave to avoid, for example, an undesirable trip.  Instead of flying a long-haul redeye, a pilot could simply rearrange his civilian or military schedule to require military leave.  And under Plaintiffs' regime, he would have every incentive to do so:  he would receive his full airline pay.  Indeed, Scanlan himself has engaged in precisely this type of schedule manipulation already.  A804-07.  Giving pilots another incentive to schedule work conflicts would seriously threaten American's operations, because American cannot reliably maintain on-time flights if pilots drop undesirable trips for last-minute, self-created conflicts with military service.  As in *Waltermyer*, this is another employer "equit[y]" that weighs heavily in favor of American.  804 F.2d

47

at 825 (finding it significant that employees could not use leave "to enlarge [their] holiday").

### C.    The Purpose Of Military Leave Is Not Comparable To The Purpose Of Jury-Duty Or Bereavement Leave

The district court also correctly held that "the purposes of the three types of leave are different." A22. Plaintiffs' arguments in response fail to fairly characterize the purposes of the leaves in question.

Plaintiffs argued below that military, jury-duty, and bereavement leave all "serve the purpose of 'satisfy[ing] compulsory obligations to others.'" A21. But nearly any leave could be framed as fulfilling this sweeping purpose. Plaintiffs' argument on appeal that bereavement leave serves the purpose of "protecting public safety," AOB 32, suffers from a similar problem. It defines the purpose of that leave so selectively that it ignores the deeply personal nature of bereavement. No one would argue that military leave is intended to enable an employee to be present with her family and attend to her mental and emotional wellbeing, as bereavement leave obviously is.

American does not dispute that military service, like jury duty, "entails the performance of a public service." AOB 32. But at least for pilots, it also entails significant financial compensation, benefits, and training that differentiate it from the day or two many citizens devote to jury service every few years. The record shows that American pilots treat military service as a "joint career." *See* A737;

A812.  Unlike jurors, who receive somewhere from $6 to $60 a day for their service, A807-08, reservists are eligible not just for significant pay, *see* A808-11, but also for medical, retirement, and life-insurance benefits, A812.  A pilot who spends about half the year flying for American and a third of the year flying for the military—as the typical pilot in this case does, *supra* at 12, 14—is doing more than performing a public service.  He is pursuing two careers and earning pay and benefits for each.

Contrary to Plaintiffs' argument, recognizing each distinct purpose served by these types of leave does not mean that "leave for jury duty could never be comparable to military leave as a matter of law."  AOB 41.  Under Section 1002.150(b), purpose is just one of multiple potential factors that bear on comparability.  Nor would such a holding "directly contradict *Waltermyer*."  AOB 41.  *Waltermyer* did not consider the purpose of the leaves at all—again, control was the defining factor.  *Supra* at 29.  And unlike this case, there was no evidence in *Waltermyer* that service-member employees took a hundred days of military leave each year to further "joint careers."[10]

---

[10] American recognizes that its argument that pay during leave is not a "benefit" it provides under its CBAs for any type of leave is foreclosed by *Travers*.  *See* A16 (rejecting argument).  American preserves the argument for review by the *en banc* Court or Supreme Court.

## II.    PLAINTIFFS' BREACH-OF-CONTRACT CLAIM FAILS

Plaintiffs separately alleged that AAG breached the Profit Sharing Plan by not imputing earnings for military leave when calculating profit-sharing awards. The district court correctly concluded that this claim failed twice over.  The Profit Sharing Plan unambiguously forecloses Plaintiffs' interpretation and AAG's good-faith interpretation of the Plan is entitled to deference regardless.

### A.    The Plain Text Of The Profit Sharing Plan Unambiguously Forecloses Plaintiffs' Claim

The Plan states that participating employees shall receive a percentage of AAG's profits based on their "Eligible Earnings."  A922.  "Eligible Earnings," in turn, means "'Compensation,' as that term is defined for purposes of employer contributions, in the qualified defined contribution plan."  A925.  For pilots, the qualified defined contribution plan is the American 401(k) Plan for Pilots.  A929-1019.  And Section 1.19 of that plan defines "Compensation" to encompass "all amounts reported as wages on the IRS Form W-2" from American (subject to an inapplicable exception).  A1032; A937-42.  In other words, only actual wages count as Eligible Earnings under the Profit Sharing Plan; imputed earnings are not included within the definition of Compensation under the 401(k) Plan, so they do not count as Eligible Earnings.

