No. 22-3294

# In the United States Court of Appeals for the Third Circuit

JAMES P. SCANLAN; CARLA RINER,

*Plaintiffs-Appellants*,

*v.*

AMERICAN AIRLINES GROUP, INC.;
AMERICAN AIRLINES, INC.,

*Defendants-Appellees.*

*ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA*

---

## BRIEF FOR *AMICUS CURIAE* AIRLINES FOR AMERICA IN SUPPORT OF APPELLEES

---

Douglas W. Hall
  *Counsel of Record*
David T. Raimer
Michael Heckmann
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20002
Tel:  (202) 879-5432
Fax:  (202) 626-1700
Email:  dwhall@jonesday.com

*Counsel for Airlines for America*

## CORPORATE DISCLOSURE STATEMENT

Airlines for America has no parent corporation and does not issue stock.  No publicly held company owns more than 10% of Airlines for America.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES...................................................................iii

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT........................... 3

ARGUMENT ......................................................................................... 6

I.    THE DISTRICT COURT CORRECTLY HELD THAT
      MILITARY LEAVE IS NOT COMPARABLE TO JURY DUTY
      OR BEREAVEMENT LEAVE ........................................................ 6

    A.  The Frequency with Which Pilots Take Military Leave
        Distinguishes It from Other Forms of Leave............................. 7

    B.  Pilots' Unique Ability to Control the Overlap Between
        Their Work Schedules and Frequent Military Duties
        Magnifies the Difference Between Military and Other
        Forms of Leave ........................................................................ 11

    C.  Plaintiffs' Interpretation of USERRA Would Have Grave
        Consequences for the Airline Industry and the Flying
        Public ....................................................................................... 17

II.   USERRA REQUIRES LEAVES TO BE COMPARED
      CATEGORICALLY, NOT INDIVIDUALLY ................................. 24

CONCLUSION ................................................................................... 28

CERTIFICATE OF COMPLIANCE ....................................................... 29

CERTIFICATE OF SERVICE............................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baker v. United Parcel Serv. Inc.*,
  No. 2:21-cv-00114 (E.D. Wash. 2021) ................................................... 9

*Brewer v. Quaker State Oil Refining Corp.*,
  72 F.3d 326 (3d Cir. 1995) ..................................................................... 26

*Clarkson v. Alaska Airlines, Inc.*,
  59 F.4th 424 (9th Cir. 2023) .................................................................. 9

*Clarkson v. Alaska Airlines, Inc.*,
  No. 19-cv-00005 (E.D. Wash. 2021) ................................................. 9, 10

*Joll v. Valparaiso City. Sch.*,
  953 F.3d 923 (7th Cir. 2020) .................................................................. 26

*McCoy v. WGN Continental Broadcasting Co.*,
  957 F.2d 368 7th Cir. 1992) ................................................................... 26

*Scanlan v. Am. Airlines Group, Inc.*,
  No. 2:18-cv-04040-HB (E.D. Pa. 2021) .......................................... 12, 25

*Waltermyer v. Aluminum Co. of Am.*,
  804 F.2d 821 (3rd Cir. 1986) .............................................................. 27

STATUTES

38 U.S.C. § 4301 .................................................................................... 14

38 U.S.C. § 4327 .................................................................................... 18

OTHER AUTHORITIES

20 C.F.R. § 1002.85 ................................................................................ 13

20 C.F.R. § 1002.150 ........................................................................... 8, 24

Captain Richard Corbett, *The Military's Enduring
  Connection to the Airline Industry*, Air Line Pilot
  (Nov. 2020), ............................................................................................ 1

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. App. P. 29 ....................................................................... 3

Memorandum from Chief of Navy Reserve to All Navy
    Reserve Personnel: Military Duty Notification to Civilian
    Employers (Sept. 8, 2016) ....................................................... 14

*Types of Military Service*, myFUTURE, ................................... 14

Rob Wile, *Airlines Cancel Hundreds of Flights Before
    Summer Travel Season Because of Pilot Shortage*, NBC
    News (June 8, 2022) ................................................................ 19

*Reserve Retirement*, Military Compensation ............................ 20

## STATEMENT OF INTEREST

Airlines for America (A4A) is the nation's oldest and largest airline trade association.   A4A works to foster a business and regulatory environment that ensures a safe, secure, and healthy U.S. airline industry.   Accordingly, A4A has been actively involved in the development of laws and regulations applicable to its members throughout its history.