Plaintiffs frame the question as whether "the 401(k) plan impute[s] income for military service in calculating employer contributions?"  AOB 43.  But the

governing documents ask whether earnings are included within the *definition* of Compensation in the 401(k) Plan.  Plaintiffs thus divine their arguments not from Plan text, but from the general "design[]" of the Plan, which they proclaim is meant "to treat compensation the same way that it is treated for purposes of employer contributions under the 401(k) plan."  AOB 43.  Plaintiffs are wrong about the overall design of the plans.  *See infra* at 52-53.  But regardless, a general sense of contractual design cannot overcome the actual words of the contract.  *See, e.g.*, *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 290 (3d Cir. 2005).  Had the Profit Sharing Plan intended to count imputed earnings in calculating profit-sharing awards, it would not have specifically imported the *definition* of Compensation, which includes only actual wages.

To the degree Plaintiffs root their argument in actual Plan language, it seems to be Section 3.5 of the 401(k) Plan.  AOB 44.  Section 3.5 requires American to impute earnings during military leave for purposes of complying with specific legal rules for pension plans.[11]  A957-58.  But the Profit Sharing Plan is not a pension plan, which is why AAG incorporated only the definition of Compensation in 1.19 and not this pension-plan-specific provision into the Profit Sharing Plan.

---

[11] Section 3.5 itself makes plain that its purpose is to provide a "Special Rule[,]" 26 U.S.C. § 414(u), to comply with "section 414(u)" of the Tax Code, and 38 U.S.C. § 4318, USERRA's rule requiring imputed earnings for pension contributions. A957-58.

Section 1.19 defines Compensation for the Pilot 401(k) Plan (and thus the Profit Sharing Plan) "unless a different definition expressly applies pursuant to *Section 3.6*." A937 (emphasis added). Had the definition of Compensation also been modified by Section 3.5, the Plan would have said so. The fact that Section 1.19 specifically mentions Section 3.6 but not Section 3.5 as modifying the definition of Compensation is strong evidence that Section 3.5 does not modify the definition of Compensation. *See CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655-56 (Tex. 1987).

### B. The District Court Correctly Deferred To AAG's Longstanding Interpretation Of The Profit Sharing Plan

Under Texas law, when an employer "determines that an employee is not entitled to benefits" under "an employer-funded plan which is made a part of the employment contract between the employer and the employee, and with provisions which make the employer's determination final, ... the only way that determination can be attacked is by showing that there was bad faith or fraud in the employer's actions." *Macy v. Waste Mgmt., Inc*., 294 S.W.3d 638, 648 (Tex. App. 2009) (emphasis and citation omitted); *see also Gibson*, 2012 WL 761930, at *4-5 (affirming summary judgment); *Kern v. Sitel Corp*., 517 F.3d 306, 309-12 (5th Cir. 2008) (same).

Plaintiffs can scarcely contend that fraud or bad faith motivated interpreting the Profit Sharing Plan not to require awards based on imputed earnings. After all,

Scanlan himself was told repeatedly by his union when the Plan was first rolled out that, based on "discussions with the company … only earnings from a pilot's W2 would be considered as eligible earnings for the purposes of [profit-sharing] computation." A1054-63. The union's corporate representative echoed this understanding, testifying that "[h]istorically profit sharing has been paid based upon W-2 revenue." A871.

Plaintiffs argue that this longstanding and well-known interpretation is not entitled to deference because, as a matter of technical corporate formalities, AAG did not adopt this interpretation. Plaintiffs are wrong.

As Plaintiffs note (AOB 45), the Profit Sharing Plan vests interpretive authority in AAG's Compensation Committee. And the record shows that the Compensation Committee delegated this interpretive authority to Kim Wicker, American's Director of Executive Compensation, and her team, who in turn exercised that authority. When AAG instituted the Profit Sharing Plan in 2017, it also adopted a resolution authorizing company officers "to take and do any and all acts and things which they may deem necessary, advisable or appropriate, in order to effectuate the purposes" of the Profit Sharing Plan, and a resolution providing "that all actions taken by the officers of the Company or any person or persons designated and authorized by any such officer in connection with the

implementation" of the Profit Sharing Plan are "adopted, ratified, confirmed, and approved in all respects." A908; A920.