For decades, Congress has regulated the employment rights and obligations of military servicemembers and their civilian employers. Those regulations are of particular interest to A4A because "the North American airline industry and the pilots who fly for it have been inextricably linked to the armed forces."[1]   A4A's members have long looked to the military as a primary source of pilot candidates, and the armed services "still supply their fair share of applicants for pilot jobs."[2] A4A's members proudly employ thousands of military reservists and

---

[1] Captain Richard Corbett, *The Military's Enduring Connection to the Airline Industry*, Air Line Pilot (Nov. 2020), https://www.alpa.org/news-and-events/air-line-pilot-magazine/military-enduring-connection-airline-industry.

[2] *Id.*

1

veterans and work closely with military leadership to support the armed services and those who continue to serve therein. A4A's members collectively provide many thousands of days of military leave to pilots annually, allowing them to effectively pursue a parallel career in the armed forces.

For these reasons, Plaintiffs' interpretation of the Uniformed Service Employment and Reemployment Rights Act (USERRA) would have grave consequences for A4A's members—consequences that would ultimately increase costs and disruptions for the flying public. According to Plaintiffs, USERRA mandates paid military leave for any pilot working for an airline that also provides paid jury duty or bereavement leave. Because of the frequency with which pilots take military leave— at rates far in excess of these other forms of paid leave—interpreting USERRA to require airlines to subsidize such leave could cost tens to hundreds of millions of dollars. And it would create a moral hazard, incentivizing pilots to schedule military activities on days they are already slated to work for their airline in order to secure various advantages, including extra pay and retirement benefits. Not only would

this increase the costs of operating affected flights, it would also increase the likelihood of flight delays and cancellations.

USERRA has been on the books for over 25 years. Yet until Plaintiffs' counsel launched this suit and others against A4A members, no one had ever suggested it required airlines to provide paid military leave—not the pilots, their unions, or the federal agencies that administer the statute. To say the least, such an interpretation would have significant negative effects nationwide on airlines and their customers. Accordingly, A4A submits this brief to provide the Court with an industry perspective on the consequences of Plaintiffs' position.[3]

## INTRODUCTION AND SUMMARY OF ARGUMENT

This is one of several cases in which a group of plaintiffs' lawyers seek to rewrite USERRA to require airlines to pay civilian wages to

---

[3] All parties consent to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored any part of this brief. No party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person (other than *amicus curiae*, its members, and their counsel) contributed money intended to fund the preparation or submission of this brief.

employees on military leave.[4]  Their theory?  That because employees receive compensation during certain forms of leave, USERRA requires airlines to pay them additional compensation during "short-term" military leave—although their definition of "short-term" shifts from case to case.

The district court correctly rejected that argument and this Court should do likewise.  As the district court concluded, military leave provided to Defendants' pilots is not "comparable" to the other forms of leave identified by Plaintiffs.  Most significantly, pilots take military leave much more frequently than other leaves, resulting in aggregate durations categorically higher than those for other forms of leave.  And the manner in which pilots bid for, are awarded, and can modify their monthly work schedules gives them significant control over how much

---

[4] *See, e.g.*, *Scanlan v. Am. Airlines Group, Inc.*, No. 2:18-cv-04040-HB (E.D. Pa.); *Huntsman v. Sw. Airlines Co.*, No. 4:19-cv-00083-PJH (N.D. Cal.); *White v. United Airlines, Inc.*, No. 1:19-cv-00114 (N.D. Ill.); *Haley v. Delta Airlines, Inc.*, No. 1:21-cv-1076-TCB (N.D. Ga.); *Baker v. United Parcel Serv. Inc.*, No. 2:21-cv-00114-SMJ (E.D. Wash.); *Beanland v. Federal Express Corporation*, No. 1:22-cv-00672 (D. Del.).

military leave they need to take. Plaintiffs' arguments to the contrary gloss over or outright discard these practical distinctions.