Wicker testified that her team not only calculated awards, but also had "the ability to interpret the plan and the profit sharing awards as well." A1903. That makes perfect sense—calculating awards necessarily requires interpretation because "not every situation or scenario [is] spelled out in the plan." A1903. Thus, Wicker explained, one instance where her team would "have to interpret the plan" was "[w]hen new wage types come into scope and we have to determine what eligible earnings are," more or less the circumstances here. *Id.*

This evidence is clearly sufficient to show an express, or at the very least implied, delegation of authority. "Express authority is derived from specific instructions by the principal in setting out duties," while "[i]mplied authority is actual authority circumstantially proved," including "all things that are directly connected with and essential to the business at hand." 2 Fletcher Cyclopedia of the Law of Corporations § 438 (Sept. 2022). The 2017 resolution, along with the authority vested in Wicker and her team to administer the Plan, necessarily delegates the responsibility to interpret the Plan when calculating awards. And, as confirmed by Wicker's testimony, she and her team regularly interpreted the Plan in order to administer it. A1903. Plaintiffs rely heavily on *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1213 (10th Cir. 2001), AOB 45-47, but that decision cannot

support the weight Plaintiffs place on it.  Here, there was an effective express

delegation by resolution, but even *Mauldin* noted that, absent the defendant's

waiver, implied delegation "would not be a difficult argument to make" given that

delegation is "necessary" in large companies and "often involves giving wide

latitude and discretion to corporate personnel."  263 F.3d at 1213 (citation

omitted).  Wicker herself echoed exactly this sentiment.  *See* A1903 (noting "all

sorts of situations that come up in an employe[r]'s history with 100,000 people"

that would require interpretation).

But if Wicker and her team did not interpret the Plan, then the interpretation

must have originated with the Committee.  After all, as the district court

recognized, imputing income for periods of military leave "has been [the

Compensation Committee's] construction from the beginning."  A29.  This

interpretation was communicated to the pilot's union, including Scanlan himself,

from the Profit Sharing Plan's adoption by the Committee.  And Wicker at a

minimum has always administered the Plan in light of this interpretation.  There is

no suggestion that Wicker exceeded her authority when calculating awards; on the

contrary, every profit-sharing calculation and payment her team made was

approved by AAG's Compensation Committee.  A1899-1900.  Thus, as is obvious

from the record, everyone, including the Compensation Committee, the pilot's

union, and even Scanlan, knew that imputed earnings did not factor into profit-sharing awards.

## CONCLUSION

For these reasons, the decision below should be affirmed.

Dated:  June 20, 2023

Respectfully submitted,


M. TRISTAN MORALES
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
 (202) 383-5300
tmorales@omm.com

L. NICOLE ALLAN
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, CA 94111
(415) 984-8700
nallan@omm.com

By:  /s/ *Anton Metlitsky*
ANTON METLITSKY
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
mrobertson@omm.com

JASON ZARROW
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com


*Attorneys for Defendants-Appellees
American Airlines Group Inc. and
American Airlines, Inc.*

## <u>CERTIFICATION OF ADMISSION TO BAR</u>

I, Anton Metlitsky, certify as follows:

1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated:  June 20, 2023              By: */s/ Anton Metlitsky*
                                   Anton Metlitsky
                                   O'MELVENY & MYERS LLP

                                   *Attorney for Defendants-Appellees*
                                   *American Airlines Group Inc. and*
                                   *American Airlines, Inc.*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A) AND LOCAL RULE 31.1

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because this brief contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

3.    This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Microsoft Defender program has been run on the file containing the electronic version of this brief and no viruses have been detected.


/s/ *Anton Metlitsky*
Anton Metlitsky

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2023, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated:  June 20, 2023                     Respectfully submitted,

                                          /s/ *Anton Metlitsky*
                                          ANTON METLITSKY
                                          O'MELVENY & MYERS LLP
                                          7 Times Square
                                          New York, NY 10036
                                          (212) 326-2000
                                          ametlitsky@omm.com