What is more, the consequences of Plaintiffs' interpretation would be significant and far-ranging. Requiring an airline to pay for time spent on short-term military leave would mean that the airline pays twice for every flight the pilot misses—once for the pilot on leave and once for the replacement pilot, who often earns a premium rate. Given the high frequency of such leaves, the aggregate cost to the airline, and ultimately to the flying public, would be daunting. And because pilots are already paid by the government for their military service, the prospect of earning additional benefits and advantages from the airline for the same period would incentivize pilots to create, rather than avoid, scheduling conflicts, directly contrary to the balance struck by USERRA. That, in turn, would further increase costs and operational disruptions and inevitably result in increased ticket prices and more frequent delayed or canceled flights. At the end of the day, Plaintiffs' interpretation would put significant pressure on airlines to eliminate other existing paid leaves—to the extent they could do so legally—as the cost of offering those benefits becomes

exponentially greater if it would also require pay for the far more frequent military leave.

Finally, Plaintiffs recover no ground with their apparent suggestion that the district court should have engaged in an individualized leave-by-leave comparison rather than weighing the category of "short-term" military leaves against other forms of leave.   USERRA regulations foreclose that interpretation, clearly requiring leaves to be compared by "type."   And for good reason: leave-by-leave comparison would be an administrative nightmare that would greatly increase compliance costs while undermining the benefits of predictability for both employers and employees.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT MILITARY LEAVE IS NOT COMPARABLE TO JURY DUTY OR BEREAVEMENT LEAVE.

In assessing comparability, the district court appropriately focused on the unique features of military leave for airline pilots that distinguish it from other forms of leave.

Most significantly, the court properly considered that pilots take military leave much more frequently than any other paid leave.  Even if

one short military leave is comparable to, say, one jury duty leave, it defies common sense to conclude that these forms of leave are comparable given that the aggregate duration of the former is substantially greater than the latter.

The court also correctly weighed the unique manner in which pilots are awarded and can modify their monthly work schedules. Those realities give pilots flexibility to minimize the impact of their military service on their civilian employment, allowing them to maintain parallel military and civilian careers. Conversely, those same tools could be used to game the system in pursuit of extra pay and retirement benefits—with other pilots, the airlines, and the flying public ultimately left to pick up the financial and operational tab. The high number of military leaves that pilots typically take increases opportunities to game the system, magnifying the resulting harm.

### A.    The Frequency with Which Pilots Take Military Leave Distinguishes It from Other Forms of Leave.

As the district court explained, and the uncontroverted evidence demonstrates, airline pilots take military leave much more frequently than they take other forms of leave. *See* A17–18. Pilots, like most other

military reservists, must go on duty for at least one weekend a month. In addition, they generally spend 4 to 6 days per month on training and other obligations.   Beyond that, pilots engage in a wide variety of voluntary paid duties, which range from public speaking engagements and attending recruiting events to participating in honor guards, air shows, and "flybys" (often for sporting events).

When all of the military leaves are added together, their aggregate duration clearly differentiates them from less common leaves.  The record in this case, for example, shows that pilots who took short-term[5] military leave took 29 such leaves on average during the nearly nine-year class period, for an aggregate duration of 93 days.  *See* A796–98.  Many individual pilots took much more short-term military leave; indeed, one

---

[5] The district court in this case held that the appropriate comparator for USERRA's purposes was Plaintiffs' proposed category of "short-term" military leave of 16 days or less, rather than all military leave taken by reservist pilots.  *See* A16–17.  As Defendants explain, short-term military leave is not a "type of leave" suitable for comparison under 20 C.F.R. § 1002.150(b); it is instead an arbitrary subset of military leave that plaintiffs gerrymander in different ways in different cases to try to manipulate the USERRA analysis in their favor.  *See* Defendants' Brief at 33–39; *infra* n.6.  Even when looking only at short-term military leave, however, the evidence clearly demonstrates that military leave is not comparable to jury duty or bereavement leave.

of the named plaintiffs took *508 days*. *Id.* at 799. All told, the frequency of short-term military leave far exceeded that of other leaves: pilots who took jury duty or bereavement leave did so less than twice during the class period, adding up to 3 (jury duty) or 4 (bereavement) days in the aggregate. *See id.* at 796–98.

These figures are typical for the industry. For example, as shown in one of the several parallel lawsuits against another A4A member, military reservist pilots at Alaska Airlines took 46 short-term[6] military leaves on average during the approximately sixteen-year class period, for an aggregate duration of 142 days per pilot. Expert Report of Darin N. Lee, Ph.D. at 61, *Clarkson v. Alaska Airlines, Inc.*, No. 19-cv-00005 (E.D. Wash. *filed* Mar. 22, 2021), ECF 138 Ex. 18. Similarly, military reservist pilots at Horizon Air Industries took 17 short-term military leaves on average, for an aggregate duration of 72 days over twelve-plus years. *Id.*

---

[6] The plaintiff in that suit defined "short-term" to mean 30 days or less, rather than the 16-days-or-less category Plaintiffs proposed here. *See Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 431 (9th Cir. 2023). In general, plaintiffs have been consistently inconsistent in what they deem to be "short-term" leave. *See, e.g.*, Complaint ¶ 1, *Baker*, No. 21-cv-00114 (E.D. Wash. *filed* Mar. 16, 2021), ECF 1 (14 days or less).

at 62. By comparison, pilots who went on jury duty or bereavement leave did so 2 to 4 times on average during the relevant class period, for a total of 4 to 12 days. *See id.* at 61–62. For pilots from both airlines, the average total days of short-term military leave per year significantly eclipsed the aggregate duration of any other form of leave.

The frequency with which reservist pilots take military leave, and the combined duration of those leaves, makes it categorically different from these other forms of leave. As the data reflects, the latter provide time off for rare, unexpected events that, even added together, amount to only a few days per year. While airlines must expend resources to cover every pilot absence, the infrequency of such leaves tightly cabins their impact. Not so for military leave. The aggregate duration of military leave dwarfs that of other forms of leave, with correspondingly outsized costs and disruptions to flight schedules—costs and disruptions which ultimately are felt by airline customers. *Infra* Part I.C.

That courts should consider frequency when comparing different forms of leave is simply common sense. Leave that occurs every other day over the course of a month is obviously different from a single day of

10

leave.   Conversely, a single six-day leave is functionally identical to consecutive three-day absences.   As the district court explained, considering frequency "is necessary to have a complete picture" of a type of leave.  A17–19.  Analyzing duration without it would "provide[] a false impression in any comparison" between military and other forms of leave. *Id.*  It is akin to describing two baseball players—"one who hits 21 home runs in a season and the other who hits three"—as "comparable" on the grounds "that both hit no more than one home run in any game." *Id.* at 22–23.

### B. Pilots' Unique Ability to Control the Overlap Between Their Work Schedules and Frequent Military Duties Magnifies the Difference Between Military and Other Forms of Leave.

Commercial pilots do not work 9:00 to 5:00, Monday through Friday. Far from it.  On the one hand, they can fly any day of the week, at almost any time of the day, on trips that can last from a single day to over a week in duration.   On the other hand, due to regulatory and contractual requirements, pilots typically end up working only about half of the days in a month.

The exact manner in which pilots are scheduled turns on the provisions negotiated between the airlines and their pilots' unions in collective bargaining agreements (CBAs). Among other things, those CBAs contain detailed procedures addressing the process by which pilots bid for, are awarded, and may modify their monthly schedules.[7] While exact procedures vary, in general, pilots submit "bids" in one month for their schedules the following month by "position"—i.e., the aircraft type they fly, the seat they hold (Captain or First Officer), and the base from which their trips start and end.

Consider a carrier that schedules pilots using a Preferential Bidding System (PBS). Under a PBS, pilots express their preferences, in priority order, regarding the type of work they would like to have on their schedule. Those bid preferences include such things as the type of flying

---

[7] The CBAs also address compensation, benefits, and leaves of absence. Each union decides what is most important to the pilots it represents at a particular airline—including, in some cases, bargaining for some form of paid military leave (or negotiating away a preexisting paid military leave benefit in exchange for enhancements to other benefits). *See* Defendants' Opposition to Plaintiff's Motion for Class Certification at 26, *Scanlan*, No. 18-cv-04040 (E.D. Pa. *filed* June 4, 2021), ECF 98.

(e.g., international versus domestic, shorter versus longer trips, etc.), the amount of flying, specific trips, and the days of the week and/or month on which they would prefer to work (or to have off).  The carrier builds and awards the pilots' schedules by position based on those preferences, taking into account their relative seniority to other pilots, negotiated contractual scheduling parameters, and regulatory duty limits and rest requirements.

Pilots have similar control over their scheduling at those carriers who use a "line bidding system," the alternative to PBS.  In those systems, pilots bid for particular schedules for the month (i.e., "lines") that the airline creates in advance that include pre-identified trips or "reserve" (i.e., on-call) duty on specific days of the month.  The lines are built in compliance with contractual and regulatory requirements, and are awarded in seniority order by pilots within their relevant position.

Whichever system airlines use for scheduling, USERRA's implementing regulations require servicemembers to provide their employers with "notice" of upcoming military duties "as far in advance as is reasonable under the circumstances."  20 C.F.R. § 1002.85(d).

13

Although USERRA does not specify how much notice employees must provide, its regulations "strongly recommend[]" at least 30 days. *Id.* This is consistent with USERRA's interest in minimizing disruption to employers and fellow employees. *See* 38 U.S.C. § 4301(a)(2). Accordingly, military and National Guard leaders have issued memoranda emphasizing that employees should provide "timely notification to their employer of pending drills, training, and deployments in order to mediate the negative impact of the member's absence," and that USERRA's protections come with "a responsibility for employer notification."[8] (In addition, some CBAs—like the one relevant to this case—require pilots to notify their employer of known upcoming military duties. *See* A20–21.) Reservists typically have advance notice of the most common forms of military duty:  monthly weekend drills and two weeks of field exercises annually.[9]  Thus, in most cases, pilots should be able to provide the

---

[8] *E.g.*, Memorandum from Chief of Navy Reserve to All Navy Reserve Personnel: Military Duty Notification to Civilian Employers (Sept. 8, 2016), https://dailydefensenews.files.wordpress.com/2016/09/militarydutynotificationtocivilianemployers.pdf.

[9] *E.g.*, *Types of Military Service*, myFUTURE, https://myfuture.com/military/types-of-military-service (last visited Mar. 27, 2023).

airline with notice of their impending service obligations prior to the monthly bid process.

Pilots are not only able, but expected, to incorporate their upcoming military duty into their scheduling bids. When an airline using a PBS is aware that a pilot will be unavailable to fly on certain days of the following month for reasons such as vacation, training, or leave (a "known absence"), it will not award the pilot work on those days. At airlines that use line bidding, pilots can bid for schedules that do not conflict with their known absences. This avoids the possibility of pilots being assigned work on days they cannot perform it ("bidding into conflicts"), which would require the airline to drop the assignment from that pilot's schedule and cover it some other way. (As with notification, the CBA in this case requires pilots to attempt to schedule their trips around their military duties. *See* A20–21).

In those atypical cases where pilots are unable to provide notice of their military duty until after they receive their civilian schedules, they still have tools to eliminate or minimize conflicts. For example, they can work with their commanders to reschedule their drills to different days

15

of the month or pick up training flights with different military units. Alternatively, they can avail themselves of CBA provisions allowing pilots to trade awarded trips or reserve duty with other pilots, drop assignments, or pick up "open time" (i.e., work not currently assigned to another pilot).

This ability of pilots to arrange and modify their work schedules to avoid foreseeable conflicts with military service distinguishes military leave from other forms of paid leave. As noted, military reservists have advance notice of their monthly weekend drills and their annual two weeks of field exercises. This allows them to provide notice of those known absences to the airline prior to the monthly bidding process and thus to avoid conflicting civilian duties. That is not the case with jury duty or bereavement leave. For example, with rare exceptions, pilots do not have advance notice that they will need to take such leaves in the subsequent month. Those are much more likely to be situations that arise on short notice, after the airline has awarded the pilots' monthly schedules. And in any event, pilots do not have the same flexibility to reschedule these leaves as they do with their military training.

16

For uncommon leaves, scheduling flexibility might be of lesser significance.  But the frequency with which pilots perform military service means that they have regular opportunities to exercise that flexibility to create potential conflicts between their work and military obligations.  *Infra* Part I.C.  This, too, makes military leave unlike any other form of paid leave.

### C.    Plaintiffs' Interpretation of USERRA Would Have Grave Consequences for the Airline Industry and the Flying Public.

Given the practical differences between military leave and various forms of paid leave, there is no reason to believe that Congress intended to require employers to supplement employees' military pay with civilian wages while they are on leave.  And there are any number of reasons to believe Congress would not have adopted, *sub silentio*, a policy that would impose such significant costs and disruptions.

The sheer frequency with which pilots take military leave would force airlines to pay pilots for the equivalent of thousands of additional (unworked) days per year.  A4A conservatively estimates that the combination of the damages plaintiffs seek in the suits already filed, the

likelihood of copycat litigation,[10] and the cost of compliance going forward would reach into the tens, if not hundreds, of millions—which, in turn, would impact what airlines charge the flying public. Other organizations that employ large numbers of military reservists would likewise find themselves in the same boat.

And cost is not the only consequence of these frequent leaves; each leave taken causes operational challenges as well. For example, airlines primarily address short-notice pilot absences through the use of "reserve" pilots, who are assigned to be on-call to step in when another pilot becomes unavailable. There are a variety of reasons an airline may need to deploy a pilot who is on reserve duty: the original pilot may call in sick, need to address a family emergency, or be legally or contractually precluded from flying due to delays earlier in the trip. Frequent short-notice scheduling conflicts resulting from pilots taking increased military

---

[10] USERRA does not have a statute of limitations, *see* 38 U.S.C. § 4327(b), and thus plaintiffs in the suits against A4A's members are seeking damages dating back to the mid-2000s.

leave would require the use of more reserve pilots. And when an airline runs out of reserve pilots, flight delays and cancellations follow.[11]

The cost and disruption that would likely result from Plaintiffs' interpretation would be further exacerbated by pilots' ability to control their schedules. The same tools that give pilots the ability to *avoid* conflicts between their military and civilian careers would also give them the ability to *create* such conflicts if they had reason to do so.

For example, Plaintiffs' demand that airlines pay the difference between an employee's civilian and military salaries would give pilots a significant economic incentive *not* to provide notice of their mandatory military service in advance of the bidding process. That would permit

---

[11] Nor is this a problem that the airlines could solve by hiring more pilots. Not only would that add yet more expense, the industry is experiencing a severe shortage of pilot candidates as it is. *E.g.*, Rob Wile, *Airlines Cancel Hundreds of Flights Before Summer Travel Season Because of Pilot Shortage*, NBC News (June 8, 2022), https://www.nbcnews.com/business/business-news/airlines-pilot-shortage-flight-cancellations-summer-travel-rcna32613. Moreover, given the unpredictability as to when, where, or in what position the airlines would need additional reserve pilots resulting from an increase in short-notice military leave conflicts, the airlines certainly would face operational disruptions even if they could hire more pilots to sit reserve duty.

them to bid for schedules with work assigned on days on which they know they have military service in order to get paid more for that service than they otherwise would have—increasing the conflicts between their civilian and military obligations.  Similarly, pilots would have a strong incentive to trade into or pick up trips that conflict with their known military service, neglecting to inform their employer of their military obligations until they have created the conflict.

Pilots would also be incentivized to bid into conflicts between their military and civilian duties in order to accrue duplicative retirement benefits.  In addition to their civilian retirement plans, reservists, like active duty military members, can earn a military pension by accumulating 20 or more years of qualifying service.  *See* A22 n.3 (district court taking judicial notice of pension availability).  Once a pilot qualifies for military retirement, his or her pay is calculated based on the total number of days served.[12]  Thus, each additional day of military service increases that pilot's pension accordingly.  This ability to bolster their

---

[12] *See Reserve Retirement*, Military Compensation, https://militarypay.defense.gov/Pay/Retirement/Reserve.aspx (last visited June 26, 2023).

military pension without sacrificing civilian pay or retirement benefits could encourage pilots to volunteer for additional military obligations beyond those they are required to perform, such as recruiting duties, honor guard, and planning and attending special projects for their units (e.g., retirements, anniversary celebrations, and "flybys").

Not only would the creation of such conflicts earn pilots the right to extra pay and retirement benefits for days of military service, it would also place them in position to earn premium pay on other work days for the airline. A pilot's assigned schedule often involves multi-day trips, which in some cases can stretch for ten to twelve days. If any part of that trip conflicts with a pilot's military duty, the airline must drop the pilot from the entire trip—even those days on which the pilot had no military duties—in order to staff it with another pilot. That pilot can then pick up flying that is currently unassigned to any pilot (i.e., "open time"), often at premium rates. Thus, by bidding into conflicts, pilots could receive up to 150% of their regular salary for any remaining days of the dropped trips they are able to backfill with open time.

Because employers are required to grant military leave when requested, there is very little the airlines could do to prevent such gamesmanship.  In fact, A4A's members have already encountered instances where pilots have engaged in this conduct, even without the motivation of extra compensation and benefits.  For instance, pilots have declined to give airlines advance notice of their known military obligations so that they can bid into conflicts, requiring the airlines to drop the conflicting work assignments and allowing the pilots to pick up premium-rate open time on other days of the month.  In addition, some pilots have elected not to disclose pending military duties of more than 30 days, which, under leave policies at many airlines, puts the pilot in an inactive status for benefit accrual purposes.  Instead, these pilots have chosen to report the leave as if it were multiple leaves of shorter duration, allowing them to continue to accrue benefits.[13]  There is thus every reason to believe such efforts to bid into conflicts would continue—and increase—if extra pay and retirement benefits were available.  As such

---

[13] Allowing plaintiffs to create an arbitrary subcategory of "short-term" leave provides even more incentive for pilots to misrepresent the duration of their leave in exactly this way.

22

conflicts increase, so too will the cost and operational disruptions they cause.

These complications could force airlines to consider eliminating benefits such as paid jury duty or bereavement leave to avoid incurring an obligation to pay for military leave. After all, even on Plaintiffs' theory, airlines are only on the hook for the latter if they provide the former. Faced with the prospect of multi-million dollar liability for military leave going forward, airlines may well be compelled to consider cutting other, longstanding benefits that are used much less frequently—certainly a perverse result that Congress did not intend when it enacted USERRA.[14]

\* \* \*

In the end, military leave is readily distinguishable from other forms of paid leave. In particular, the number of absences related to service in the armed forces, coupled with the significant control pilots exercise over their monthly schedules, calls for categorically different

---

[14] To the extent these benefits are included in CBAs, the airlines could not eliminate them unilaterally, but would have to negotiate with their pilot unions to do so. Moreover, several jurisdictions mandate paid jury duty leave, which could further hamper the airlines' ability to discontinue those benefits *in toto*.

treatment of military leave. Plaintiffs' arguments to the contrary would subvert Congress's intent and cause nationwide harm to airlines and their customers.

## II. USERRA REQUIRES LEAVES TO BE COMPARED CATEGORICALLY, NOT INDIVIDUALLY.

In an apparent effort to sidestep the distinctions between military and other forms of leave, Plaintiffs at times seem to resist a categorical comparison between the two, calling instead for a case-by-case analysis. *See, e.g.*, Plaintiffs' Brief at 28 (framing the inquiry as whether "any given stretch of military leave" is comparable to a form of nonmilitary leave). This leave-by-leave approach conflicts with USERRA's implementing regulations and would be extremely costly to administer.

USERRA regulations make clear that the comparability analysis should take place between categories of leave, not individual absences. The main provision at issue, 20 C.F.R. § 1002.150(b), establishes a categorical framework up front, addressing benefits that "vary according to the *type* of leave." 20 C.F.R. § 1002.150(b) (emphasis added). An employee is entitled to such a benefit only if it is provided for a "comparable *form* of leave"—not any comparable *instance* of leave. *Id.*

(emphasis added). Indeed, the goal of the analysis is "to determine whether any two *types* of leave are comparable." *Id.* (emphasis added). A leave-by-leave approach cannot be squared with these unambiguous instructions.

USERRA does not require leave-by-leave comparison for good reason: it would make benefits less predictable and more costly without providing offsetting gains. Like any employment policy, employers establish benefits policies ex ante to facilitate their efficient administration and to timely set expectations for employees. Those policies provide a baseline for labor negotiations, during which each side can make informed decisions about the relative costs and benefits of each policy. In 2013, for example, the Allied Pilots Association bargained away the paid military leave American had previously offered, trading it for other benefits presumably deemed more valuable. *See* Defendants' Opposition to Plaintiff's Motion for Class Certification at 26, *Scanlan*, No. 18-cv-04040 (E.D. Pa. *filed* June 4, 2021), ECF 98.

A leave-by-leave approach would upend this process, sacrificing every advantage it conveys and providing no offsetting value. Reservist

employees would not know in advance what benefits would come with each military leave, making it difficult for them to anticipate their needs from leave to leave. That problem would be magnified for labor negotiations, as there would be no clear baseline around which to bargain. This approach would also dramatically increase employers' administrative costs, requiring a full USERRA analysis to determine whether each leave for each employee was comparable to any other leave in duration, control, purpose, or any other potentially relevant factor. Even then, there would be no guarantee against liability, as a disgruntled employee could hale an employer into court any time a particular period of leave is deemed non-comparable. This, in turn, would transform the courts into "super personnel departments" responsible for reviewing each of these decisions based on their particular facts, a role the courts have declined to accept in the past.[15]

---

[15] *See, e.g., Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("'[W]e do not sit as a super-personnel department that reexamines an entity's business decision.'" (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)); *Joll v. Valparaiso City. Sch.,* 953 F.3d 923, 933 (7th Cir. 2020) ("We have said time and again (in more than one hundred reported opinions, by our

The costs and uncertainties of a leave-by-leave approach could lead employers to conclude that it would be cheaper to categorically provide contested benefits for all military leaves, even though many individual leaves would not warrant them under USERRA.  This would be an odd result under a statute designed to give military reservists "equality … not preferential treatment."  *Waltermyer v. Aluminum Co. of Am.*, 804 F.2d 821, 825 (3rd Cir. 1986).  Alternatively, the leave-by-leave approach could increase the risk that some employers stop offering paid jury duty or bereavement leave in order to avoid the exponentially greater administrative costs imposed by Plaintiffs' interpretation of USERRA.  *Supra* p. 23.  Neither result comports with the goals of USERRA.

---

count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees.").

## CONCLUSION

For these reasons—and those in Defendants' Brief—this Court should affirm the decision below.

Dated:  June 27, 2023

Respectfully submitted,

*/s/ Michael Heckmann*

Douglas W. Hall
    *Counsel of Record*
David T. Raimer
Michael Heckmann
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20002
Tel:  (202) 879-5432
Fax:  (202) 626-1700
Email:  dwhall@jonesday.com

*Counsel for Airlines for America*

28

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations contained in Third Circuit Rule of Appellate Procedure 29-2(c)(2) because, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 5,222 words, as determined by Microsoft Word's word count function.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook Standard.

Dated:  June 27, 2023          */s/ Michael Heckmann*
                               Michael Heckmann
                               *Counsel for Airlines for America*

## CERTIFICATE OF SERVICE

I certify that on June 27, 2023, I electronically filed the foregoing brief with the United States Court of Appeals for the Third Circuit using the ECF system.  All parties have consented to receive electronic service and will be served by the ECF system.


Dated:  June 27, 2023          */s/ Michael Heckmann*
                               Michael Heckmann
                               *Counsel for Airlines for America*